DHRUMIL PUROHIT, individually, and derivatively on behalf of HYMAN DIGITAL, LLC,

      *Plaintiff,*

      v.

DR. MARK HYMAN AND HYMAN DIGITAL, LLC,

      *Defendants.*

HYMAN DIGITAL, LLC,

      *Counterclaim Plaintiff,*

      v.

DHRUMIL PUROHIT,

      *Counterclaim Defendant.*

Civil Action
No. 1:24-cv-11784-WGY

## ANSWER AND COUNTERCLAIMS

## ANSWER TO SPECIFIC ALLEGATIONS

Defendants Dr. Mark Hyman and Hyman Digital, LLC, by and through their attorneys, deny all allegations in Plaintiff Dhrumil Purohit's Complaint, including those in any heading, except as expressly admitted herein:

## INTRODUCTION

1.      Defendants deny the characterization that Dr. Hyman is an "influencer" doctor, aver that Dr. Hyman is a medical doctor, and otherwise admit the allegations in Paragraph 1.

2.      Defendants deny the allegations in Paragraph 2, including, for the reasons discussed in Hyman Digital's Counterclaims, the characterization of Hyman Digital's growth and revenue and that it is the "crown jewel of Dr. Hyman's business ventures," deny knowledge and information sufficient to form a belief about the truth of the allegations concerning Mr. Purohit's ownership percentage, and admit that Mr. Purohit is a minority member of Hyman Digital and was previously employed as its CEO.

3.      Defendants deny the allegations in Paragraph 3, except admit that Hyman Digital was successful. Defendants aver that the allegations in Paragraph 3 are false, inflammatory, and irrelevant to Mr. Purohit's claims, and are included solely to inappropriately smear Dr. Hyman's reputation and improperly apply pressure.

4.      Defendants deny the date and reasons underlying Mr. Purohit's departure but otherwise admit the allegations in Paragraph 4.

5.      Defendants deny the amount to which Mr. Purohit is entitled under Hyman Digital's Operating Agreement ("Operating Agreement") and aver that Mr. Purohit's calculation is premised on Hyman Digital possessing the assets with which Mr. Purohit absconded and which he now claims are his personal property. Defendants otherwise admit the allegations in Paragraph 5.

6.      Defendants deny the allegations in Paragraph 6.

7.      Defendants deny the allegations in Paragraph 7.

8.      Defendants deny the allegations in Paragraph 8, including Mr. Purohit's characterization of the lawsuit in question, except admit that Dr. Hyman was sued by a former consultant in 2014, which settled shortly thereafter. Defendants aver that the allegations in Paragraph 8 are false, inflammatory, and irrelevant to Mr. Purohit's claims, and are included solely to inappropriately smear Dr. Hyman's reputation and apply pressure.

9.     Defendants deny the allegations in Paragraph 9.

## PARTIES

10.     Defendants deny knowledge and information sufficient to form a belief about the truth of the allegation that Mr. Purohit has a 20% equity stake in Hyman Digital, but otherwise admit the allegations in Paragraph 10.

11.     Defendants deny that Dr. Hyman is a citizen of Massachusetts (he resides in Texas), deny knowledge and information sufficient to form a belief about the truth of the allegation that Dr. Hyman has an 80% equity stake in Hyman Digital, but otherwise admit the allegations in Paragraph 11.

12.     Defendants admit the allegations in Paragraph 12.

13.     Defendants deny the allegations in Paragraph 13; aver that the description of Dr. Hyman's wife as a "figurehead" is false, inflammatory, and misogynistic; and further aver that Ms. Bella-Hyman possesses degrees from both McGill University and the University of Oxford and is a highly accomplished businesswoman in her own right who was installed as interim CEO at Mr. Purohit's suggestion, a position for which she is not presently receiving compensation.

## JURISDICTION AND VENUE

14.     Paragraph 14 contains legal conclusions to which no response is required, except Defendants admit that Plaintiff purports to invoke the Court's jurisdiction.

15.     Paragraph 15 contains a legal conclusion to which no response is required, except Defendants deny that Dr. Hyman is a resident of Massachusetts and admit that Plaintiff purports to invoke venue in the District of Massachusetts.

16.     Paragraph 16 contains a legal conclusion to which no response is required, except Defendants admit that Plaintiff purports to invoke the Court's jurisdiction.

**FUTILITY**

17.     Defendants admit the allegations in Paragraph 17.

18.     Paragraph 18 contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 18, but admit that Dr. Hyman is a supermajority member of Hyman Digital and the company's Manager.

19.     Defendants deny knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 19.

**FACTUAL ALLEGATIONS**

20.     Defendants deny the allegations in Paragraph 20, except admit that Dr. Hyman met Mr. Purohit in 2009 through mutual friends.

21.     Defendants, deny the allegations in Paragraph 21, except admit that Dr. Hyman is a medical doctor in the field of functional medicine.

22.     Defendants deny the allegations in Paragraph 22, except admit that Dr. Hyman sought Mr. Purohit's advice regarding his business.

23.     Defendants deny the allegations in Paragraph 23, except admit that Dr. Hyman and Mr. Purohit spoke several times between 2009 and 2015.

24.     Defendants deny the allegations in Paragraph 24, including the circumstances under which Mr. Purohit departed The Clean Program (for the reasons discussed in more detail in Hyman Digital's Counterclaims), except admit that, in 2015, Dr. Hyman met Mr. Purohit in Los Angeles and entered into a consulting relationship with Mr. Purohit to assist in expanding his digital, content, and online curricula business in March 2015.

25.     Defendants deny the allegations in Paragraph 25, except admit that Dr. Hyman and Mr. Purohit executed the Executive Services Agreement ("ESA") in July 2015, which established

Mr. Purohit as Hyman Digital's CEO. Defendants respectfully refer the Court to the ESA for its full text and context.

26. Defendants admit the allegations in Paragraph 26.

27. Defendants deny the allegations in Paragraph 27, deny knowledge and information sufficient to form a belief about the truth of the allegation that Mr. Purohit has a 20% equity share in Hyman Digital, except admit that Mr. Purohit negotiated for an equity share in Hyman Digital.

28. Defendants admit that the ESA contains the compensation provisions referenced in Paragraph 28, and respectfully refer the Court to the ESA for its full text and context. Defendants deny knowledge and information sufficient to form a belief about the truth of the allegations that Mr. Purohit in fact received an additional equity interest in Hyman Digital as compensation or exercised an option to purchase an additional equity interest in Hyman Digital.

29. Defendants deny knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 29, except admit that Schedule A to the Hyman Digital Operating Agreement identifies Mr. Purohit as owning 4.8% of Hyman Digital and that Hyman Digital has issued Mr. Purohit IRS Forms K-1s identifying him as a having a 20% ownership interest in Hyman Digital, and respectfully refer the Court to the Operating Agreement and IRS Forms K-1for their full text and context.

30. Defendants deny the allegations in Paragraph 30, including those contained in the section heading "B".

    a. Defendants deny the allegations in Paragraph 30(a), except admit that Hyman Enterprises is a financially successful venture.

    b. Defendants deny the allegations in Paragraph 30(b), except admit that Dr. Hyman manages The Ultra Wellness Center, which focuses on functional medicine.

c. Defendants deny the allegations in Paragraph 30(c), except admit that Dr. Hyman owns the Vitamin Portfolio.

31. Defendants deny the allegations in Paragraph 31.

32. Defendants deny the allegations in Paragraph 32.

33. Defendants deny the allegations in Paragraph 33, except admit that Mr. Purohit served only as the CEO of Hyman Digital. Defendants aver that, as discussed in more detail in Hyman Digital's Counterclaims, Mr. Purohit would at times falsely claim that he served as the CEO of other companies Dr. Hyman owned, including publicly claiming to be the CEO of Dr. Hyman's medical practice, The Ultra Wellness Center.

34. Defendants deny the allegations in Paragraph 34.

35. Defendants deny the allegations in Paragraph 35.

36. Defendants deny the characterization of Hyman Digital's growth and revenue and that it is the "crown jewel of Dr. Hyman's business ventures," but otherwise admit the allegations in Paragraph 36.

37. Defendants admit the allegations in Paragraph 37.

38. Defendants deny the allegations in Paragraph 38, except admit that, in May 2018, Hyman Digital produced a podcast called the *Broken Brain Podcast*, which Mr. Purohit hosted, based on a successful docuseries created by Hyman Digital.

39. Defendants deny the allegations in Paragraph 39, except admit that the *Dhru Purohit Podcast* was distributed through social media channels bearing Mr. Purohit's name. As discussed in more detail in Hyman Digital's Counterclaims, Defendants aver that Mr. Purohit contemporaneously referred to the *Dhru Purohit Podcast* as a rebranding of Hyman Digital's *Broken Brain Podcast*.

40. Defendants deny the allegations in Paragraph 40, except admit that Hyman Digital managed Dr. Hyman's social media channels and aver that the only instance in which a 5% commission was paid from Hyman Enterprises to Hyman Digital was for the production of periodic Instagram live posts, which Mr. Purohit actively discouraged.

41. Defendants deny the allegations in Paragraph 41.

42. Defendants deny the allegations in Paragraph 42, including the characterization of this "arrangement," and respectfully refer the Court to the email chain for its full text and context.

43. Defendants deny the allegations in Paragraph 43.

44. Defendants deny the allegations in Paragraph 44, except admit that *Try This* began in July 2021 and was primarily developed by Mr. Purohit in his role as a Hyman Digital employee.

45. Defendants deny knowledge and information sufficient to form a belief about the truth of the allegations that Mr. Purohit set up *Try This* on a third-party email host and the size of *Try This*'s current email list. Defendants otherwise deny the allegations in Paragraph 45, except admit that Mr. Purohit currently hosts *Try This* on his personal website, in contravention of the ESA.

46. Defendants deny the allegations in Paragraph 46, except admit that Hyman Digital discussed hiring an employee to make content for *Try This* in April 2021 as a company asset, and ultimately hired an employee to do so with Dr. Hyman's approval, which was given on the understanding that the employee would work on Hyman Digital's content generally, as opposed to just *Try This*.

47. Defendants deny the allegations in Paragraph 47 and aver that this employee was paid by Hyman Digital.

48. Defendants deny the allegations in Paragraph 48, except admit that Hyman

Digital's accountant tracked certain Hyman Digital employees' time.

49. Defendants deny the allegations in Paragraph 49.

50. Defendants deny the allegations in Paragraph 50, including the characterization that *Try This* paid Hyman Digital a "commission," but admit that *Try This*'s first sponsorship occurred in February 2022.

51. Defendants deny the allegations in Paragraph 51, but admit that Hyman Digital's accountant tracked *Try This*'s incoming and outgoing payments.

52. Defendants deny the allegations in Paragraph 52, except admit that Hyman Digital is closely associated with Dr. Hyman's name and reputation.

53. Defendants deny the allegations in Paragraph 53.

54. Defendants deny the allegations in Paragraph 54, except admit that Hyman Digital has two members, Dr. Hyman (who is a supermajority member) and Mr. Purohit (who is a minority member), and that, pursuant to the Operating Agreement and ESA, Mr. Purohit was to serve as its CEO and Dr. Hyman was to be Mr. Purohit's Manager.

55. Defendants deny the allegations in Paragraph 55, including the insinuation that Dr. Hyman was intimately involved in Hyman Digital's operations, except admit that Dr. Hyman occasionally provided input for Hyman Digital's content decisions, often at Mr. Purohit's request.

56. Defendants deny the allegations in Paragraph 56, except admit that Dr. Hyman regularly received financial statements from Hyman Digital.

57. Defendants deny the allegations in Paragraph 57, except admit that Dr. Hyman received a weekly email from Hyman Digital's controller with all credit card payments, transfers, and checks to approve.

58. Defendants deny the allegations in Paragraph 58.

59. Defendants deny the allegations in Paragraph 59, including the section heading "B". Defendants aver that the allegations in Paragraph 59 are false, inflammatory, and irrelevant to Mr. Purohit's claims, and are included solely to inappropriately smear Dr. Hyman's reputation and apply pressure.

    a. Defendants deny the allegations in Paragraph 59(a), except admit that Dr. Hyman married Brianna Bella-Hyman, and that Ms. Bella-Hyman was appointed the interim CEO of Hyman Digital after Mr. Purohit's resignation (on Mr. Purohit's recommendation).

    b. Defendants deny knowledge and information sufficient to form a belief about the truth of the allegations, including the allegation that employees "complain[ed]." Defendants otherwise deny the allegations in Paragraph 59(b).

    c. Defendants deny knowledge and information sufficient to form a belief about the truth of the allegations. Defendants otherwise deny the allegations in Paragraph 59(c).

    d. Defendants deny the allegations in Paragraph 59(d), except admit that Dr. Hyman has asked a Hyman Digital employee to mail him cannabis gummies from California to Massachusetts (both states where cannabis is legal).

60. Defendants deny the allegations in Paragraph 60.

61. Defendants deny the allegations in Paragraph 61.

62. Defendants deny the allegations in Paragraph 62.

63. Defendants deny the allegations in Paragraph 63.

64. Defendants deny the allegations in Paragraph 64, including the section heading "C".

65. Defendants deny the allegations in Paragraph 65.

a. Defendants deny the allegations in Paragraph 65(a), except aver that Dr. Hyman has donated money to the Food Fix Campaign

b. Defendants deny the allegations in Paragraph 65(b), including the suggestion that captive insurance is illegal in any way, except admit that Dr. Hyman has employed a tax strategy colloquially referred to as "captive insurance."

c. Defendants deny the allegations in Paragraph 65(c).

66. Defendants deny the allegations in Paragraph 66, except admit that some of Dr. Hyman's businesses have been audited by the Internal Revenue Service.

67. Defendants deny the allegations in Paragraph 67, except admit that Mr. Purohit advised Dr. Hyman against utilizing captive insurance for Hyman Digital.

68. Defendants deny the allegations in Paragraph 68, except admit that the IRS has issued demands for information from some of Dr. Hyman's companies regarding a fully legal tax strategy.

69. Defendants deny the allegations in Paragraph 69, including section heading "D", except admit that Dr. Hyman hosted the podcast *House Call* and currently hosts *The Doctor's Farmacy*, that *The Doctor's Farmacy* is produced by Hyman Digital, and that Dr. Hyman is the only medical professional associated with Hyman Digital. Defendants aver that Mr. Purohit has no medical background or credentials, and thus has no basis to determine what constitutes accurate medical facts or the proper interpretation of medical research.

70. Defendants deny the allegations in Paragraph 70.

71. Defendants deny the allegations in Paragraph 71, except admit that Dr. Hyman was previously the Founder and Director of the Center for Functional Medicine at the Cleveland Clinic and that he also previously held the title of Head of Strategy and Innovation and Senior Advisor

(Dr. Hyman now holds the title of Founder and Senior Advisor).

72. Defendants deny the allegations in Paragraph 72, except admit that Dr. Hyman produced several specials with PBS.

73. Defendants deny knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 73.

74. Defendants deny the allegations in Paragraph 74.

75. Defendants deny the allegations in Paragraph 75.

76. Defendants deny the allegations in Paragraph 76.

77. Defendants deny the allegations in Paragraph 77, including section heading "E".

78. Defendants deny the allegations in Paragraph 78.

    a. Defendants deny the allegations in Paragraph 78(a), except admit that Thrive Market is an online grocery company, Dr. Hyman has an equity interest in Thrive Market, and Dr. Hyman's stake in Thrive Market in 2015 was valued at around $98,000; and aver that Thrive Market paid Hyman Digital $757,000 as compensation for its promotional activities.

    b. Defendants deny the allegations in Paragraph 78(b), except admit that Dr. Hyman owns Hyman Enterprise and that Hyman Enterprises paid Hyman Digital back for all costs Hyman Digital expended to promote Hyman Enterprises' products.

    c. Defendants deny the allegations in Paragraph 78(c), except admit that Dr. Hyman owns The Ultra Wellness Center, the company's gross revenues increased from $4,296,851.57 in 2016 to $8,461,429 in 2022, and its net profits increased from $126,118 to $845,416 in 2022; and aver that The Ultra Wellness Center's growth had nothing to do with Mr. Purohit.

d. Defendants deny the allegations in Paragraph 78(d), except admit that *Mark's Picks* is owned by Hyman Digital, the email list grew to over 300,000 addresses at some point, and that *Mark's Picks* was initially built to promote five things that Dr. Hyman was enjoying that week.

e. Defendants deny the allegations in Paragraph 78(e), except admit that Hyman Digital created an email list related to *The Broken Brain* and the email list grew to up to almost one million addresses at its height.

79. Defendants deny the allegations in Paragraph 79, including the section heading "F", except admit that Hyman Digital entered into a partnership with Function Health, an individualized lab testing company.

80. Defendants deny the allegations in Paragraph 80, including the underlying reasons why Mr. Purohit opposed Hyman Digital's partnership with Function Health.

81. Defendants deny the allegations in Paragraph 81, except admit that Dr. Hyman is the co-founder and co-owner of Function Health and the supermajority member and Manager of Hyman Digital and that Function Health's agreement with Hyman Digital was finalized in May 2023.

82. Defendants deny the allegations in Paragraph 82.

83. Defendants deny the allegations in Paragraph 83.

84. Defendants deny the allegations in Paragraph 84.

85. Defendants deny the allegations in Paragraph 85, except admit that Mr. Purohit stated that he would resign from Hyman Digital on September 12, 2023, and Mr. Purohit's resignation from Hyman Digital resulted in him offering to forego his equity in Function Health.

86. Defendants deny the allegations in Paragraph 86, except admit that Mr. Purohit

agreed to remain at Hyman Digital until November 30, 2023, and that Ms. Bella-Hyman (Dr. Hyman's now-wife) was selected to serve as interim CEO.

87.     Defendants deny the allegations in Paragraph 87, including Mr. Purohit's characterization of the September 14, 2023, email, and respectfully refer the Court to the September 14, 2023, email for its full text and context.

88.     Defendants admit that Mr. Purohit is a minority member of Hyman Digital, and that the Operating Agreement contains such a provision, and respectfully refer the Court to the Operating Agreement for its full text and context. Defendants deny knowledge and information sufficient to form a belief about the truth of the allegation that Mr. Purohit has a 20% membership interest in Hyman Digital.

89.     Defendants deny that Hyman Digital employed or currently employs a CFO, but otherwise admit the allegations in Paragraph 89.

90.     Defendants deny the allegations in Paragraph 90, including the suggestion that Mr. Purohit personally owns the *Dhru Purohit Podcast* and *Try This*.

91.     Defendants deny the allegations in Paragraph 91, including section heading "G".

92.     Defendants deny the allegations in Paragraph 92.

93.     Defendants deny the allegations in Paragraph 93, except admit that Dr. Hyman was sued by one former consultant in 2014. Defendants aver that the allegations in Paragraph 93 are false, inflammatory, and irrelevant to Mr. Purohit's claims, and are included solely to inappropriately smear Dr. Hyman's reputation and apply pressure.

94.     Paragraph 94 contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 94, and respectfully refer the Court to the Complaint for its full text and context.

95. Paragraph 95 contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 95. Defendants aver that the allegations in Paragraph 95 are false, inflammatory, and irrelevant to Mr. Purohit's claims, and are included solely to inappropriately smear Dr. Hyman's reputation and apply pressure.

    a. Paragraph 95(a) contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 95(a).

    b. Paragraph 95(b) contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 95(b).

    c. Paragraph 95(c) contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 95(c).

    d. Paragraph 95(d) contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 95(d).

    e. Paragraph 95(e) contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 95(e).

96. Defendants deny the allegations in Paragraph 96, except admit that the lawsuit was filed in August 2014 and settled in April 2015.

**Breach of Contract: HD Operating Agreement—Failure to Purchase Membership**
**(Individually Against Dr. Hyman and Hyman Digital, LLC)**

97.     Defendants incorporate by reference their pleadings in response to the preceding paragraphs of the Complaint, and otherwise deny the allegations in Paragraph 97.

98.     Defendants admit the allegations in Paragraph 98.

99.     Defendants admit the allegations in Paragraph 99.

100.    Defendants deny the allegations in Paragraph 100.

101.    Defendants deny the allegations in Paragraph 101, deny knowledge and information sufficient to form a belief about the truth of the allegation that Mr. Purohit owned 20% of Hyman Digital, except admit that Mr. Purohit stated his intent to resign as CEO of Hyman Digital on September 12, 2023, and respectfully refer the Court to the Operating Agreement for its full text and context.

102.    Defendants admit the allegations in Paragraph 102, and respectfully refer the Court to the Operating Agreement for its full text and context.

103.    Paragraph 103 contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 103, and respectfully refer the Court to the Operating Agreement for its full text and context.

104.    Paragraph 104 contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 104, deny knowledge and information sufficient to form a belief about the truth of the allegation that Mr. Purohit has a 20% interest in Hyman Digital, and respectfully refer the Court to the Operating Agreement for its full text and context.

105.    Defendants deny knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 105.

106. Paragraph 106 contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the amount Mr. Purohit is owed from Hyman Digital, and respectfully refer the Court to the Operating Agreement for its full text and context.

107. Defendants deny the allegations in Paragraph 107.

108. Defendants deny the allegations in Paragraph 108.

109. Paragraph 109 contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 109.

### SECOND CAUSE OF ACTION
**Breach of Contract: HD Operating Agreement—Failure to Make Distributions**
**(Individually Against Dr. Hyman and Hyman Digital, LLC)**

110. Defendants incorporate by reference their pleadings in response to the preceding paragraphs of the Complaint, and otherwise deny the allegations in Paragraph 110.

111. Paragraph 111 contains a legal conclusion to which no response is required. To the extent that a response is required, Defendants admit that the Operating Agreement contains some of the quoted language, and respectfully refer the Court to the Operating Agreement for its full text and context.

112. Defendants deny the allegations in Paragraph 112 and deny knowledge and information sufficient to form a belief about the truth of the allegation that Dr. Hyman has an 80% membership interest.

113. Defendants deny the allegations in Paragraph 113.

114. Defendants deny the allegations in Paragraph 114.

115. Paragraph 115 contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 115.

### THIRD CAUSE OF ACTION
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(Individually Against Dr. Hyman and Hyman Digital, LLC)**

116.     Defendants incorporate by reference their pleadings in response to the preceding paragraphs of the Complaint, and otherwise deny the allegations in Paragraph 116.

117.     Paragraph 117 contains a legal conclusion to which no response is required.

118.     Paragraph 118 contains a legal conclusion to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 118, deny knowledge and information sufficient to form a belief about the truth of the allegation that Mr. Purohit had a 20% membership interest in Hyman Digital, and respectfully refer the Court to the Operating Agreement for its full text and context.

119.     Defendants deny the allegations in Paragraph 119.

120.     Defendants deny the allegations in Paragraph 120.

121.     Defendants deny the allegations in Paragraph 121, except aver that Ms. Bella-Hyman was appointed the interim CEO of Hyman Digital, based on Mr. Purohit's recommendation, on September 15, 2023, after Mr. Purohit resigned and abandoned his duties to the company.

122.     Defendants deny the allegations in Paragraph 122.

123.     Defendants deny the allegations in Paragraph 123.

124.     Paragraph 124 contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 124.

### FOURTH CAUSE OF ACTION
**Breach of Fiduciary Duty**
**(Individually Against Dr. Hyman)**

125.     Dr. Hyman incorporates by reference their pleadings in response to the preceding paragraphs of the Complaint, and otherwise denies the allegations in Paragraph 125.

126.     Dr. Hyman denies the allegations in Paragraph 126, denies knowledge and information sufficient to form a belief about the truth of the allegation that Dr. Hyman is an 80% member of Hyman Digital, except admits that he is a supermajority member of Hyman Digital and the company's Manager.

127.     Dr. Hyman denies the allegations in Paragraph 127, denies knowledge and information sufficient to form a belief about the truth of the allegation that Mr. Purohit is a 20% member of Hyman Digital, except admits that Mr. Purohit is a minority member of Hyman Digital.

128.     Paragraph 128 contains a legal conclusion to which no response is required. To the extent a response is required, Dr. Hyman denies the allegations in Paragraph 128, denies knowledge and information sufficient to form a belief about the truth of the allegation that Dr. Hyman is an 80% member of Hyman Digital, except admits that he is a supermajority member of Hyman Digital and the company's Manager.

129.     Dr. Hyman denies the allegations in Paragraph 129.

   a.   Dr. Hyman denies the allegations in Paragraph 129(a).

   b.   Dr. Hyman denies the allegations in Paragraph 129(b).

   c.   Dr. Hyman denies the allegations in Paragraph 129(c).

   d.   Dr. Hyman denies the allegations in Paragraph 129(d).

   e.   Dr. Hyman denies the allegations in Paragraph 129(e).

   f.   Dr. Hyman denies the allegations in Paragraph 129(f).

   g.   Dr. Hyman denies the allegations in Paragraph 129(g), except admits that he has asked a Hyman Digital employee to mail him cannabis gummies from California to Massachusetts (states where cannabis is legal).

   h.   Dr. Hyman denies the allegations in Paragraph 129(h), except admit that the IRS

has issued demands for information from some of Dr. Hyman's companies regarding a fully legal tax strategy.

    i.  Dr. Hyman denies the allegations in Paragraph 129(i).

    j.  Dr. Hyman denies the allegations in Paragraph 129(j).

    k.  Dr. Hyman denies the allegations in Paragraph 129(k).

    l.  Dr. Hyman denies the allegations in Paragraph 129(l).

    m.  Dr. Hyman denies the allegations in Paragraph 129(m).

    n.  Dr. Hyman denies the allegations in Paragraph 129(n).

130.    Dr. Hyman denies the allegations in Paragraph 130.

131.    Dr. Hyman denies the allegations in Paragraph 131 and denies knowledge and information sufficient to form a belief about the truth of the allegation that Mr. Purohit has a 20% membership interest in Hyman Digital.

132.    Dr. Hyman denies the allegations in Paragraph 132, denies knowledge and information sufficient to form a belief about the truth of the allegation that Mr. Purohit has a 20% membership interest in Hyman Digital, and admits that Ms. Bella-Hyman was appointed the interim CEO of Hyman Digital after Mr. Purohit resigned from the company.

133.    Dr. Hyman denies the allegations in Paragraph 133.

134.    Dr. Hyman denies the allegations in Paragraph 134.

135.    Paragraph 135 contains a legal conclusion to which no response is required. To the extent a response is required, Dr. Hyman denies the allegations in Paragraph 135.

136.    Paragraph 136 contains a legal conclusion to which no response is required. To the extent a response is required, Dr. Hyman denies the allegations in Paragraph 136.

137.    Paragraph 137 contains a legal conclusion to which no response is required. To the

extent a response is required, Dr. Hyman denies the allegations in Paragraph 137.

## FIFTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (Derivatively Against Dr. Hyman)

138.    Dr. Hyman incorporates by reference their pleadings in response to the preceding paragraphs of the Complaint, and otherwise denies the allegations in Paragraph 138.

139.    Dr. Hyman denies the allegations in Paragraph 139, denies knowledge and information sufficient to form a belief about the truth of the allegation that Dr. Hyman is an 80% member of Hyman Digital, except admits that he is a supermajority member of Hyman Digital and the company's Manager.

140.    Dr. Hyman denies the allegations in Paragraph 140, denies knowledge and information sufficient to form a belief about the truth of the allegation that Mr. Purohit has a 20% membership interest in Hyman Digital, and admits that he is a supermajority member of Hyman Digital and the company's Manager.

141.    Paragraph 141 contains a legal conclusion to which no response is required. To the extent a response is required, Dr. Hyman denies the allegations in Paragraph 141, and denies knowledge and information sufficient to form a belief about the truth of the allegation that Dr. Hyman has an 80% membership interest in Hyman Digital.

142.    Dr. Hyman denies the allegations in Paragraph 142.

    a.    Dr. Hyman denies the allegations in Paragraph 142(a).

    b.    Dr. Hyman denies the allegations in Paragraph 142(b).

    c.    Dr. Hyman denies the allegations in Paragraph 142(c).

    d.    Dr. Hyman denies the allegations in Paragraph 142(d).

    e.    Dr. Hyman denies the allegations in Paragraph 142(e).

    f.    Dr. Hyman denies the allegations in Paragraph 142(f).

g.   Dr. Hyman denies the allegations in Paragraph 142(g).

h.   Dr. Hyman denies the allegations in Paragraph 142(h), except admit that the IRS has issued demands for information from some of Dr. Hyman's companies regarding a fully legal tax strategy.

i.   Dr. Hyman denies the allegations in Paragraph 142(i).

j.   Dr. Hyman denies the allegations in Paragraph 142(j).

k.   Dr. Hyman denies the allegations in Paragraph 142(k).

l.   Dr. Hyman denies the allegations in Paragraph 142(l).

m.   Dr. Hyman denies the allegations in Paragraph 142(m).

n.   Dr. Hyman denies the allegations in Paragraph 142(n).

143.   Dr. Hyman denies the allegations in Paragraph 143.

144.   Dr. Hyman denies the allegations in Paragraph 144, denies knowledge and information sufficient to form a belief about the truth of the allegation that Mr. Purohit has a 20% membership interest in Hyman Digital, and admits that Ms. Bella-Hyman was appointed the interim CEO of Hyman Digital after Mr. Purohit resigned from the company.

145.   Dr. Hyman denies the allegations in Paragraph 145.

146.   Dr. Hyman denies the allegations in Paragraph 146.

147.   Paragraph 147 contains a legal conclusion to which no response is required. To the extent a response is required, Dr. Hyman denies the allegations in Paragraph 147.

148.   Paragraph 148 contains a legal conclusion to which no response is required. To the extent a response is required, Dr. Hyman denies the allegations in Paragraph 148.

**SIXTH CAUSE OF ACTION**
**Misappropriation of Corporate Opportunity**
**(Derivatively Against Dr. Hyman)**

149. Dr. Hyman incorporates by reference their pleadings in response to the preceding paragraphs of the Complaint, and otherwise denies the allegations in Paragraph 149.

150. Dr. Hyman denies the allegations in Paragraph 150, except admits that he is a supermajority member of Hyman Digital and the company's Manager.

151. Dr. Hyman denies the allegations in Paragraph 151, denies knowledge and information sufficient to form a belief about the truth of the allegation that Mr. Purohit has a 20% membership interest in Hyman Digital, and admits that Mr. Purohit is a minority member of Hyman Digital.

152. Paragraph 152 contains a legal conclusion to which no response is required. To the extent a response is required, Dr. Hyman denies the allegations in Paragraph 152, and denies knowledge and information sufficient to form a belief about the truth of the allegation that Dr. Hyman has an 80% membership interest in Hyman Digital.

153. Dr. Hyman denies the allegations in Paragraph 153, except admits that he is a supermajority member of Hyman Digital and the company's Manager.

154. Paragraph 154 contains a legal conclusion to which no response is required. To the extent a response is required, Dr. Hyman denies the allegations in Paragraph 154.

155. Dr. Hyman denies the allegations in Paragraph 155.

156. Dr. Hyman denies the allegations in Paragraph 156 and denies knowledge and information sufficient to form a belief about the truth of the allegation that Mr. Purohit has a 20% membership interest in Hyman Digital.

157. Paragraph 157 contains a legal conclusion to which no response is required. To the extent a response is required, Dr. Hyman denies the allegations in Paragraph 157.

## SEVENTH CAUSE OF ACTION
### Declaratory Judgment—Authorship of Copyrights, 17 U.S.C. § 101 et seq.
### *The Dhru Purohit Podcast*
### (Individually Against Hyman Digital)

158.    Hyman Digital incorporates by reference their pleadings in response to the preceding paragraphs of the Complaint, and otherwise denies the allegations in Paragraph 158.

159.    Hyman Digital denies the allegations in Paragraph 159.

160.    Hyman Digital admits the allegations in Paragraph 160.

161.    Paragraph 161 contains a legal conclusion to which no response is required. To the extent a response is required, Hyman Digital denies the allegations in Paragraph 161.

162.    Paragraph 162 contains a legal conclusion to which no response is required. To the extent a response is required, Hyman Digital denies the allegations in Paragraph 162.

163.    Paragraph 163 contains a legal conclusion to which no response is required. To the extent a response is required, Hyman Digital denies the allegations in Paragraph 163.

## EIGHTH CAUSE OF ACTION
### Declaratory Judgment—Authorship of Copyrights, 17 U.S.C. § 101 et seq.
### *Try This* Newsletter
### (Individually Against Hyman Digital)

164.    Hyman Digital incorporates by reference their pleadings in response to the preceding paragraphs of the Complaint, and otherwise denies the allegations in Paragraph 164.

165.    Hyman Digital denies the allegations in Paragraph 165.

166.    Hyman Digital admits the allegations in Paragraph 166.

167.    Paragraph 167 contains a legal conclusion to which no response is required. To the extent a response is required, Hyman Digital denies the allegations in Paragraph 167.

168.    Paragraph 168 contains a legal conclusion to which no response is required. To the extent a response is required, Hyman Digital denies the allegations in Paragraph 168.

169.    Paragraph 169 contains a legal conclusion to which no response is required. To the

extent a response is required, Hyman Digital denies the allegations in Paragraph 169.

## NINTH CAUSE OF ACTION
### Declaratory Judgment—Non-Infringement of Trademarks, 15 U.S.C. § 1051 et seq.
### The *Dhru Purohit Podcast* and *The Dhru Purohit Show*
### (Individually Against Hyman Digital)

170. Hyman Digital incorporates by reference their pleadings in response to the preceding paragraphs of the Complaint, and otherwise denies the allegations in Paragraph 170.

171. Hyman Digital denies the allegations in Paragraph 171, except admits that Mr. Purohit published the *Dhru Purohit Podcast* during his tenure with Hyman Digital as a company employee.

172. Hyman Digital denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 172.

173. Hyman Digital admits the allegations in Paragraph 173.

174. Hyman Digital denies the characterization "threatened" but otherwise admits the allegations in Paragraph 174.

175. Hyman Digital denies the characterization "threatened" but otherwise admits the allegations in Paragraph 175.

176. Paragraph 176 contains a legal conclusion to which no response is required. To the extent a response is required, Hyman Digital denies the allegations in Paragraph 176.

177. Paragraph 177 contains a legal conclusion to which no response is required. To the extent a response is required, Hyman Digital denies the allegations in Paragraph 177.

## TENTH CAUSE OF ACTION
### Declaratory Judgment—Non-Infringement of Trademarks, 15 U.S.C. § 1051 et seq.
### *Try This* Newsletter
### (Individually Against Hyman Digital)

178. Defendants incorporate by reference their pleadings in response to the preceding paragraphs of the Complaint, and otherwise denies the allegations in Paragraph 178.

179. Hyman Digital denies the allegations in Paragraph 179.

180. Hyman Digital denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 180.

181. Hyman Digital admits the allegations in Paragraph 181.

182. Hyman Digital denies the characterization "threatened" but otherwise admits the allegations in Paragraph 182.

183. Hyman Digital denies the characterization "threatened" but otherwise admits the allegations in Paragraph 183.

184. Paragraph 184 contains a legal conclusion to which no response is required. To the extent a response is required, Hyman Digital denies the allegations in Paragraph 184.

185. Paragraph 185 contains a legal conclusion to which no response is required. To the extent a response is required, Hyman Digital denies the allegations in Paragraph 185.

## ELEVENTH CAUSE OF ACTION
### Declaratory Relief—*The Dhru Purohit Podcast*

186. Defendants incorporate by reference their pleadings in response to the preceding paragraphs of the Complaint, and otherwise deny the allegations in Paragraph 186.

187. Paragraph 187 contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 187.

188. Defendants deny the characterization "threatened" but otherwise admit the allegations in Paragraph 188.

189. Defendants deny the allegations in Paragraph 189, but admit that Mr. Purohit contests Hyman Digital's ownership of the *Dhru Purohit Podcast*.

190. Defendants deny the allegations in Paragraph 190.

191. Paragraph 191 contains a legal conclusion to which no response is required. To the

extent a response is required, Defendants deny the allegations in Paragraph 191.

192. Paragraph 192 contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 192.

## TWELFTH CAUSE OF ACTION
### Declaratory Relief—*Try This* Newsletter

193. Defendants incorporate by reference their pleadings in response to the preceding paragraphs of the Complaint, and otherwise deny the allegations in Paragraph 193.

194. Paragraph 194 contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 194.

195. Defendants deny the characterization "threatened" but otherwise admit the allegations in Paragraph 195.

196. Defendants deny the allegations in Paragraph 196, but admit that Mr. Purohit contests Hyman Digital's ownership of *Try This*.

197. Defendants deny the allegations in Paragraph 197.

198. Paragraph 198 contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 198.

199. Paragraph 199 contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 199.

## THIRTEENTH CAUSE OF ACTION
### Declaratory Judgment—Ownership of YouTube, Instagram, Spotify, Apple, Facebook, X (Formerly Twitter), and TikTok Accounts (Collectively, the "Social Media Accounts") (Individually Against Hyman Digital)

200. Hyman Digital incorporates by reference their pleadings in response to the preceding paragraphs of the Complaint, and otherwise denies the allegations in Paragraph 200.

201. Hyman Digital denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 201.

202. Hyman Digital denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 202.

203. Hyman Digital denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 203.

204. Hyman Digital denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 204.

205. Hyman Digital denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 205.

206. Hyman Digital denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 206.

207. Hyman Digital denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 207.

208. Hyman Digital does not view this Paragraph as requiring a response. To the degree a response is required, Hyman Digital denies the allegations in Paragraph 208.

209. Paragraph 209 contains a legal conclusion to which no response is required. To the extent a response is required, Hyman Digital denies the allegations in Paragraph 209.

210. Hyman Digital denies the allegations in Paragraph 210, including the characterization "threatened" but admits that Hyman Digital claims either a property interest in Mr. Purohit's social media channels or compensation for the revenue generated by the social media channels as the direct and proximate result of hosting Hyman Digital's content.

211. Hyman Digital denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 211.

212. Hyman Digital denies the allegations in Paragraph 212.

213.    Hyman Digital denies the allegations in Paragraph 213.

214.    Paragraph 214 contains a legal conclusion to which no response is required. To the extent a response is required, Hyman Digital denies the allegations in Paragraph 214.

215.    Paragraph 215 contains a legal conclusion to which no response is required. To the extent a response is required, Hyman Digital denies the allegations in Paragraph 215.

### PRAYER FOR RELIEF

Defendants deny that Mr. Purohit suffered any cognizable injury or damages entitling him to legal recourse and deny that Mr. Purohit is entitled to any such relief, whether monetary, compensatory, punitive, declarative, equitable, costs, and/or fees relating to this matter, or in any other form sought by him.

### AFFIRMATIVE DEFENSES

#### First Defense

The Complaint fails to state a claim upon which relief can be granted.

#### Second Defense

Plaintiff fails to state a claim for punitive damages.

#### Third Defense

Plaintiff's alleged harm and damages, if any, are speculative.

#### Fourth Defense

Without conceding that Plaintiff suffered any damages stemming from the alleged wrongdoing, Plaintiff has failed to mitigate or minimize his alleged damages.

#### Fifth Defense

Plaintiff sustained no cognizable injury by reason of any of Defendants' conduct. Plaintiff makes only conclusory allegations of damages.

### Sixth Defense

Plaintiff's claims are barred, in whole or in part, based on the doctrine of estoppel.

### Seventh Defense

Plaintiff's claims are barred, in whole or in part, based on the doctrine of unclean hands as a result of his misconduct.

### Eighth Defense

Plaintiff's claims are barred, in whole or in part, based on the doctrine of laches as a result of his unjustified, unreasonable, and prejudicial delay in raising his claims.

### Ninth Defense

Plaintiff's claims for breach of fiduciary duty and misappropriation of corporate opportunity are barred, in whole or in part, based on the statute of limitations.

### Tenth Defense

Plaintiff's claims are barred by reason of his unlawful conduct.

### Eleventh Defense

Plaintiff's claims are barred, in whole or in part, based on the faithless servant doctrine as a result of his disloyalty.

### Twelfth Defense

Plaintiff has not adequately pleaded that Dr. Hyman is the alter ego of Hyman Digital.

### Thirteenth Defense

Without conceding that Plaintiff suffered any damages stemming from the alleged wrongdoing by Defendants, any "damage" incurred by Plaintiff as a result of any alleged wrongful conduct should be offset by the value of the Hyman Digital assets and trade secrets that Mr. Purohit misappropriated.

Defendants are not knowingly waiving any affirmative defense and hereby expressly reserve the right to amend their Answer and include all such defenses as may become available or apparent during pretrial proceedings of this action.

## DEFENDANT HYMAN DIGITAL'S COUNTERCLAIMS
## AGAINST PLAINTIFF DHRUMIL PUROHIT

Counterclaim Plaintiff Hyman Digital, LLC brings this action against Counterclaim Defendant Dhrumil Purohit for damages, costs, injunctive relief, and other remedies arising from the following allegations and claims.

### INTRODUCTION

1.      Dr. Mark Hyman is a world-renowned physician specializing in the field of functional medicine. Already a sought-after expert, speaker, accomplished author, and successful businessperson, Dr. Hyman created Hyman Digital, LLC as a platform to share decades of accumulated medical experience and knowledge to educate and benefit millions of people unserved or unassisted by traditional medical pathways.

2.      According to his website, Mr. Dhrumil Purohit is a self-described "serial entrepreneur in the health and wellness industry," despite having no medical or scientific training or expertise.

3.      In 2015, Dr. Hyman hired Dhrumil Purohit to serve as Hyman Digital's Chief Executive Officer to promote the work of Dr. Hyman and other medical experts. The terms of Mr. Purohit's employment as CEO, and his duties and obligations to Hyman Digital, were set forth in an Executive Services Agreement dated July 15, 2015 (the "ESA") (a true and correct copy of the ESA is attached hereto as Exhibit 1). As part of his compensation, Mr. Purohit received 10% of Hyman Digital, vested over four years. ESA, Schedule A. Dr. Hyman retained the other 90% of the company. *Id.*

4.      As CEO and pursuant to the ESA, Mr. Purohit was expected to develop and grow Hyman Digital's products and content, and promote Dr. Hyman and his associated brands, through creative and innovative social media, content development, product development, advertising, and

31

sponsorship initiatives.

5.      In addition, the ESA acknowledged and reiterated Mr. Purohit's fiduciary duty of loyalty to Hyman Digital. To that end, Mr. Purohit agreed in the ESA to devote his best efforts and all his business time to Hyman Digital, ESA § 1.B, and to refrain from activities and outside ventures that would detract from or interfere with his duties to Hyman Digital, *id.* § 1.D., and avoid conflicts of interest, *id.* § 1.E., including taking advantage of any company opportunities for his own benefit, *id.* § 7.A.4.

6.      Mr. Purohit was well compensated for serving as Hyman Digital's CEO, receiving millions of dollars in salary, equity compensation, distributions, and discretionary bonuses. In exchange, he agreed that all content he created in the scope of his role as CEO constituted work for hire, belonging solely to Hyman Digital. *See* ESA, § 5.E

7.      Hyman Digital had high hopes for Mr. Purohit's tenure as CEO and believed it had found a true partner, despite Mr. Purohit's lack of medical background or expertise. Unfortunately, Hyman Digital's hope and trust in Mr. Purohit were misplaced.

8.      From the very beginning of his tenure, Mr. Purohit used Hyman Digital for his own personal benefit. He hired friends and family members for senior Hyman Digital positions, despite their lack of qualifications, and used valuable advertising real estate in Hyman Digital content to promote—for free—his own platforms, as well his friends' and family members' content, products, and services. While internally and externally presenting himself as though he were developing content for Hyman Digital, he was instead developing and growing both his own following and competing products on the back of Hyman Digital and Dr. Hyman—the *Dhru Purohit Podcast* and *Try This* newsletter. He used company time, company employees and resources, and services that were paid for by the company. Mr. Purohit used Hyman Digital's

reputation and broad reach, including Hyman Digital's assets (email lists, newsletters, website, podcasts, and social media) to line his own pockets and to promote what he now—counterfactually—claims are his own personal products.

9.     At the same time, he neglected his duties to other areas of Hyman Digital, resulting in static growth, a diminished follower base, and declining performance relative to peers. This included failing to update the company's branding or website for over five years, failing to develop a strategic plan despite repeated requests to produce one, failing to innovate on new products or services, and inexplicably allowing successful revenue streams to expire, such as a membership program that had earned more than $500,000 a year.

10.     Mr. Purohit used Hyman Digital as his personal bank account, using its funds, employees, knowledge, expertise, and branding to develop competing products, products of family members, and what he now claims are his own products. He then put into action his plan to abscond with it all.

11.     In September 2023, Mr. Purohit abruptly announced his resignation and claimed, for the first time, that he *personally* owned the *Dhru Purohit Podcast* and the *Try This* newsletter, content that was developed on company time, using company expertise, reputation, employees, and resources, all during and in the course of his employment as CEO. Contrary to the position he now takes, it was well understood by Mr. Purohit and every Hyman Digital employee that those products were company property. For example, all advertisers and sponsors for the content were contracted under Hyman Digital's masthead by Hyman Digital employees. They were invoiced by Hyman Digital and they remitted payment to Hyman Digital. And all advertising and sponsorship revenue for the content flowed through Hyman Digital and was recorded in the company's financial statements. In short, Mr. Purohit's newly invented claim of personal ownership flies in

the face of the facts, the unambiguous terms of the ESA, and black letter law.

12.     When Hyman Digital discovered Mr. Purohit had taken company assets and requested that Mr. Purohit return the products after he left—a reasonable request, since they were clearly company property—Mr. Purohit responded with attempts to extort Dr. Hyman and Hyman Digital by threatening to level unfounded, irrelevant, and inflammatory claims against Dr. Hyman unless Dr. Hyman agreed to pay him an exorbitant sum *and* allow him keep the company assets he had stolen.

13.     Dr. Hyman and Hyman Digital refused to be cowed by Mr. Purohit's extortionate demands. And so, like clockwork, Mr. Purohit made good on his threat to destroy Dr. Hyman and Hyman Digital, filing a voluminous complaint ("Complaint") against them for, among other things, breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and declaratory judgment related to his supposed ownership of the products he had stolen. To apply pressure on Dr. Hyman and Hyman Digital, Mr. Purohit also peppered his Complaint with false, irrelevant, and inflammatory allegations of harassment, self-dealing, and other supposed misconduct. Mr. Purohit's strategy is clear—he aims to smear Dr. Hyman and Hyman Digital and drag their reputations through the mud merely for having the audacity to demand a fair and equitable distribution of assets and the return of property Hyman Digital rightfully owns.

14.     Mr. Purohit's threats and improper tactics are nothing more than a desperate attempt to shake down Dr. Hyman and Hyman Digital, and to avoid liability for his own wrongdoing. As a member and the CEO of Hyman Digital, and pursuant to the express terms of the ESA, Mr. Purohit owed Hyman Digital a fiduciary duty of loyalty. Mr. Purohit flagrantly and knowingly breached this fundamental duty, costing Hyman Digital tens of millions of dollars in lost revenue,

relationships with sponsors and advertisers, and the platform reach and brand exposure that Dr. Hyman hired Mr. Purohit to achieve in the first place.

15.      Mr. Purohit tried to use Hyman Digital as a launching pad for his own career and to exploit Dr. Hyman's renown, popularity, network, and success to boost his own profile and platform. In doing so, Mr. Purohit violated his contractual and fiduciary duties. He misappropriated Hyman Digital's property, opportunities, and trade secrets, and he unjustly enriched himself, his friends, and his family. Mr. Purohit must be held to account and prevented from further profiting from his wrongdoing and further tarnishing the Dr. Hyman brand, and he must cease utilizing and profiting from Hyman Digital property.

## JURISDICTION AND VENUE

16.      The Court has subject matter jurisdiction over the dispute pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 15 U.S.C. § 1221 because Hyman Digital asserts claims for copyright and trademark infringement under federal law. The Court also has supplemental jurisdiction over Hyman Digital's other claims pursuant to 28 U.S.C. § 1367 and Federal Rule of Civil Procedure 13 because the claims form part of the same case or controversy as its federal copyright and federal trademark claims.

17.      The Court has personal jurisdiction over the dispute because Hyman Digital's claims arise from transactions with Mr. Purohit in Massachusetts; Mr. Purohit's wrongful acts injured Hyman Digital, which is headquartered in Massachusetts; and Mr. Purohit submitted himself to the jurisdiction of the Court by filing his Complaint there. Additionally, both the ESA and Hyman Digital's Operating Agreement ("Operating Agreement") require that any action relating to or arising from the agreements be brought in any court of the Commonwealth of Massachusetts sitting in Berkshire County or the United States District Court for the District of

Massachusetts, Springfield Division.

18. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Hyman Digital's claims occurred in Massachusetts. Additionally, the ESA requires that any action under the agreement be brought in a court of the Commonwealth of Massachusetts sitting in Berkshire County or the United States District Court for the District of Massachusetts, Springfield Division.

## PARTIES

19. Counterclaim Plaintiff Hyman Digital is a limited liability corporation organized under the laws of Massachusetts and headquartered at 55 Pittsfield Road, Suite 9, Lenox, Massachusetts 01240. The mission of the company is to grow and support Dr. Hyman's efforts to promote functional medicine, educate consumers through evidence-based but easily understandable content, and improve health outcomes. In service of this mission, Hyman Digital produces content across multiple platforms, including social media content, newsletters, podcasts, products, and books.

20. Counterclaim Defendant Dhrumil Purohit is a resident of Los Angeles, California.

## FACTUAL ALLEGATIONS

### Dr. Hyman and the Creation of Hyman Digital

21. Dr. Hyman is a world-renowned physician, author, content creator, and expert ambassador of functional medicine.

22. Over his nearly four decades of experience, he has helped treat and heal countless patients and is a global leader in the fields of functional and nutritional medicine, as well as food and healthcare policy. Dr. Hyman has more than 35 years of experience creating a unique patient-centered holistic approach to help treat chronic disease and other conditions and has used his

medical training and experience to develop cutting-edge medical and nutritional programs to optimize health and vitality and address medical problems at their core.

23.     Dr. Hyman has lectured all over the world and regularly appears as a medical expert on television shows and award-winning documentaries. He has developed, managed, and grown multiple brands, services, books, newsletters, and digital content—indeed, he is one of the leading health authors in the world with fifteen New York Times bestsellers.

24.     As a leading physician, he has devoted his life to helping people and has a sterling track record of success as a doctor, author, speaker, and businessman. He is the recipient of numerous awards, including: The 2016 Leadership Award from the Institute for Functional Medicine; a 2015 Books for Better Life Hall of Fame Author Inductee; the 2015 Christian Book of the Year Award for The Daniel Plan (co-authored with Rick Warren & Daniel Amen); the 2013 Nantucket Project Award for Implementation of Ideas that Change Lives; the 2010 Council on Litigation Management's Professionalism Award; the 2009 Linus Pauling Award for Leadership in Functional Medicine; the 2009 Media & Communications Award from the American College of Nutrition; and the 2007 Books for A Better Life Award.

25.     At the behest of the world-renowned Cleveland Clinic, Dr. Hyman established the first Center for Functional Medicine at one of the world's premier medical institutes, including raising over $20 million for research. For his pioneering work at Cleveland Clinic, he was appointed Pritzker Foundation Chair in Functional Medicine at the Cleveland Clinic Lerner College of Medicine. Upon information and belief, far from distancing itself from Dr. Hyman as alleged in Mr. Purohit's Complaint, the Chair of the Cleveland Clinic's Department of Wellness and Preventive Medicine would testify to Dr. Hyman's personal and professional integrity, years of dedicated service to the Cleveland Clinic, and generous support of the Cleveland Clinic and its

mission.

26. Dr. Hyman is presently an advisor to leading members of Congress on health and food policy and has been asked to testify before Congress numerous times. He was instrumental in helping members of Congress establish the first Prevention and Wellness Caucus and his non-profit has led many legislative and regulatory initiatives that are actively driving a nation-wide health care transformation. He was a key advisor and participant in the recent White House Conference on Hunger, Nutrition and Health. Dr. Hyman also co-founded Function Health, currently one of the fastest growing healthcare companies in the world. He is a widely respected global leader in health who has spoken at many prestigious conferences and lectures including the Milken Institute, the Vatican, the World Economic Forum, the Clinton Global Initiative, the Central Intelligence Agency, the State Department, and TEDMED.

27. Dr. Hyman also led humanitarian efforts and brought the first medical team to Haiti after the 2010 earthquake, for which he was featured on 60 Minutes. His non-profit work in faith-based wellness has helped over one million people through his co-development of The Daniel Plan, a faith-based wellness program at the Saddleback Church with Rick Warren, and a book called The Daniel Plan that Dr. Hyman co-authored on faith-based wellness. He has been solicited by and is currently advising several international governments and royal families, including currently developing a state-of-the-art health and longevity center abroad. He has also been asked to lead the transformation of the national institutional health care program for a major country.

28. Hyman Digital was created in 2015. The mission of the company was to grow and support Dr. Hyman's efforts to promote functional medicine, educate consumers through evidence-based but easily understandable content, and improve health outcomes. In service of this mission, Hyman Digital produced content across multiple platforms, including social media posts,

newsletters, podcasts, and books.

29.     By 2015, Dr. Hyman was already a successful businessperson, earning millions of dollars across his multiple ventures. Dr. Hyman's businesses had a combined gross revenue of $83 million with net profits of over $13 million.[1]

30.     Hyman Digital was created to promote, grow, and monetize Dr. Hyman's digital presence, and accordingly Dr. Hyman's other activities and ventures provided essential support to the brand awareness and growth, marketing, and network building that powered Hyman Digital's success. For example, Dr. Hyman wrote nearly one book per year during this period, each of which was a New York Times bestseller and drew widespread print media, radio, television, podcast, and social media acclaim and exposure, directing otherwise unattainable attention to Hyman Digital's content and products.

31.     Dr. Hyman also invested $1,500,000 of non-Hyman Digital funds into the production and development of five public television specials, produced with the assistance of Hyman Digital's staff, that were widely distributed, raising $40 million for public television and reaching over 200 million households. These specials drove further awareness and traffic to Hyman Digital assets. Indeed, the PBS specials produced by Dr. Hyman are some of the most popular in the network's history, generating more than $40 million in revenue for public television. In addition, his global speaking engagements also drove awareness and business that directly benefited Hyman Digital. The Hyman Digital time and resources used to produce these promotional materials were fully reimbursed by Dr. Hyman personally, despite Dr. Hyman never being compensated by Hyman Digital for these outside marketing efforts that amounted to

---

[1] Dr. Hyman's companies have only continued to grow in the years since. Furthermore, those independent businesses represent the majority of Dr. Hyman's net worth, earning a topline revenue of $21,495,791 in 2023 (of which Hyman Digital earned $6,963,311, or around 24%).

substantially enhanced exposure and public-and-brand recognition.

32.     In addition, Dr. Hyman brought significant partnership opportunities to Hyman Digital. For example, Thrive Market (in which Dr. Hyman is an investor) developed into a key strategic partner that supported Hyman Digital with over $757,000 in affiliate commissions, sponsorship, and advertising revenue.

33.     Hyman Digital relies on Dr. Hyman's expertise, relationships, reputation, and knowledge, as the founder, majority owner, and sole employee with medical credentials.

*The Hiring of Mr. Purohit and Execution of the ESA*

34.     Dr. Hyman met Mr. Purohit several years before hiring him as Hyman Digital's CEO. At the time, Mr. Purohit was the CEO of The Clean Program, another company founded on the principles of functional medicine. Dr. Hyman has since learned that the circumstances surrounding Mr. Purohit's departure from the Clean Program are eerily similar to his departure from Hyman Digital. On information and belief, the medical doctors associated with the Clean Program will testify accordingly, including that Mr. Purohit tried to abscond with company property he claimed as his own.

35.     Hyman Digital was created in 2015 at Mr. Purohit's request so that Dr. Hyman could hire Mr. Purohit and Mr. Purohit could receive equity in the company and serve as the company's CEO.

36.     At the time of Hyman Digital's creation, as a brand-new business, the company naturally had no revenue. To get the company started, Dr. Hyman seeded the company through credits from other companies he built prior to his affiliation with Mr. Purohit. Over the next eight years, Dr. Hyman continued to fund Hyman Digital's overhead and operations through payments and loans from his other companies, Hyman Enterprises and the Vitamin Portfolio, of greater than

$2.4 million and $5.2 million respectively. Hyman Digital's ensuing growth flowed in large part from these investments.

37.     Dr. Hyman offered Mr. Purohit the opportunity of a lifetime, particularly given Mr. Purohit's lack of medical training and expertise. Dr. Hyman did so because he believed that Mr. Purohit would be a loyal partner who had media and commercial skills that could help Dr. Hyman amplify his and the company's message. In short, Mr. Purohit was hired to help leverage and build Dr. Hyman's brand—not Mr. Purohit's.

38.     On July 1, 2015, Hyman Digital and Mr. Purohit entered into the ESA, pursuant to which Mr. Purohit agreed to serve as the company's CEO, subject to the duties and responsibilities assigned by the Manager, Dr. Hyman. *See* ESA, § 1.A.

39.     As compensation for serving as Hyman Digital's CEO, Mr. Purohit received a salary of $140,000 per year, as well as equity compensation of 10% of Hyman Digital, to vest over a four-year period. *Id.* at Schedule A.

40.     The ESA reiterated and confirmed that Mr. Purohit "owe[d] a fiduciary duty of loyalty, fidelity and allegiance to act at all times in the best interests of [Hyman Digital] and take no action that would intentionally injure [Hyman Digital's] business, its interests, or its reputation." *Id.* at § 1.E. As part of this duty, Mr. Purohit was required to (1) "devote [his] best efforts and all of [his] business time to the performance of [his] duties," (2) not "engage in any activities outside the scope of [his] employment if such activities would detract from or interfere with the fulfillment of [his] responsibilities or duties" as CEO, and (3) not "knowingly become involved in a conflict of interest with [Hyman Digital]." *Id.* at §§ 1.B, D–E.

41.     As CEO, the ESA required Mr. Purohit to "manage [Hyman Digital]'s digital business strategy, product development, marketing and sales" and "initiate and grow new business

relationships" while, reporting to the Manager (Dr. Hyman). *Id.* at § 1.C. In this capacity, Mr. Purohit was clearly prohibited from "tak[ing] advantage of any business opportunity that might be of interest to [Hyman Digital]." *Id.* at § 7.A.4. In other words, his job was to promote and grow Hyman Digital, and Hyman Digital alone.

42.     The ESA clearly stated that all of Mr. Purohit's "Work" for Hyman Digital constituted work for hire owned by Hyman Digital, and that Mr. Purohit transferred all rights, title, and interest in and for such work to Hyman Digital to the degree such work was not considered work for hire. *Id.* at § 5.E. The ESA also prohibits Mr. Purohit from reproducing, distributing, or publicly displaying or exhibiting any such Work. *Id.*

43.     The ESA also required Mr. Purohit to safeguard Hyman Digital's "Proprietary Information," including "customer, supplier, and/or vendor information, lists or subscription lists," "sales or marketing information, plans or strategies" and, importantly, to not "use or seek to use [such information] for [his] own financial benefit or for the financial benefit of any person or entity other than the Company." *Id.* at §§ 5.D, 5.F.

44.     Additionally, Mr. Purohit agreed to be bound by the ESA's broad non-competition and non-solicitation provisions, which not only prohibited him from working for another doctor but also from selling and promoting competing health and wellness products.

45.     The non-competition provision prohibited Mr. Purohit from "participating, whether directly or indirectly, in the design, development, management or operation of . . . any Direct Competitor," that is, "any business of an independent doctor of functional medicine that primarily promotes functional medicine on-line, or sells on-line products, including, without limitation, printed, visual and/or audio materials relating to health and wellness, and vitamin and mineral supplements." *Id.* at § 6.C.

46.     The non-solicitation provision prohibited Mr. Purohit from "recruiting, soliciting or inducing any non-clerical employee, independent contractor or consultant of the Company to terminate his or her employment with, or otherwise reduce his or her relationship with, the Company," and "soliciting or inducing any person or entity to terminate, or otherwise to cease, reduce, or diminish in any way its relationship with or prospective relationship with the Company." *Id.* at § 6.B. These provisions remained in place throughout Mr. Purohit's employment, as well as for one year after his departure. *Id.* at § 6.A.

47.     The ESA also provides that, if Mr. Purohit "breach[ed] any of the covenants set forth in [the ESA]," he was to pay "all costs (including attorneys' fees and the collection thereof) incurred by the Company in establishing that breach and in otherwise enforcing any of the covenants or provisions of [the ESA]." *Id.* at § 6.F. The ESA also plainly authorized immediate injunctive relief. Specifically, Section 6.E provides that any violation of the non-competition or non-solicitation provisions "cannot be reasonably or adequately compensated in damages or in an action at law and breach of those provisions will cause the Company irreparable harm," and accordingly that "the Company shall be entitled to injunctive relief . . . with respect to the breach of [Section 6]." *Id.* § 6.E.

48.     The ESA provides that it "shall be governed and construed in accordance with the laws of the State of New York, applicable to agreements made and to be performed in New York and shall be construed without regard to any presumption or other rule requiring construction against the party causing the Agreement to be drafted." *Id.* § 9.A.

49.     The ESA provides that all amendments must be formal and in writing. *Id.* § 9.C. Since its execution, the ESA has not been amended.

***Hyman Digital's Broken Brain Docuseries, Email List, and Podcast***

50.     In 2018, Hyman Digital released two 8-part docuseries called *The Broken Brain* and *The Broken Brain 2*, which featured Dr. Hyman and a cross-section of leading experts who examined the application of functional medicine to brain disorders. In conjunction with the release of *The Broken Brain*, Hyman Digital obtained trademarks for the phrase "Broken Brain" in both print and media (Reg. Nos. 5,544,836 and 5,544,833). True and correct copies of these trademarks are attached hereto as Exhibit 2.

51.     *The Broken Brain* docuseries received substantial acclaim and millions of views. In light of the widespread public appetite for the docuseries' health-related content, Hyman Digital launched a general audience spinoff podcast called the *Broken Brain Podcast*, focused exclusively on topics related to mental and brain health.

52.     To protect its material, Hyman Digital obtained copyrights for five episodes of the podcast: Episode 33 featuring David Perlmutter (Reg. No. SR 998-867); Episode 145 featuring Dr. Dale Bredesen (Reg. No. SR 998-864); Episode 9 featuring Max Lugavere (Reg. No. SR 998-943); Episode 70 featuring Chris Kresser (Reg. No. SR 998-865); and Episode 48 featuring Dr. Izabella Wentz (Reg. No. SR 998-863). True and correct copies of these copyrights are attached hereto as Exhibit 3.

53.     Nearly one million subscribers to *The Broken Brain* docuseries email list were also added to the *Broken Brain Podcast* listserv. That email list supported the success of the podcast, helping it quickly develop a large and loyal audience.

54.     As part of his work for Hyman Digital, Mr. Purohit was responsible for developing and producing both Hyman Digital's *The Broken Brain* docuseries and the *Broken Brain Podcast*, as well as their associated marketing, advertising, and sales strategies. Specifically, Mr. Purohit

was responsible for (1) ensuring that the emails and social media contacts gathered in connection with the *Broken Brain Podcast* were integrated into marketing and promotional efforts across the Hyman Digital universe to maximize the significant value of those assets. Mr. Purohit was also responsible for (2) obtaining and engaging sponsors and advertisers for the *Broken Brain Podcast*.

55. Approximately once a week, Hyman Digital would release a new episode of the *Broken Brain Podcast* and then email every address on the email list promoting the podcast and his social media channels. This email list and the associated weekly email announcements represented valuable advertising real estate. Indeed, Hyman Digital's other newsletters charge premium prices for third-party product features and advertisements. Mr. Purohit, however, failed to secure sponsorships for this product, resulting in substantial lost revenue for Hyman Digital.

56. Rather than using Dr. Hyman's existing social media platforms, or creating "Broken Brain" titled channels, Mr. Purohit instead unilaterally decided to use his personal social media channels, which had previously been used solely for personal content (and never for podcasts, commercial content, or even health-related content), to post episodes of Hyman Digital's the *Broken Brain Podcast*. In addition, he set up separate podcast distribution channels, including with Acast (a third-party podcast hosting and monetization company), under his personal name to publish Hyman Digital's *Broken Brain Podcast* and other Hyman Digital content.[2]

57. As a result of this misappropriation, Mr. Purohit's personal social media channels accumulated subscribers that should have accrued to Hyman Digital. Unsurprisingly, the subscriber base of Mr. Purohit's personal social media channels grew exponentially after he began using them to post and house Hyman Digital's podcast episodes and related content, leveraging Dr. Hyman's name and reputation. For example, his YouTube channel grew from approximately

---

[2] Neither Hyman Digital nor Dr. Hyman was aware that Mr. Purohit used his personal social media channels to release company content until after Mr. Purohit resigned.

16,000 to over 500,000 subscribers, and his Instagram account grew from approximately 6,000 to 140,000 followers, providing Mr. Purohit with significant opportunities for monetization.

***Mr. Purohit's Exploitation of Hyman Digital's Assets for Personal Gain***

58.    In the three years after its creation, Mr. Purohit helped produce some 200 episodes of the *Broken Brain Podcast*, a considerable undertaking that took up a large portion of Mr. Purohit's time as CEO of Hyman Digital.

59.    In April 2021, without first discussing it with Dr. Hyman, let alone receiving his consent, Mr. Purohit changed the name of the *Broken Brain Podcast* to the *Dhru Purohit Podcast*. The podcast's content, general format, sponsors, and subscribers remained the same, but Mr. Purohit changed its logo and other branding to emphasize his own name and brand instead of Hyman Digital's.

60.    A copy of the *Broken Brain Podcast* logo as it appeared before April 2021 is below:



61.    A copy of the *Dhru Purohit Podcast* logo as it appeared after April 2021 is below:



62.     Through his words and actions, Mr. Purohit consistently represented that the changes were nothing more than a rebranding of the same podcast.

63.     For example, Mr. Purohit started the podcast's first post-rebrand episode by saying "[h]i everyone, Dhru Purohit here, host of this podcast, which is now called the *Dhru Purohit Podcast*, formerly known as the *Broken Brain Podcast*. New title, same great content." Dhru Purohit, *My Step-by-Step Sleep Protocol*, YouTube (March 31, 2021), https://www.youtube.com/watch?v=xxOZYeMwm18. Similarly, in a May 22, 2023, email, Mr. Purohit described the podcast as "previously called Broken Brain, now called the Dhru Purohit Podcast."

64.     In addition, numerous contemporaneous company emails, on which Mr. Purohit was copied, all confirm that this was merely a rebranding. For example, in a March 30, 2021, email, a Hyman Digital employee wrote: "Hi Dhru, [w]e connected with each of your sponsors to update their custom URLs and discount codes to reflect the rebrand of Broken Brain." Mr. Purohit confirmed this understanding, responding "[o]n it!"

65.     Furthermore, until Mr. Purohit filed his Complaint in this action, he also hosted all

prior episodes of the *Broken Brain Podcast* alongside the *Dhru Purohit Podcast* on the same Acast podcast platform and social media channels, further evidencing that the *Dhru Purohit Podcast* was merely a continuation of the *Broken Brain Podcast* under a different name—not a new product.

66.     Despite the rebranding, both Hyman Digital and Mr. Purohit treated the *Dhru Purohit Podcast* as Hyman Digital property. Mr. Purohit worked to develop and grow the podcast during normal business hours, using Hyman Digital employees and resources. Hyman Digital engaged a YouTube marketer, paid for by Hyman Digital, to implement a YouTube strategy to grow subscribers. The podcast remained featured on Hyman Digital's website and other media properties, and Mr. Purohit continued utilizing the email list and social media accounts originally developed for the *Broken Brain Podcast* to promote the *Dhru Purohit Podcast*. All advertisers and sponsors for the *Dhru Purohit Podcast* were contracted under Hyman Digital's masthead by Hyman Digital employees, invoiced by Hyman Digital, and remitted payment to Hyman Digital.

67.     A sample sponsorship agreement for the *Dhru Purohit Podcast* is excerpted below:

---

### THE DHRU PUROHIT SPONSORSHIP ADVERTISEMENT AGREEMENT

This Agreement (the "Agreement") is entered into by and between HYMAN DIGITAL, LLC, having its legal business address at 55 Pittsfield Road, Suite 9, Lenox, Massachusetts 01240 (hereinafter "Hyman Digital") and SPONSOR (hereinafter "SPONSOR"), having its legal business address in Nevada, both of whom agree to be bound by this Agreement dated _____. Hyman Digital and SPONSOR shall hereinafter be referred to collectively as the "Parties".

Whereas, Hyman Digital is a company that produces the Dhru Purohit Podcast with Dhru Purohit as the host. The podcast is well known with a large listener base and has over ten million downloads to date. Hyman Digital seeks reputable advertising sponsors for each of its podcast episodes.

Whereas, SPONSOR is a US company SPONSOR seeks to advertise its company, SPONSOR, or product via the The Dhru Purohit Podcast podcast to gain additional sales, clientele or recognition.

NOW, THEREFORE, in consideration of the mutual covenants and promises made by the parties hereto, Hyman Digital and SPONSOR covenant and agree as follows:

---

68.     All advertising and sponsorship revenue for the *Dhru Purohit Podcast* flowed

through Hyman Digital and is reflected in the company's financial statements.

69.     Thereafter, Mr. Purohit began devoting a significant amount of company time and resources to Hyman Digital's the *Dhru Purohit Podcast*, even adding a second weekly episode— which required the dedication of a full-time team, including a new assistant and a new videographer, both employed by Hyman Digital.

70.     In fact, based on a detailed review of Mr. Purohit's Hyman Digital calendar from 2022 and 2023, he devoted the large majority of his time to the *Dhru Purohit Podcast* and *Try This*, a newsletter Mr. Purohit developed at Hyman Digital (discussed *infra*), at the expense of his other duties as CEO. Other than a weekly Hyman Digital team meeting, Mr. Purohit's calendar for this period evidences only a few meetings unrelated to the *Dhru Purohit Podcast* and *Try This*.

71.     While the *Broken Brain Podcast* focused exclusively on brain and mental health topics, Mr. Purohit eventually pivoted the *Dhru Purohit Podcast* to focus on general health topics, using a nearly identical format, content, business model, guests, and sponsors as Hyman Digital's other primary podcast, *The Doctor's Farmacy*, a general health podcast which was and is hosted by Dr. Hyman. In essence, unless *Dhru Purohit Podcast* were also a Hyman Digital product, it would create a situation where Hyman Digital's products competed with each other for subscribers and views.

72.     In the interest of (1) focusing his schedule on major health initiatives and leadership, patient care, and professional education; (2) avoiding a public image issue with multiple name changes; (3) retaining an active and growing marketing list; and (4) maintaining cordial relations with his CEO (who clearly courted public recognition and attention), Dr. Hyman acquiesced to Mr. Purohit's questionable rebranding strategy upon discovering it after the fact, and did not then demand that Mr. Purohit revert the *Dhru Purohit Podcast* back to the *Broken Brain*

*Podcast* or something more identifiable with Hyman Digital. Based on Mr. Purohit's conduct and representations, Dr. Hyman justifiably believed that the *Dhru Purohit Podcast* was being operated as a Hyman Digital asset, that its advertising revenue, goodwill, and opportunities for growth and cross-promotion would flow to the company, and that Mr. Purohit was growing and expanding Hyman Digital's footprint and messaging.

73. In a similar spirit, Dr. Hyman accepted Mr. Purohit's subsequent March 2022 request to receive 95% of Hyman Digital's profit from the *Dhru Purohit Podcast*, which was paid to Mr. Purohit exclusively as an incentive and discretionary commission. Pursuant to this arrangement, Hyman Digital (which received all the podcast's revenue in the first instance, because it owned it) remitted a quarterly payment to Mr. Purohit for these proceeds, again in the spirit of keeping Mr. Purohit motivated as Hyman Digital's CEO. This arrangement, as confirmed through communications between Dr. Hyman and Mr. Purohit at the time, was intended as a bonus for the effort required to build the podcast, and to incentivize the continued growth and development of the *Dhru Purohit Podcast* as a Hyman Digital asset.

74. Hyman Digital and Mr. Purohit also developed an electronic newsletter, released through a newly curated email list, called *Try This,* that—were it not a Hyman Digital asset— would have directly competed with Hyman Digital's other products (*Mark's Picks*) on Hyman Digital's own platform. Mr. Purohit worked to develop *Try This* during his tenure as CEO, and its content was entirely within the scope of Hyman's Digital's business. Indeed, Hyman Digital hired an employee whose job duties included, among other things, "writing *Try This*" content and who used the Hyman Digital website, email lists and podcast advertising spots to promote *Try This*. Although Mr. now Purohit seeks to characterize this as a personal hire, the job offer was made on behalf of Hyman Digital, and the employee's acceptance letter clearly indicates that she was to be

a Hyman Digital employee. She was paid by Hyman Digital and her email signature represented that she was a Hyman Digital employee.

75. Like the *Dhru Purohit Podcast,* all *Try This* sponsors and advertisers were negotiated and secured by Hyman Digital employees, were contracted under Hyman Digital's name, and all sponsorship and advertising revenue was paid to Hyman Digital. Every aspect of this arrangement was reflected contemporaneously in Hyman Digital's books and records, and all costs and revenue associated with *Try This* were recorded in Hyman Digital's financial statements. And just like Hyman Digital's the *Dhru Purohit Podcast, Try This* was promoted by and posted on Hyman Digital's website.

76. An example of one of *Try This*'s sponsorship agreements is below:



77. The quality of the *Try This* website, scientific articles, and promotional work, compared with Mr. Purohit's other work product for Hyman Digital, makes clear that Mr. Purohit devoted significant time and effort towards *Try This*, while simultaneously neglecting other Hyman Digital assets such as *The Doctor's Farmacy* podcast, and other newsletters, which suffered material declines in web traffic, social media engagement, and podcast downloads—all of which are material indicators of the company's health.

78.     Beginning with the *Broken Brain Podcast* and continuing with the *Dhru Purohit Podcast*, Mr. Purohit began using the associated *The Broken Brain* newsletter and email list (highly valuable advertising real estate worth more than $50,000 per post) and the company's website (including over 500 pages on the website used by Hyman Digital, drhyman.com) to amplify and direct traffic to Mr. Purohit's personal social media channels and the two products he developed during his employment as CEO: the *Try This* newsletter and the *Dhru Purohit Podcast*.

79.     The emails promoting Mr. Purohit's personal social media channels, *Try This*, and the *Dhru Purohit Podcast* were sent out under Dr. Hyman's name—not Mr. Purohit's—effectively using Dr. Hyman's reputation and prestige to enhance Mr. Purohit's brand. This was acceptable at the time because Hyman Digital believed these emails were meant to further *the company's* business, not Mr. Purohit's personal brand. An example email blast from "Mark Hyman MD" promoting the *Dhru Purohit Podcast* is below:

**From:** "Mark Hyman MD" <admin@brokenbrain.com>
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** How to Get Your Energy Back TODAY with Dr. Amy Shah
**Date:** Thu, 01 Apr 2021 20:50:17 +0000
**Importance:** Normal

---

**How to Get Your Energy Back TODAY with Dr. Amy Shah**

I'm excited to announce our first episode of *The Dhru Purohit Podcast*! It's the same content and format of *The Broken Brain Podcast* you love, just with a fresh name and look.

This week, Dhru and his guest take a look at the many moving pieces to good health. Stress, diet, the microbiome, hormones, and the immune system are just some of the parts that impact how well we feel day-to-day. Unfortunately, it can be easy for one or more of these areas to get thrown off-kilter, leading to fatigue and burnout.

80.     Compounding matters, Hyman Digital has learned that Mr. Purohit actively

encouraged multiple sponsors of Hyman Digital's *The Doctor's Farmacy* podcast to re-direct substantial advertising dollars away from *The Doctor's Farmacy* and toward the *Dhru Purohit Podcast*—the only Hyman Digital media property with (1) Mr. Purohit's name and branding on it, (2) that Mr. Purohit hosts, and (3) with a majority of the revenue expressly allocated for Mr. Purohit in a discretionary commission.

### Mr. Purohit's Misconduct as CEO and Abrupt Resignation

81.     During his employment as CEO, Mr. Purohit's management style was at times unprofessional and inappropriate. During performance reviews, employees repeatedly mentioned his absence from the company's operations and expressed confusion about the reporting structure. Mr. Purohit was prone to intemperate outbursts, and on numerous occasions he publicly disrespected and disparaged Dr. Hyman, including to employees and potential investors, and during important discussions with potential partners that represented significant opportunities for the company.

82.     A particularly egregious example involved Function Health, Inc. ("Function Health"), a company with which Hyman Digital maintains a key business relationship. Function Health specializes in facilitating affordable access to hundreds of important laboratory tests and providing easy-to-decipher results alongside targeted, richly detailed, evidence-based artificial-intelligence-driven insights from the world's top doctors. In exchange for vesting shares in Function Health, a point on which Mr. Purohit insisted, Mr. Purohit and Hyman Digital's Chief Content Officer Kaya Purohit (his sister) were incentivized to provide marketing services through Hyman Digital to help Function Health cultivate its audience and brand within the health and wellness space.

83.     Throughout the relationship with Function Health, Mr. Purohit was hostile and

uncooperative with the Function Health team; intemperate, insulting, and rude toward Dr. Hyman (i.e., his Manager) in front of Function Health CEO and staff; and highly uncooperative with respect to Dr. Hyman's clear directives, to the detriment of Hyman Digital's reputation and relationship with Function Health. In yet further evidence of his self-dealing, Mr. Purohit requested that equity in Function Health go directly to him personally, as opposed to Hyman Digital (the entity actually supporting Function Health), to the detriment of Hyman Digital, and Dr. Hyman, overall.

84. Mr. Purohit's outrageous behavior with respect to Function Health came to a head during a September 12, 2023, conference call with the Function Health team. On the call, Mr. Purohit refused to proceed with a quick Instagram post from Dr. Hyman regarding a particular type of laboratory test, loudly reproached Dr. Hyman for "overruling him" and "swooping and pooping," calling him "clueless," being "too flexible" with "these types of minimal-overhead, large-yield efforts," and issued Dr. Hyman an ultimatum that he would quit if Dr. Hyman agreed to the post.

85. Following the call, Dr. Hyman sought to speak with Mr. Purohit one-on-one to better understand his aggressive and uncooperative behavior towards him and Function Health. In response to this effort to fashion a more productive path forward, Mr. Purohit explicitly stated to Dr. Hyman, "I quit," and launched into an expletive-laden diatribe about how he needed to build his own brand and focus on efforts that wholly benefitted Mr. Purohit and members of his family. His resignation took effect November 30, 2023.[3]

**Mr. Purohit's Wrongful Post-Resignation Conduct**

86. Upon resigning, Mr. Purohit absconded with the *Dhru Purohit Podcast* and *Try*

---

[3] The family members that Mr. Purohit hired to work for Hyman Digital resigned shortly before his own resignation took effect.

*This*. He continues to host a back catalogue of Hyman Digital podcasts and newsletters on his personal social media channels and continues to create new content for the *Dhru Purohit Podcast* and *Try This*, despite both being Hyman Digital's property. Worse, Mr. Purohit continues to sell advertising for the *Dhru Purohit Podcast*'s back catalogue, profiting to the tune of hundreds of thousands of dollars off content that was created during his employment with Hyman Digital. And until filing this claim, he continued to host and receive revenue from the *Broken Brain Podcast*, only removing this valuable catalogue in July 2024 without permission or notice, leaving Hyman Digital without any distribution channel for this asset, and putting Hyman Digital's sponsorship contracts at risk for this catalogue.

87. Mr. Purohit has not paid Hyman Digital any portion of the advertising or other revenue he has received in connection with these products since resigning from Hyman Digital.

88. More brazenly, Mr. Purohit has used these products to promote the work of individuals and companies that directly compete with Hyman Digital and its partners, including Peter Attia and Lifeforce.

89. This behavior was intentional. For example, four days after Mr. Purohit filed his Complaint, he featured Dr. Layne Norton on *The Dhru Purohit Show*. Dr. Norton has repeatedly criticized, often in vulgar terms, both Dr. Hyman and his medical advice, calling him "an absolute joke," "a disgrace to [his] profession," "fake news," and someone who spreads "[f]ear mongering bullshit." *See, e.g.*, Layne Norton, PhD (@BioLayne), X (Mar. 17, 2019), https://x.com/BioLayne/status/1107452258558578688. As a result, Hyman Digital is faced with the humiliating situation of having its own property being used to denigrate and disparage the company brand, resulting in diminished value and lost revenue.

90. Moreover, in a clear attempt to copy Hyman Digital's business model, and in

violation of his contractual non-solicitation obligations, Mr. Purohit solicited multiple former employees of Hyman Digital as well as several company partners and sponsors to switch their allegiances from Hyman Digital to the *Dhru Purohit Podcast* and *Try This*.

91.     Mr. Purohit has, by his actions, effectively acknowledged that his operation of the *Dhru Purohit Podcast* constitutes an unlawful use of Hyman Digital's property and trademarks. In response to a cease-and-desist letter from Hyman Digital in November 2023, Mr. Purohit changed the name of the *Dhru Purohit Podcast* to *The Dhru Purohit Show*. But merely changing the name of the podcast does not cure his unlawful conduct, because he continues to use the same format and intellectual property, and many of the same partners, sponsors, and advertisers.

92.     A copy of the *Dhru Purohit Podcast* logo as it appeared before April 30, 2024, is below:



93.     A copy of *The Dhru Purohit Show* logo as it appeared after April 30, 2024, is below:



94.     In addition, shortly after commencing this litigation, Mr. Purohit removed all episodes and content of the *Broken Brain Podcast* from his channels—content he at least implicitly acknowledges belongs to Hyman Digital but that he has not returned or paid for.

***Hyman Digital Discovers Additional Improprieties***

95.     Following Mr. Purohit's departure, Hyman Digital carried out an organizational audit, and for the first time began to uncover the depth and extent of Mr. Purohit's malfeasance, neglect of duties, and improper self-dealing. Although Hyman Digital's investigation is ongoing, it currently estimates that Mr. Purohit's misconduct has caused the company damages totaling more than $30 million.

96.     In addition to using Hyman Digital's resources and brand to develop his own competing products, Mr. Purohit failed to fulfill many of his basic responsibilities as Hyman Digital's CEO. During his entire tenure, Mr. Purohit never prepared an organizational strategy, or team project plans, despite being obligated to do so under the ESA and Hyman Digital's Operating Agreement. *See* Exhibit 1, § 1C; Operating Agreement § 7.6(b) (a true and correct copy of which is attached hereto as Exhibit 4). This was not an oversight. Dr. Hyman repeatedly requested this

information in the period leading up to Mr. Purohit's resignation.

97. In fact, Hyman Digital obtained its first ever operational strategy and business plan only after Brianna Bella-Hyman became the interim-CEO, and later CEO, of Hyman Digital after Mr. Purohit resigned.

98. Mr. Purohit displayed a similar neglect with Hyman Digital's other core areas. For example, he failed to develop, design, or manage an online marketplace for the company's website, resulting in an untapped potential revenue source. He also failed to update Hyman Digital's website or newsletters despite requests to do so, making the website appear dated and behind the industry's developing trends and best practices—in stark contrast to Mr. Purohit's personal website. And Mr. Purohit failed to incorporate any industry best practices, or even baseline operational strategies, including employing paid media, customer retargeting, or any search engine optimization strategy, costing Hyman Digital a significant amount in potential revenue.

99. In addition, Mr. Purohit inexplicably retired previously successful product lines—including the 10 Day Detox (a highly successful digital course based on Dr. Hyman's #1 New York Times' Bestselling book, *The 10 Day Detox*) and the Hyman+ membership (a community subscription service that produced a significant amount of recurring annual revenue)—without replacing them with comparable revenue drivers, or even a strategic plan for addressing the loss in revenue or the diminished diversification of Hyman Digital's revenue streams. Instead, Mr. Purohit displayed a preference for "automatic recurring revenue" from podcasts and newsletters, even though that left the company vulnerable to sponsors pulling advertising contracts due to declining engagement metrics. And indeed, during the period leading up to Mr. Purohit's departure, the steady decline in Hyman Digital's social media and podcast engagement and chart performance that occurred on his watch resulted in regular complaints from sponsors, putting one

of Hyman Digital's primary revenue streams at risk.

100.     Under Mr. Purohit's management, the email address list developed in connection with *The Broken Brain* docuseries, containing over one million addresses, fell to nearly half its size, equating to lost revenue of nearly $50,000 per week since 2018 (totaling nearly $16 million). Of course, the email list, along with the unpaid promotion he gained by hosting and promoting these channels on the Hyman Digital website, served Mr. Purohit's purposes, growing his own YouTube subscriber base from approximately 16,000 followers to over 500,000 and his Instagram following from approximately 6,000 to 140,000 during the years since he started using Hyman Digital assets to promote himself.

101.     As a direct result of Mr. Purohit's constant self-promotion to subscribers who originally signed up for content from Dr. Hyman, the engagement on the email list is so low that it is now almost worthless, compared to Dr. Hyman's other email lists. Mr. Purohit, in an attempt to build himself up, essentially destroyed one of Hyman Digital's most valuable assets, an obvious breach of his fiduciary duties to the company. At the time of his departure, the *Dhru Purohit Podcast* email distribution list had decreased in size from the original one million address list inherited from *The Broken Brain* documentary, to only 468,000, with a 34.8% open rate and a 0.6% click through rate. In contrast, Hyman Digital's *Longevity Journal* newsletter, which has been redesigned and overhauled since Mr. Purohit's resignation, now has an open rate of 70% and a click through rate of 15.3% (among the highest in the industry).

102.     Mr. Purohit was responsible for managing Hyman Digital's finances, including bank statements, credit card statements, transfers, and authorization of pending wires. Working with Hyman Digital's controller, Mr. Purohit meticulously tracked every penny in and out of the accounts, including any intercompany transfers that took place. Mr. Purohit used this level of

knowledge and control over Hyman Digital's finances to his personal advantage.

103. For example, and as evidenced by the statements for Mr. Purohit's company credit card, Mr. Purohit regularly charged personal expenses to his Hyman Digital credit card throughout the entire duration of his employment, including groceries, clothing, travel, event tickets, restaurants, and Mr. Purohit's personal coaching sessions.

104. These expenses were not a requirement of Mr. Purohit's position as Hyman Digital's CEO. The ESA provides that Mr. Purohit may only be reimbursed for "reasonably and necessary expenses incurred by you in connection with the performance services for the Company[.]" ESA, Schedule A.

105. Conversely, Dr. Hyman's almost non-existent use of the Hyman Digital credit card—except for obvious corporate expenses like the rental of a podcast studio—provides a sharp contrast that reveals Mr. Purohit's serious misappropriation of company resources for personal gain, consistent with Mr. Purohit's modus operandi.

106. Hyman Digital has discovered that both Mr. Purohit and his sister, Kaya Purohit (discussed *infra*), deleted all emails in their company inboxes shortly before their departure, in a transparent attempt to conceal his malfeasance and a clear display of consciousness of guilt. Fortunately for the company, it was able to access "sent" emails, allowing Hyman Digital visibility into their deliberate misuse of company time and assets.

107. In addition to Mr. Purohit's dereliction of his duties to the company, he also overemphasized his medical knowledge and expertise and his role at Dr. Hyman's other companies, without Dr. Hyman's or those companies' knowledge or consent. For example, Mr. Purohit claimed on his personal website to have been the CEO of Dr. Hyman's medical practice, The Ultra Wellness Center, a claim that is flatly refuted by multiple employees at

The Ultra Wellness Center, including the clinic's Practice Manager and all the practicing physicians. Indeed, Mr. Purohit's lack of medical credentials would have made his appointment as CEO of a medical practice both irresponsible and untenable. But it is yet another example of Mr. Purohit attempting to hold himself out as a medical expert, when he clearly is not.

***The Hiring and Subsequent Departure of Mr. Purohit's Friends and Family Members***

108.     During his time as CEO, Mr. Purohit repeatedly hired members of his family and other friends to work for Hyman Digital in high profile positions, without regard to their qualifications and often to the detriment of the company.

109.     One such family member was Kaya Purohit, Mr. Purohit's sister, who Mr. Purohit hired to serve as the Chief Content Officer ("CCO") of Hyman Digital. In this position, Ms. Purohit was paid $300,000 per year, nearly three times the average compensation for other Hyman Digital employees, in a clear attempt to unjustly enrich himself and his family at the expense of the Company as she devoted company time to develop and create competing products, along with Mr. Purohit's wife.

110.     While employed in a C-suite role with Hyman Digital, and on company time, Ms. Kaya Purohit developed and grew her own startup brand, Beeya Wellness ("Beeya"), a supplement company she co-founded with Mr. Purohit's wife. The business model and playbook for Beeya were heavily based on one of Dr. Hyman's already-existing products—Farmacy LLC—and was designed to be its direct competitor.

111.     With Mr. Purohit's full knowledge, Ms. Purohit created Beeya using company time and resources, again to the benefit of Mr. Purohit through his wife and sister.[4] This included using Hyman Digital employees during work hours to arrange for Beeya's promotion on Hyman

_____

[4] It should be noted that neither Mr. Purohit's wife nor his sister are doctors.

Digital's Mark's Picks newsletter, as evidenced by, among other things, the following email:



112.    Mr. Purohit was complicit in Beeya's promotion. For example, in a *Try This* Newsletter in November 2022, Mr. Purohit included the following promotion of Beeya: "If you or anyone you know is interested in hormonal support through menopause and post menopause, check this out. My wife and sister are the founders of a Beeya, a company all about supporting women's health and hormones." Rather than focusing on securing new partnerships that would increase the revenue flow for Hyman Digital, Mr. Purohit wasted valuable newsletter real estate to promote familial ventures to the detriment of the Hyman Digital brand.

113.    Mr. Purohit also authorized Ms. Purohit to start a podcast called *Hormone Happy Hour* independently of Hyman Digital, which competed with Hyman Digital's primary podcast, *The Doctor's Farmacy*. In Mr. Purohit's company emails, he shamelessly volunteered to promote Ms. Purohit's products without any compensation to Hyman Digital. This included reaching out to prior guests on the *Dhru Purohit Podcast*, through his Hyman Digital email, and asking the

guests whether they would appear on Ms. Purohit's podcast.

114. Despite the problematic nature of having the CCO of one of Dr. Hyman's companies creating a competing start-up company and product during her tenure, Dr. Hyman did not object to Ms. Purohit continuing to develop Beeya because he thought Beeya was a small side project that would bolster Ms. Purohit's morale and keep her motivated to produce successful content for Hyman Digital. Unfortunately, it had the opposite effect.

115. Ms. Purohit spent the majority of her time as CCO developing Beeya and *Hormone Happy Hour*. She simultaneously neglected her duties at Hyman Digital, routinely posting content Dr. Hyman recorded years ago (sometimes up to 10 years ago)–all under Mr. Purohit's watch. This recycled and potentially outdated content was a poor substitute for new content, but Ms. Purohit often eschewed the development of new content, such as for *Health Bites*, a special *Doctor's Farmacy* weekly episode. Focusing on creating new and innovative Hyman Digital content would have taken more time to develop and limited her availability to focus on her personal project, Beeya.

116. Overall, during her time as CCO, and under Mr. Purohit's watch, Hyman Digital's social media and podcast following declined, while Beeya's grew considerably, aided in part by blogs published by Hyman Digital products promoting Beeya and its products (at Mr. Purohit and Ms. Purohit's direction).

117. When Mr. Purohit resigned, Ms. Purohit followed him in leaving the company.

118. Throughout her entire tenure at Hyman Digital, the sum total of her work was being overpaid to produce recycled content that was embarrassing to the company and lost social media and podcast followers, all the while paying her to produce products that now compete with Hyman Digital.

119.    Mr. Purohit knew that Ms. Purohit did not intend to fulfill the functions of her role as CCO when he hired her. The purpose of Mr. Purohit's hiring of his sister was to enrich a member of his family and use Hyman Digital's resources to facilitate Ms. Purohit's development of a competing brand–one that would benefit him directly through his wife.

120.    As CEO, Mr. Purohit had direct supervisory control over Ms. Purohit and could have directed her to cease the development of Beeya and *Hormone Happy Hour* on company time, to instead focus on the growth of Hyman Digital's content strategy. Instead, he did the opposite.

121.    Mr. Purohit provided valuable promotional real estate to Beeya for free on Hyman Digital's platforms for years, including on Dr. Hyman's website. Hyman Digital received no compensation from promoting Beeya, nor any equity share in the business—an arrangement that only existed for companies affiliated with Mr. Purohit's friends and family. Put differently, Mr. Purohit gave Beeya hundreds of thousands of dollars in free support, placing his and his family's interests over that of Hyman Digital, and resulting in significant lost revenue and opportunities, and a decline in Hyman Digital's following.

122.    Mr. Purohit's decision to hire Ms. Purohit was just one example of his nepotistic hiring practices. He also hired Harshal Purohit, another sister, to work on content management, despite her background as an attorney with no relevant medical or social media content experience. He also hired his personal trainer as Chief Operating Officer ("COO"), despite that he was woefully unqualified for the position and exhibited signs of erratic behavior and instability (which ultimately led to his firing as COO because of his poor performance and threats to endanger Hyman Digital and its employees, requiring a restraining order). Mr. Purohit also hired several other family members including his father, aunt, and brother-in-law to work in various capacities within Hyman Digital.

*Hyman Digital's Efforts to Repair the Harm Caused by Mr. Purohit*

123.     Mr. Purohit's neglect left Hyman Digital in a precarious position upon Mr. Purohit's abrupt resignation, leaving the company's new leadership and team members to create from scratch the effective business strategy that Mr. Purohit never created, and to recover from his abrupt and unprofessional exit from a company with globally declining metrics due to his self-dealing actions and his neglect of the company.

124.     As a result of Mr. Purohit's failures, after his resignation, Hyman Digital was forced to heavily invest in upgrading its infrastructure, including an entire rebranding of company assets, upgrading all of its newsletters, launching a new website, and establishing (for the first time) marketing best practices—such as employing search engine optimization, paid marketing, and customer targeting practices—all undertaken at a significant cost to the company.

125.     In stark contrast to Mr. Purohit's failures, Dr. Hyman and Hyman Digital's new CEO Ms. Bella-Hyman have dedicated significant time and resources into improving the company. Among other things, they have developed a top-down business plan and a product plan for relaunching highly profitable courses and curriculum that Mr. Purohit inexplicably allowed to expire. They created a project roadmap, including critical paths and dependency frameworks. They have also implemented operational and organizational documentation practices, training, and onboarding manuals, and have undertaken a robust market, peer, and competitive analysis. As a result of their companywide performance audit, they have redesigned and overhauled existing channels such as *Longevity Journal, Mark's Picks,* and *Mark's Kitchen* as well as *The Doctor's Farmacy* newsletter; implemented key performance indicators; rebuilt the company website and updated broken back-links; implemented measures to optimize e-commerce performance, including retargeting, keyword tagging, search keywords, and paid media; outsourced *The*

*Doctor's Farmacy* podcast to a professional podcast producer (the same producer responsible for the Joe Rogan sale to Spotify and launching other top podcasts for Spotify); built a professional podcast studio; and undertaken a thorough evaluation of customer and user profiles to allow for accurate persona mapping. In addition to fixing the many neglected channels, Hyman Digital has recently hired additional employees, including a President and CCO and a Director of Medical Research, demonstrating Hyman Digital's serious investment in the continued success and growth of its products.

126.    In addition, under Dr. Hyman and Ms. Bella-Hyman's leadership, Hyman Digital has undergone a complete redesign and overhaul of the three sponsored newsletters, resulting in primary revenue-driving metrics such as click-through rates increasing by more than 600%. Because of the substantial performance increase following Mr. Purohit's departure, Hyman Digital has been able to triple its sponsorship fee. This obvious opportunity should have been seized by Mr. Purohit, had he been paying even the slightest attention to the company and not grossly neglecting his duties as CEO.

127.    Hyman Digital has also undertaken efforts to improve corporate governance and financial controls following Mr. Purohit's departure, to prevent further misappropriation, self-dealing, and waste of the type that characterized Mr. Purohit's tenure as CEO. Indeed, because of the need to address the disarray and lack of organizational and strategic plans that were revealed following Mr. Purohit's departure, Hyman Digital has not made any distributions to either of its members—Dr. Hyman or Mr. Purohit—since the second quarter of 2023. The company has instead invested in the company (as discussed above) and investigated and pursued Mr. Purohit's numerous and brazen breaches of the ESA, most notably absconding with the *Dhru Purohit Podcast* and *Try This*. Pursuant to Section 6.F of the ESA, Hyman Digital is entitled to recover

these associated attorneys' and other fees.

***Newly Discovered Information Regarding Mr. Purohit's Employment History***

128.     While investigating the depth and extent of Mr. Purohit's wrongdoing at Hyman Digital since his departure, Hyman Digital learned that Mr. Purohit had engaged in similar misconduct with The Clean Program, the company where he served as CEO immediately prior to Hyman Digital.

129.     Upon information and belief, The Clean Program was started by Dr. Alejandro Junger, Mr. Purohit, and another individual. The company was an extension of Dr. Junger's medical practice and his New York Times bestselling book CLEAN. The Clean Program's structure was similar to Hyman Digital's—Dr. Junger would serve as the face and medical advisor of the company, while Mr. Purohit would run the company's operations on a day-to-day basis.

130.     Primarily based on Dr. Junger's book, as well as several key television appearances and celebrity endorsements, The Clean Program began to take off and more employees were required other than the three initial founders. Just as Mr. Purohit falsely claimed to be CEO of Dr. Hyman's medical practice, The Ultra Wellness Center, he also falsely claimed to be the co-author of the CLEAN book.

131.     Like with Hyman Digital, Mr. Purohit hired family members to fill several senior open positions at The Clean Program, including Kaya Purohit, despite that none had the requisite qualifications for the positions for which they were hired. All of his family members were paid generous salaries.

132.     Initially, Dr. Junger and Mr. Purohit were based in New York City. Eventually, Dr. Junger moved to Los Angeles. Soon after, Mr. Purohit and his family members followed. Mr. Purohit then had the company rent apartments in Los Angeles for his family to move into.

133.     Dr. Junger's and the other partner's relationship with Mr. Purohit eventually soured. Employees at The Clean Program complained of Mr. Purohit's dictatorial management style. Dr. Junger had issues with Mr. Purohit inserting himself in meetings and consultations with some of Dr. Junger's high profile and celebrity patients with whom Mr. Purohit afterwards attempted to develop relationships. This created friction between Dr. Junger and the patients, who did not want to interact with Mr. Purohit, as he would purport to give them advice despite not being a doctor or medical professional. Mr. Purohit also began questioning Dr. Junger's medical advice in front of patients, despite having no medical education whatsoever, which created issues with Dr. Junger's medical practice.

134.     Unbeknownst to Dr. Hyman, Mr. Purohit left The Clean Program in 2015 in disgrace. When Mr. Purohit informed Dr. Junger and Mr. Britton of his resignation, he suggested a phased-out departure followed by a buyout of his ownership share. At this point, Dr. Junger and Mr. Britton were eager for Mr. Purohit to depart and decided it was better if he resigned immediately.

135.     Mr. Purohit reacted unfavorably to the request to resign immediately. He falsely claimed that he had built The Clean Program entirely on his own. He refused to leave the company and retained counsel to contest the request. He convinced many of The Clean Program's employees to resign, promising them new positions at Hyman Digital (of which Dr. Hyman and Hyman Digital were unaware). He also made derogatory comments about Dr. Junger to some of his patients, who thereafter stopped seeing Dr. Junger. Later, cameras at The Clean Program's office captured Mr. Purohit entering the office to steal company property, which forced the company's owners to change the locks for the office. He was immediately cut out of all company access and accounts after sending an aggressive and defamatory email at 4 a.m., threatening his

partners. After this outburst and his repeated patterns of behavior that attempted to aggrandize himself, Mr. Junger and the other partner concluded he was emotionally unstable, aggressive, and threatening to the company.

136. Shockingly, Mr. Purohit called Dr. Junger's ex-wife—with whom Dr. Junger was in the midst of divorce proceedings—and accused Dr. Junger of fabricated sexual misconduct claims, which put a severe strain on the divorce proceedings and cost him millions of dollars. When Dr. Junger confronted Mr. Purohit about calling his ex-wife, Mr. Purohit denied doing so, even though his ex-wife confirmed that Mr. Purohit had, in fact, called her to make the false allegations.

137. Mr. Purohit's ignominious history with The Clean Program further evidences a clear pattern of grifting off actual medical experts, unwarranted self-promotion and aggrandizement, made-up allegations of sexual harassment, corporate theft, nepotism at the expense of the company, and aggressive and emotionally unstable tendencies.

### FIRST CAUSE OF ACTION
#### (Breach of Contract Under New York Law)

138. Hyman Digital re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

139. Mr. Purohit was at all relevant times a party to the ESA.

140. Mr. Purohit repeatedly breached the ESA by failing to faithfully, diligently, and in Hyman Digital's best interests, manage the company's digital business strategy, product development, marketing, and sales, at times in contravention of clear directives from Dr. Hyman, his Manager.

141. Mr. Purohit also breached the ESA by using his position as CEO to divert Hyman Digital's resources and proprietary information away from initiating and growing Hyman Digital's

business relationships and towards the development of the *Dhru Purohit Podcast* and *Try This*, products that Mr. Purohit planned to misappropriate from the Company following his resignation.

142.     Mr. Purohit repeatedly breached the ESA by misappropriating the *Dhru Purohit Podcast* (now *The Dhru Purohit Show*) and *Try This* after his resignation, despite the ESA clearly stating that such content was the rightful property of Hyman Digital.

143.     Mr. Purohit repeatedly breached the non-competition provision of the ESA by promoting the work of individuals and companies in direct competition with Hyman Digital, including his family's ventures and his own ventures, and promoting others such as Peter Attia and Lifeforce.

144.     Mr. Purohit breached the non-solicitation provision of the ESA by soliciting several company employees, partners, and sponsors to switch their allegiances from Hyman Digital's other products to the *Dhru Purohit Podcast* and *Try This*, products he later absconded with.

145.     Hyman Digital has been damaged as a direct result of Mr. Purohit's breaches of the ESA, including, among other things, revenue opportunities lost by Mr. Purohit's laser focused development of products he intended to, and did, abscond with after his resignation, lost business relationships with advertisers and sponsors, and resources Hyman Digital was forced to expend to uncover Mr. Purohit's repeated breaches. In addition, Hyman Digital is entitled to disgorgement of all compensation, in any form, paid to Mr. Purohit during his period of disloyalty.

**SECOND CAUSE OF ACTION**
**(Breach of Fiduciary Duty Under Massachusetts Law)**

146.     Hyman Digital re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

147.     As CEO of Hyman Digital, Mr. Purohit owed Hyman Digital a fiduciary duty to faithfully execute his duties in Hyman Digital's best interests. Additionally, Mr. Purohit owed a

fiduciary duty, and continues to owe such duty, as a member of Hyman Digital.

148.     Mr. Purohit breached and continues to breach his fiduciary duty of loyalty to Hyman Digital by, among other things, misappropriating company property, including the *Dhru Purohit Podcast* (now *The Dhru Purohit Show*) and *Try This*, for his own personal gain.

149.     The *Dhru Purohit Podcast* and *Try This*, including its content, marks, and copyrights, are clearly company property under the ESA. As such, Mr. Purohit is prohibited from utilizing or directing the *Dhru Purohit Podcast* and *Try This* in a manner meant to benefit him to the detriment of Hyman Digital's interest in the property.

150.     By absconding with the *Dhru Purohit Podcast* and *Try This*, Mr. Purohit violated his fiduciary duty to Hyman Digital, including his duty of loyalty to Hyman Digital as one of its members.

151.     Alternatively, to the extent Mr. Purohit claims that the *Dhru Purohit Podcast* (now *The Dhru Purohit Show*) and *Try This* are his personal property, he breached his fiduciary duty to Hyman Digital during his time as the company's CEO by using his business time, and Hyman Digital staff, resources, and opportunities, for personal and competitive projects rather than for the company's best interests.

152.     Mr. Purohit diverted Hyman Digital's resources to develop and grow the *Dhru Purohit Podcast*. These actions were initially to the benefit of Hyman Digital, until Mr. Purohit absconded with the product, despite it being company property.

153.     He also improperly used Hyman Digital's resources and brand to develop and grow *Try This*, a product that competed with Hyman Digital's other products. These actions were for Mr. Purohit's own financial benefit, as evidenced by his later theft of the product after his resignation, despite being the legal property of Hyman Digital.

154. Mr. Purohit also usurped corporate opportunities belonging to Hyman Digital, including by (1) providing highly valuable advertising real estate for no cost to promote the *Dhru Purohit Podcast*, *Try This*, Beeya, and other companies associated with Mr. Purohit's friends and family; and (2) since his resignation as CEO, selling advertising spots and sponsorships on episodes of the *Dhru Purohit Podcast* (now the *Dhru Purohit Show*) and the *Broken Brain Podcast*, including their back catalogues, without Hyman Digital's permission and without remitting any advertising or sponsorship revenue to Hyman Digital.

155. Mr. Purohit breached his fiduciary duty as CEO by hiring members of his family to Hyman Digital positions, overpaying them, and permitting them to eschew their employee responsibilities in favor of using Hyman Digital's resources to grow the *Dhru Purohit Podcast*, *Try This*, and their own startup products such as Beeya. These actions were for Mr. Purohit's own benefit and the benefit of his family members.

156. Hyman Digital has been damaged as a direct result of Mr. Purohit's breaches of his fiduciary duty, including revenue opportunities lost by Mr. Purohit's focus on development of products he and his family intended to abscond with after his resignation, lost business relationships with advertisers and sponsors, and resources Hyman Digital was forced to expend to uncover Mr. Purohit's repeated fiduciary breaches. In addition, Hyman Digital is entitled to disgorgement of all compensation, in any form, paid to Mr. Purohit during his period of disloyalty.

### THIRD CAUSE OF ACTION
**(Misappropriation of Corporate Opportunity Under Massachusetts Law)**

157. Hyman Digital re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

158. Mr. Purohit is a minority member of Hyman Digital, and, until November 30, 2023, served as its CEO.

159.    As CEO and as a member of Hyman Digital, Mr. Purohit owed, and continues to owe, Hyman Digital a fiduciary duty of loyalty, including a duty not to usurp, divert, or otherwise misappropriate its corporate opportunities for his own benefit.

160.    In addition, the ESA also expressly prohibited Mr. Purohit from "tak[ing] advantage of any business opportunity which might be of interest to the Company." ESA § 7.A.4.

161.    Hyman Digital's podcasts, newsletters, email lists, and website constitute highly valuable advertising real estate. Hyman Digital charges third parties premium rates for promotion and ad placement on these assets, and these advertising, sponsorship, and promotional placements constitute corporate opportunities.

162.    Rather than selling advertisements, sponsorships, or promotional space to third parties, Mr. Purohit instead used that space to promote—for free—his own social media channels and companies, products, and services associated with his family members and friends.

163.    By doing so, Mr. Purohit usurped, diverted, or misappropriated Hyman Digital's corporate opportunities.

164.    Mr. Purohit did not offer these opportunities to Hyman Digital, disclose these self-interested transactions to Hyman Digital in advance, or otherwise obtain Hyman Digital's permission to provide advertising, sponsorship, and promotional space at no cost to his friends and family, or to use it for his own self-promotion.

165.    In addition, after resigning as CEO, Mr. Purohit continued to sell advertising and sponsorship against new episodes of the *Dhru Purohit Podcast* and the back catalogues of the *Dhru Purohit Podcast* and the *Broken Brain Podcast*. Since resigning as CEO, all revenue from those sales has gone solely to Mr. Purohit, and he has not remitted any advertising or sponsorship revenue to Hyman Digital.

166.     Under the clear terms of the ESA and governing law, the *Dhru Purohit Podcast* and the *Broken Brain Podcast* belong to Hyman Digital and are Hyman Digital assets. Advertising and sponsorship placements on these assets, including on their back catalogues, constitute Hyman Digital corporate opportunities.

167.     By selling advertising and sponsorship against these Hyman Digital assets, Mr. Purohit usurped, diverted, or misappropriated Hyman Digital's corporate opportunities.

168.     Mr. Purohit did not offer these opportunities to Hyman Digital, disclose these self-dealing transactions to Hyman Digital in advance, or otherwise obtain Hyman Digital's permission to sell advertising and sponsorships against Hyman Digital's assets.

169.     Hyman Digital has suffered damages as a result of Mr. Purohit's misappropriation of its corporate opportunities in the form of lost revenue and damage to Hyman Digital's reputation, credibility, and goodwill.

170.     As a result of these action, Hyman Digital is entitled to a constructive trust over the profits Mr. Purohit has obtained based on this misappropriation, and Mr. Purohit should be required to disgorge any profits he received from his misappropriation of Hyman Digital's corporate opportunities.

**FOURTH CAUSE OF ACTION**
**(Misappropriation of Trade Secrets Under M.G.L. c.93, § 42, *et seq.*)**

171.     Hyman Digital re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

172.     Hyman Digital's email address list acquired from the release of *The Broken Brain* docuseries was a trade secret legally owned by Hyman Digital.

173.     Mr. Purohit used *The Broken Brain* email list to promote and grow his personal brand, as well as to promote and develop a subscriber list for *Try This*.

174. Mr. Purohit developed *Try This* by using and leveraging Hyman Digital's business strategy, such as by including the precise type of content that Dr. Hyman requested Mr. Purohit include in Hyman Digital's and Dr. Hyman's other newsletters.

175. Hyman Digital's business, marketing, and content strategies for its newsletters are trade secrets legally owned by Hyman Digital.

176. Mr. Purohit developed the *Dhru Purohit Podcast* (itself a rebranding of Hyman Digital's *Broken Brain Podcast*) while working for Hyman Digital, and in the course of his duties as CEO.

177. Hyman Digital's business, marketing, and content strategy for the *Dhru Purohit Podcast* was a trade secret legally owned by Hyman Digital.

178. Hyman Digital took reasonable steps to protect its trade secrets. Among other things, Hyman Digital imposed broad confidentiality obligations on Mr. Purohit in the ESA as conditions of employment, including an obligation to safeguard Hyman Digital's "Propriety Information," which specifically includes "customer, supplier and/or vendor information, lists or subscription lists" and "sales or marketing information, plans or strategies." ESA § 5.

179. Hyman Digital's trade secrets have not been placed in the public domain or rendered readily accessible, either prior to or as a result of their misappropriation by Mr. Purohit.

180. Following his departure from Hyman Digital, Mr. Purohit continued to develop, promote, and monetize the *Dhru Purohit Podcast*. In response to a cease-and-desist letter, he changed the name to *The Dhru Purohit Show*, but did not otherwise change its content or format. Mr. Purohit continues to produce episodes of the so-called *Dhru Purohit Show* to this day.

181. Mr. Purohit knew or had reason to know that the email list and Hyman Digital's business, marketing, and content strategies for its newsletters and podcasts were acquired under

circumstances giving rise to a duty to limit its use to instances expressly or impliedly consented to by Hyman Digital. In the ESA, Mr. Purohit agreed to safeguard the Company's "Proprietary Information," which includes, among other things, "customer, supplier, and/or vendor information, lists or subscription lists" and "sales or marketing information, plans or strategies," Exhibit 1 § 5.D, and not to "use or seek to use it for [Mr. Purohit's] own financial benefit or for the financial benefit of any person or entity other than the Company," *id.* § 5.F.

182.    Nevertheless, Mr. Purohit misappropriated Hyman Digital's email list and business strategies by using them to develop and grow the *Dhru Purohit Podcast* (now *The Dhru Purohit Show*) and *Try This* without Hyman Digital's express or implied consent.

183.    Mr. Purohit continues to misappropriate these trade secrets, despite resigning from his position as CEO of Hyman Digital, by using Hyman Digital's content and business strategy to grow the *Dhru Purohit Podcast* (now *The Dhru Purohit Show*) and *Try This* without Hyman Digital's express or implied consent.

184.    Hyman Digital has suffered damages from Mr. Purohit's misappropriation in the form of lost revenue, which should have flowed to the company from the proper use of Hyman Digital's email list and business strategies, as well as from the *Dhru Purohit Podcast* (now *The Dhru Purohit Show*) and *Try This* (products Mr. Purohit absconded with).

185.    Mr. Purohit's misappropriation was willful and malicious, entitling Hyman Digital to injunctive relief, double damages, and attorneys' fees pursuant to M.G.L. c.93, §§ 42A-C.

### FIFTH CAUSE OF ACTION
### (Conversion Under Massachusetts Law)

186.    Hyman Digital re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

187.    Mr. Purohit was responsible for managing Hyman Digital's finances, including

bank statements, credit card statements, transfers, and authorization of pending wires.

188.    During his employment, Mr. Purohit retained a company credit card, which was to be used solely for Hyman Digital expenses.

189.    Mr. Purohit regularly charged personal expenses to his company credit card, including groceries, clothing, travel, event tickets, restaurants, and Mr. Purohit's personal coaching sessions.

190.    Mr. Purohit later approved such expenses himself for payment by Hyman Digital.

191.    These expenses were not company expenses. As a result, Mr. Purohit had no right to incur such expenses on the company's credit card nor to approve such expenses for payment by Hyman Digital.

192.    Mr. Purohit never reimbursed Hyman Digital for the amounts he charged on the company's credit card for personal (i.e., non-company) expenses.

193.    The money paid by Hyman Digital to cover Mr. Purohit's personal expenses on the company's credit card constituted Hyman Digital's property.

194.    By incurring personal charges on the company's credit card, and approving the company's payment of such expenses, Mr. Purohit unlawfully converted Hyman Digital's personal property for his personal use and enjoyment.

195.    Hyman Digital has been damaged by Mr. Purohit's conversion in the amount that Mr. Purohit charged on the company's credit card for his personal (i.e., non-company) expenses.

### SIXTH CAUSE OF ACTION
**(Unjust Enrichment Under Massachusetts Law)**

196.    Hyman Digital re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

197.     Hyman Digital conferred on Mr. Purohit, as CEO of Hyman Digital, the power to use Hyman Digital's resources and brand to develop and grow the *Dhru Purohit Podcast* and *Try This*.

198.     Mr. Purohit knew or appreciated that his operation and control of the *Dhru Purohit Podcast* and *Try This* was a benefit conferred on him as CEO of Hyman Digital for the purpose of enriching Hyman Digital.

199.     Mr. Purohit absconded with the *Dhru Purohit Podcast* and *Try This*, products legally owned by Hyman Digital, after his resignation.

200.     Mr. Purohit has and continues to monetize the *Dhru Purohit Podcast* (now *The Dhru Purohit Show*) and *Try This* through ad revenue and social media engagement.

201.     His retention and continued monetization of these products thus constitutes an unjust retention of Hyman Digital's property, which Mr. Purohit was only permitted to operate and control in his role as CEO of Hyman Digital, a role he no longer possesses.

<u>**SEVENTH CAUSE OF ACTION**</u>
**(Declaratory Judgment)**

202.     Hyman Digital re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

203.     The ESA clearly states that all of Mr. Purohit's work for Hyman Digital constituted work-made-for-hire owned by Hyman Digital, and that Mr. Purohit transferred all rights, title, and interest in and for such work to Hyman Digital even if such work is not recognized work-made-for-hire. ESA § 5.E.

204.     In addition, the *Dhru Purohit Podcast* and *Try This* constitute "work made for hire" pursuant to 17 U.S.C. §§ 101 and 201(b), and accordingly belong to Hyman Digital, Mr. Purohit's employer.

205.     Mr. Purohit created the *Dhru Purohit Podcast* and *Try This* during his employment at Hyman Digital and within the scope of his duties as CEO of Hyman Digital.

206.     These products are thus the rightful property of Hyman Digital, with which Mr. Purohit has absconded since his resignation as CEO.

207.     Additionally, Mr. Purohit's own social media channels, which he used to post content related to the *Dhru Purohit Podcast*, became the property of Hyman Digital to the degree they were used to promote Hyman Digital products and obtain the financial proceeds thereof.

208.     Mr. Purohit refuses to recognize that the *Dhru Purohit Podcast* (now *The Dhru Purohit Show*), *Try This*, and his personal social media channels (with regard to the Hyman Digital content posted on them and the growth in the channels' followers directly attributable to the company) are the property of Hyman Digital.

209.     Thus, declaratory judgment in favor of Hyman Digital is appropriate under M.G.L. c. 231A, § 1, and 18 U.S.C. § 2201, to confirm that the property in dispute is fully owned by Hyman Digital under the clear terms of the ESA, as well as 17 U.S.C. §§ 101, 201(b).

## EIGHTH CAUSE OF ACTION
### (Copyright Infringement Under the Copyright Act)

210.     Hyman Digital re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

211.     Hyman Digital owns valid copyrights for five episodes of the *Broken Brain Podcast*, now called the *Dhru Purohit Podcast*. *See* Exhibit 3.

212.     Hyman Digital registered a copyright for Episode 33 featuring David Perlmutter on April 18, 2024 (Reg. No. SR 998-867).

213.     Hyman Digital registered a copyright for Episode 145 featuring Dr. Dale Bredesen on April 28, 2024 (Reg. No. SR 998-864)

214.    Hyman Digital registered a copyright for Episode 9 featuring Max Lugavere on April 28, 2024 (Reg. No. SR 998-943)

215.    Hyman Digital registered a copyright for Episode 70 featuring Chris Kresser on April 28, 2024 (Reg. No. SR 998-865)

216.    Hyman Digital registered a copyright for Episode 48 featuring Dr. Izabella Wentz on April 28, 2024 (Reg. No. SR 998-863).

217.    These copyrighted episodes were created solely by employees of Hyman Digital within the scope of their employment, including Mr. Purohit.

218.    As a result, and pursuant to the clear terms of the ESA, Mr. Purohit was on notice of the fact that Hyman Digital retained the exclusive right to reproduce, perform, and distribute for monetary gain the copyrighted works.

219.    Mr. Purohit absconded with and unlawfully copied Hyman Digital's copyrighted works and, until right before filing his Complaint, continued to host and offer for distribution such works on his social media channels, earning revenue. The copyrighted works were housed and offered for distribution in the exact same form as they were when Mr. Purohit worked for Hyman Digital, with no changes or deviations that would evidence some new creation by Mr. Purohit post-resignation.

220.    In addition to offering the works for public consumption in their exact copyrighted form, Mr. Purohit used such works to secure advertising and sponsorship revenue for the *Dhru Purohit Podcast*. In conjunction with the significant subscribers accumulated since Hyman Digital started using Mr. Purohit's social media channels to post its content, this strategy netted Mr. Purohit significant revenue.

221.    Since his resignation, Mr. Purohit has never paid Hyman Digital any portion of the

advertising or other revenue he has received from the copyrighted material, nor any social media content on his channels, despite the revenue accruing to Mr. Purohit because of his misappropriation of Hyman Digital's property and back catalogue.

222. As a result, Hyman Digital has been damaged by Mr. Purohit's copyright infringement, including lost sponsorship and advertising revenue and the cost of uncovering the depths and extent of Mr. Purohit's infringement of Hyman Digital's works.

## NINTH CAUSE OF ACTION
### (Trademark Infringement Under the Lanham Act)

223. Hyman Digital re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

### *Infringement of the Broken Brain Podcast*

224. In addition to the *Broken Brain Podcast* being Hyman Digital's property, "Broken Brain" is a registered trademark of Hyman Digital that prohibits others from using the phrase to market health, nutrition, and vitality products. This includes obvious derivative uses of the phrase, such as the *Broken Brain Podcast*, which differs in no meaningful way from "Broken Brain," especially when used in the health and wellness space.

225. Hyman Digital registered "Broken Brain" as a trademark on August 21, 2018, as a Class 9 good and service (i.e., "[d]igital media, namely, pre-recorded DVDs, downloadable audio and video recordings, and CDs featuring and promoting health, nutrition, and vitality"). *See* Exhibit 2.

226. Hyman Digital registered "Broken Brain" as a trademark on August 21, 2018, as a Class 16 good and service (i.e., "[p]rinted publications and materials, namely books, written articles, pamphlets, handouts, worksheets, transcripts and newsletters related to health, nutrition and vitality"). *See* Exhibit 2.

227.     Mr. Purohit continued to promote and offer for public consumption episodes of the *Broken Brain Podcast* via his personal social media channels in their original name and form (i.e., as episodes of the *Broken Brain Podcast*).

228.     In every relevant aspect, the public has likely confused the *Broken Brain Podcast* as belonging to Mr. Purohit, instead of Hyman Digital.

229.     The name and logos of the *Broken Brain Podcast* were exactly the same after his resignation as they were before Mr. Purohit absconded with the product and up until Mr. Purohit removed all episodes of the *Broken Brain Podcast* in July 2024 (in connection with filing his Complaint).

230.     The format of the *Broken Brain Podcast*'s episodes was exactly the same as it was before Mr. Purohit absconded with them. In every relevant manner, there was no substantive difference between the *Broken Brain Podcast* before Mr. Purohit absconded with it and after he absconded with it. They were the exact same goods.

231.     The channels by which the public accessed the *Broken Brain Podcast* were exactly the same as they were before Mr. Purohit absconded with the product. Until Mr. Purohit removed the *Broken Brain* episodes from the distribution and social media channels in July 2024, the public accessed episodes of the *Broken Brain Podcast* through Mr. Purohit's social media channels (just as they did when Mr. Purohit worked at Hyman Digital).

232.     The manner by which Mr. Purohit advertised the *Broken Brain Podcast* after his resignation mirrored how he advertised it during his employment with Hyman Digital.

233.     The prospective purchasers of the content in the *Broken Brain Podcast* were the same as they were before Mr. Purohit absconded with the product. For example, until July 2024 (when Mr. Purohit removed all episodes of the *Broken Brain Podcast*), Mr. Purohit continued to

offer episodes of the *Broken Brain Podcast* through his social media channels for his social media subscribers—the exact same publication method and subscriber base as when he worked at Hyman Digital. The mirroring nature of the prospective purchasers is what makes Mr. Purohit's infringement of the mark all the more damaging.

234.    Mr. Purohit absconded with the *Broken Brain Podcast*—the rightful property and mark of Hyman Digital—for the sole purpose of continuing to operate it as if it remained a Hyman Digital product. He did this to maximize his own financial benefit to the detriment of Hyman Digital.

235.    Hyman Digital's mark is very strong. It is an inherently distinctive mark, requiring no additional evidence to qualify for protection under the Lanham Act. Regardless, to the degree the mark is merely descriptive, it has acquired secondary meaning in the market, the primary significance of which is to identify the source of the product rather than the product itself. The fact that the *Broken Brain Podcast* mark and product was the exact same as it was before Mr. Purohit's resignation means that there can be no mistaking that the public viewed this product as originating from Hyman Digital.

236.    Despite knowing that the *Broken Brain Podcast* remains Hyman Digital's property, Mr. Purohit chose to misappropriate Hyman Digital's mark and property for his own financial gain, in direct violation of the Lanham Act.

237.    Hyman Digital has been damaged by Mr. Purohit's trademark infringement under the Lanham Act, including lost sponsorship and advertising revenue, consumer confusion, and the cost of uncovering the depths and extent of Mr. Purohit's infringement of Hyman Digital's mark.

### Infringement of the Dhru Purohit Podcast (now The Dhru Purohit Show) and Try This

238.    In addition to the *Dhru Purohit Podcast* and *Try This* being Hyman Digital's

property, they are also protectible marks, the use of which denotes the source of the underlying works as Hyman Digital products (which they are).

239. By absconding with the *Dhru Purohit Podcast* and *Try This*, and continuing to operate them as his own products, Mr. Purohit infringed on Hyman Digital's marks by promoting Hyman Digital's marks as his own.

240. In every relevant aspect, the public has likely confused and will likely continue to confuse the *Dhru Purohit Podcast* and *Try This* as belonging to Mr. Purohit, instead of Hyman Digital.

241. The name and logos of the *Dhru Purohit Podcast* and *Try This* were exactly the same after his resignation as they were before Mr. Purohit absconded with the products.

242. The format of the *Dhru Purohit Podcast*'s episodes, and the *Try This* newsletter, are exactly the same as they were before Mr. Purohit absconded with them. In every relevant manner, there are no substantive differences between the *Dhru Purohit Podcast* and *Try This* before Mr. Purohit absconded with them and after he absconded with him. They are the exact same goods.

243. The channels by which the public accessed the *Dhru Purohit Podcast* and *Try This* are the exact same as they were before Mr. Purohit absconded with them. The public accessed episodes of the *Dhru Purohit Podcast* through Mr. Purohit's social media channels (just as they did when Mr. Purohit worked at Hyman Digital). The public accessed new releases of *Try This* through email (just as they did when Mr. Purohit worked at Hyman Digital).

244. The manner by which Mr. Purohit advertised the *Dhru Purohit Podcast* and *Try This* mirrors how he advertised them during his employment with Hyman Digital. In fact, during his tenure at Hyman Digital, Mr. Purohit directed sponsors and advertisers away from other Hyman

Digital products to the *Dhru Purohit Podcast* and *Try This*, evidencing that, had he not done so, those sponsor and advertising dollars would have flowed to other Hyman Digital products. And after resigning from Hyman Digital, he convinced Hyman Digital sponsors and advertisers to switch from Hyman Digital to the *Dhru Purohit Podcast* and *Try This*. For all intents and purposes, the parties' advertising universe was the same.

245. The prospective purchasers of the content in the *Dhru Purohit Podcast* and *Try This* are the same as they were before Mr. Purohit absconded with them. For example, Mr. Purohit continues to post content for the *Dhru Purohit Podcast* to his social media channels for his social media subscribers—the exact same publication method and subscriber base as when he worked at Hyman Digital. The mirroring nature of the prospective purchasers of the products was what made Mr. Purohit's infringement of the marks all the more damaging.

246. Mr. Purohit absconded with the *Dhru Purohit Podcast* and *Try This*—the rightful property and marks of Hyman Digital—for the sole purpose of continuing to operate them as if they remained Hyman Digital products. He did this to maximize his own financial benefit to the detriment of Hyman Digital.

247. Hyman Digital's marks are very strong. They are inherently distinctive marks, requiring no additional evidence to qualify for protection under the Lanham Act. This is what makes Mr. Purohit's infringement more intentional. Had he simply resigned from the company and started a podcast and newsletter with a completely different name, logo, and method of publication, there is no way in which he would have the sizable subscriber base (which is, after all, Hyman Digital's subscriber base) as he has now, not to mention the advertising and sponsorship revenue.

248. Regardless, to the degree the marks are merely descriptive, they have acquired

secondary meaning in the market, the primary significance of which is to identify the source of the product rather than the product itself. The fact that the *Dhru Purohit Podcast* and *Try This* marks and products were the exact same as they were before Mr. Purohit's resignation means that there can be no mistaking that the public viewed these products as originating from Hyman Digital.

249. Despite knowing that the *Dhru Purohit Podcast* and *Try This* remained Hyman Digital's property, Mr. Purohit chose to misappropriate Hyman Digital's marks and property for his own financial gain, in direct violation of the Lanham Act.

250. After receiving a cease-and-desist letter from Hyman Digital, and in a tacit acknowledgement of his wrongdoing, Mr. Purohit changed the name of the *Dhru Purohit Podcast* to *The Dhru Purohit Show*.

251. Mr. Purohit's violation of the Lanham Act continues with the *Dhru Purohit Show*. Despite the slight name change, Mr. Purohit continues to use the same format, intellectual property, revenue streams, newsletter, and email lists that he did when it was the *Dhru Purohit Podcast* (both before and after his resignation). The public is thus just as likely to be confused that *The Dhru Purohit Show* denotes the source of a Hyman Digital product as it was when it was called the *Dhru Purohit Podcast*.

252. Mr. Purohit continues to operate *Try This* just as he did before he absconded with the product. Despite the cease-and-desist letter, Mr. Purohit attempted no effort whatsoever to change the newsletter's name. This makes his continued violation of the mark all the more blatant.

253. Hyman Digital has been damaged by Mr. Purohit's trademark infringement under the Lanham Act, including lost sponsorship and advertising revenue, consumer confusion, and the cost of uncovering the depths and extent of Mr. Purohit's infringement of Hyman Digital's marks.

### TENTH CAUSE OF ACTION
**(Trademark Infringement Under Massachusetts Common Law)**

254.    Hyman Digital re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

***Infringement of the Broken Brain Podcast***

255.    In addition to the *Broken Brain Podcast* being Hyman Digital's property, "Broken Brain" is a registered trademark of Hyman Digital that prohibits others from using the phrase to market health, nutrition, and vitality products. This includes obvious derivative uses of the phrase, such as the *Broken Brain Podcast*, which differs in no meaningful way from "Broken Brain," especially when used in the health and wellness space.

256.    Hyman Digital registered "Broken Brain" as a trademark on August 21, 2018, as a Class 9 good and service (i.e., "[d]igital media, namely, pre-recorded DVDs, downloadable audio and video recordings, and CDs featuring and promoting health, nutrition, and vitality"). *See* Exhibit 2.

257.    Hyman Digital registered "Broken Brain" as a trademark on August 21, 2018, as a Class 16 good and service (i.e., "[p]rinted publications and materials, namely books, written articles, pamphlets, handouts, worksheets, transcripts and newsletters related to health, nutrition and vitality"). *See* Exhibit 2.

258.    Until he filed his Complaint in July 2024, Mr. Purohit continued to promote and offer for public consumption episodes of the *Broken Brain Podcast* via his personal social media channels in their original name and form (i.e., as episodes of the *Broken Brain Podcast*).

259.    In every relevant aspect, the public has likely confused the *Broken Brain Podcast* as belonging to Mr. Purohit, instead of Hyman Digital.

260.    The name and logos of the *Broken Brain Podcast* were exactly the same after his resignation as they were before Mr. Purohit absconded with the product.

261. The format of the *Broken Brain Podcast*'s episodes was exactly the same as it was before Mr. Purohit absconded with them. In every relevant manner, there was no substantive difference between the *Broken Brain Podcast* before Mr. Purohit absconded with it and after he absconded with it. They were the exact same goods.

262. The channels by which the public accessed the *Broken Brain Podcast* were exactly the same as they were before Mr. Purohit absconded with the product. The public accessed episodes of the *Broken Brain Podcast* through Mr. Purohit's social media channels (just as they did when Mr. Purohit worked at Hyman Digital).

263. The manner by which Mr. Purohit advertised the *Broken Brain Podcast* after his resignation mirrored how he advertised it during his employment with Hyman Digital.

264. The prospective purchasers of the content in the *Broken Brain Podcast* were the same as they were before Mr. Purohit absconded with the product. For example, until July 2024, Mr. Purohit continued to offer episodes of the *Broken Brain Podcast* via his social media channels for his social media subscribers—the exact same publication method and subscriber base as when he worked at Hyman Digital. The mirroring nature of the prospective purchasers is what makes Mr. Purohit's infringement of the mark all the more damaging.

265. Mr. Purohit absconded with the *Broken Brain Podcast*—the rightful property and mark of Hyman Digital—for the sole purpose of continuing to operate it as if it remained a Hyman Digital product. He did this to maximize his own financial benefit to the detriment of Hyman Digital.

266. Hyman Digital's mark is very strong. It is an inherently distinctive mark, requiring no additional evidence to qualify for protection under Massachusetts common law. Regardless, to the degree the mark is merely descriptive, it has acquired secondary meaning in the market, the

primary significance of which is to identify the source of the product rather than the product itself. The fact that the *Broken Brain Podcast* mark and product was the exact same as it was before Mr. Purohit's resignation means that there can be no mistaking that the public viewed this product as originating from Hyman Digital.

267. Despite knowing that the *Broken Brain Podcast* remains Hyman Digital's property, Mr. Purohit chose to misappropriate Hyman Digital's mark and property for his own financial gain, in direct violation of Massachusetts common law.

268. Hyman Digital has been damaged Mr. Purohit's trademark infringement under Massachusetts common law, including lost sponsorship and advertising revenue, consumer confusion, and the cost of uncovering the depths and extent of Mr. Purohit's infringement of Hyman Digital's mark.

**Infringement of the Dhru Purohit Podcast (now The Dhru Purohit Show) and Try This**

269. In addition to the *Dhru Purohit Podcast* and *Try This* being Hyman Digital's property, they are also protectible marks, the use of which denotes the source of the underlying works as Hyman Digital products (which they are).

270. By absconding with the *Dhru Purohit Podcast* and *Try This*, and continuing to operate them as his own products, Mr. Purohit infringed on Hyman Digital's marks by promoting Hyman Digital's marks as his own.

271. In every relevant aspect, public has likely confused and will likely continue to confuse the *Dhru Purohit Podcast* and *Try This* as belonging to Mr. Purohit, instead of Hyman Digital.

272. The name and logos of the *Dhru Purohit Podcast* and *Try This* were exactly the same after his resignation as they were before Mr. Purohit absconded with the products.

273. The format of the *Dhru Purohit Podcast*'s episodes, and the *Try This* newsletter, are exactly the same as they were before Mr. Purohit absconded with them. In every relevant manner, there are no substantive differences between the *Dhru Purohit Podcast* and *Try This* before Mr. Purohit absconded with them and after he absconded with him. They are the exact same goods.

274. The channels by which the public accessed the *Dhru Purohit Podcast* and *Try This* are the exact same as they were before Mr. Purohit absconded with them. The public accessed episodes of the *Dhru Purohit Podcast* through Mr. Purohit's social media channels (just as they did when Mr. Purohit worked at Hyman Digital). The public accessed new releases of *Try This* through email (just as they did when Mr. Purohit worked at Hyman Digital).

275. The manner by which Mr. Purohit advertised the *Dhru Purohit Podcast* and *Try This* mirrors how he advertised them during his employment with Hyman Digital. In fact, during his tenure at Hyman Digital, Mr. Purohit directed sponsors and advertisers away from other Hyman Digital products to the *Dhru Purohit Podcast* and *Try This*, evidencing that, had he not done so, those sponsor and advertising dollars would have flowed to other Hyman Digital products. And after resigning from Hyman Digital, he convinced Hyman Digital sponsors and advertisers to switch from Hyman Digital to the *Dhru Purohit Podcast* and *Try This*. For all intents and purposes, the parties' advertising universe was the same.

276. The prospective purchasers of the content in the *Dhru Purohit Podcast* and *Try This* are the same as they were before Mr. Purohit absconded with them. For example, Mr. Purohit continues to post content for the *Dhru Purohit Podcast* to his social media channels for his social media subscribers—the exact same publication method and subscriber base as when he worked at Hyman Digital. The mirroring nature of the prospective purchasers of the products was what made

Mr. Purohit's infringement of the marks all the more damaging.

277. Mr. Purohit absconded with the *Dhru Purohit Podcast* and *Try This*—the rightful property and marks of Hyman Digital—for the sole purpose of continuing to operate them as if they remained Hyman Digital products. He did this to maximize his own financial benefit to the detriment of Hyman Digital.

278. Hyman Digital's marks are very strong. Both are inherently distinctive marks, requiring no additional evidence to qualify for protection under Massachusetts common law. This is what makes Mr. Purohit's infringement more intentional. Had he simply resigned from the company and started a podcast and newsletter with a completely different name, logo, and method of publication, there is no way in which he would have the sizable subscriber base (which is, after all, Hyman Digital's subscriber base) as he has now, not to mention the advertising and sponsorship revenue.

279. Regardless, to the degree the marks are merely descriptive, they have acquired secondary meaning in the market, the primary significance of which is to identify the source of the product rather than the product itself. The fact that the *Dhru Purohit Podcast* and *Try This* marks and products were the exact same as they were before Mr. Purohit's resignation means that there can be no mistaking that the public viewed these products as originating from Hyman Digital.

280. Despite knowing that the *Dhru Purohit Podcast* and *Try This* remained Hyman Digital's property, Mr. Purohit chose to misappropriate Hyman Digital's marks and property for his own financial gain, in direct violation of Massachusetts common law.

281. After receiving a cease-and-desist letter from Hyman Digital, and in a tacit acknowledgement of his wrongdoing, Mr. Purohit changed the name of the *Dhru Purohit Podcast* to *The Dhru Purohit Show*.

282.     Mr. Purohit's violation of Massachusetts common law continues with *The Dhru Purohit Show*. Despite the slight name change, Mr. Purohit continues to use the same format, intellectual property, revenue streams, newsletter, and email lists that he did when it was the *Dhru Purohit Podcast* (both before and after his resignation). The public is thus just as likely to be confused that *The Dhru Purohit Show* denotes the source of a Hyman Digital product as it was when it was called the *Dhru Purohit Podcast*.

283.     Mr. Purohit continues to operate *Try This* just as he did before he absconded with the product. Despite the cease-and-desist letter, Mr. Purohit attempted no effort whatsoever to change the newsletter's name. This makes his continued violation of the mark all the more blatant.

284.     Hyman Digital has been damaged by Mr. Purohit's trademark infringement under Massachusetts common law, including lost sponsorship and advertising revenue, consumer confusion, and the cost of uncovering the depths and extent of Mr. Purohit's infringement of Hyman Digital's marks.

## PRAYER FOR RELIEF

**WHEREFORE**, Hyman Digital requests that the Court enter judgment in its favor and against Mr. Purohit and provide the following relief:

A.      An award of damages against Mr. Purohit, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Hyman Digital for all monetary and/or economic damages;

B.      An award of damages against Mr. Purohit, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Hyman Digital for all non-monetary and/or compensatory damages;

C.      An award of damages for any and all other monetary and/or non-monetary losses

suffered by Hyman Digital, including, but not limited to, loss of income, reputational harm and harm to professional reputation, in an amount to be determined at trial, plus prejudgment interest;

D. Disgorgement of all compensation, in any form, paid to Mr. Purohit during his period of disloyalty.

E. An award of punitive damages, and any applicable penalties (including double damages pursuant to M.G.L. c.93, § 42B) and/or liquidated damages in an amount to be determined at trial;

F. Prejudgment interest on all amounts due;

G. An award of costs that Hyman Digital has incurred in this action, including, but not limited to, expert witness fees, as well as Hyman Digital's reasonable attorney's fees and costs to the fullest extent permitted by law;

H. A declaratory judgment that the *Dhru Purohit Podcast*, *The Dhru Purohit Show*, Try *This*, and Mr. Purohit's personal social media channels (insofar as they posted and continue to host Hyman Digital content) are the property of Hyman Digital;

I. Injunctive relief for the continued misappropriation and use of Hyman Digital's trade secrets and property (including the operation of *The Dhru Purohit Show* and *Try This*), as well as its copyrights and trademarks; and

J. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Hyman Digital hereby demands a trial by jury on all causes of action, claims, or issues in this action that are triable by a jury as a matter of right.

Dated: August 2, 2024

Respectfully submitted,

HYMAN DIGITAL, LLC and DR. MARK HYMAN

By their attorneys,

/s/ Alexander K. Parachini
Alexander K. Parachini (BBO #569567)
Karen Friedman Agnifilo (*pro hac vice forthcoming*)
David Russell (*pro hac vice forthcoming*)
E. DANYA PERRY PLLC
445 Park Avenue, 7th Floor
New York, NY 10022
aparachini@danyaperrylaw.com
kagnifilo@danyaperrylaw.com
drussell@danyaperrylaw.com
Tel: (212) 213-3070

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) and paper copies will be sent to those indicated as non-registered participants on August 2, 2024.

/s/ Alexander K. Parachini
Alexander K. Parachini
