# EXHIBIT 1

## **EXECUTIVE SERVICES AGREEMENT**

The parties to this Agreement dated as of July 1, 2015 are Hyman Digital, LLC (f/k/a Hyman Digital), a Massachusetts limited liability company with a principal place of business at 55 Pittsfield Road, Lenox Commons, Suite 9, Lenox, Massachusetts 01240 (hereinafter the "***Company***"), and Dhrumil Purohit, an individual residing at 2012 10th Street, Santa Monica, CA 90405 ("***you***" or "***your***").

**WHEREAS**, the Company wishes to engage you, and you wish to accept engagement with, the Company, on the terms and subject to the conditions set forth in this Agreement.

**IT IS THEREFORE** agreed as follows:

1. <u>Employment</u>.

    A. During the Term (defined below), you shall serve the Company as the Chief Executive Officer with such duties and responsibilities as may be assigned to you by the Company's Manager (the "***Manager***") and as are normally associated with a position of that nature, including, without limitation, developing and executing a business model, developing, producing and marketing new and existing products through an online marketplace, developing, designing and managing such online marketplace and the Company's website, initiating and growing new business relationships, growing a sales prospect database, and generating monthly and annual reports, budgets and financial plans. You will be responsible for the overall management of the Company's digital business strategy, product development, marketing and sales. You will report directly to the Company's Manager.

    B. You shall devote your best efforts and all of your business time to the performance of your duties under this Agreement and shall perform them faithfully, diligently, competently and in a manner consistent with the policies of the Company.

    C. You shall report to the Manager on a monthly basis at a minimum and more often as dictated by the significance of the decision making required. You shall timely submit to the Manager for approval monthly, or quarterly and/or annual financial plans as requested by the Manager, and shall faithfully adhere to such plans as are approved by the Manager, and you shall be responsible for preparing and submitting to the Members of the Company the Annual Budget and Strategic Plan (as defined in the Company's Operating Agreement dated September 9, 2015 (the "***Operating Agreement***")) for the remainder of this year as soon as practicable, and thereafter at least 90 days prior to the commencement of each subsequent fiscal year.

    D. You shall not engage in activities outside the scope of your employment if such activities would detract from or interfere with the fulfillment of your responsibilities or duties under this Agreement or require substantial time or services. You shall not serve as a director, manager, officer, consultant, advisor, or the equivalent of any such positions, of or to any company or other entity and shall not receive fees or other remuneration for work performed outside the scope of your employment without the prior consent of the Manager. This consent shall not be unreasonably withheld.

1

E.  You acknowledge and agree that you owe a fiduciary duty of loyalty, fidelity and allegiance to act at all times in the best interests of the Company and take no action that would intentionally injure the Company's business, its interests, or its reputation. It is agreed that any direct or indirect interest in, connection with, or benefit from any outside activities, particularly commercial activities, which interest might in any way adversely affect Company, or any of its affiliates, involves a possible conflict of interest. In keeping with your fiduciary duties to the Company, you agree that you shall not knowingly become involved in a conflict of interest with the Company, or its affiliates, or upon discovery thereof, allow such a conflict to continue. Moreover, you agree that you shall disclose to the Manager any facts that might involve a possible conflict of interest.

F.  You shall ensure that to the extent any books and records of the Company are not physically located at the Company's main office or located on a common server, you will provide physical copies of all such records and/or upload scanned copies of all such books and records to the Manager no less than monthly, or as otherwise directed by the Manager. Additionally, you shall update a complete list, to be kept at the Company's main office, of the following information:

1. all bank account and credit card account information, including passwords and login information; and
2. all domain names, URL's and related hosting accounts for all websites, including passwords and login information.

You will also provide the Company monthly with the following:

1. copies of and/or access to all marketing data and reports analyzing such data from any marketing persons/entities from each and every campaign or launch conducted by or on behalf of the Company;
2. original version of all executed contracts and agreements entered into on behalf of the Company;
3. drafts of any proposed contracts and agreement to be entered into on behalf of the company; and
4. copies of all source code, software or other computer programs useful or necessary to the Company.

2.  Term.  Your services under this Agreement shall commence on July 1, 2015 (the "*Effective Date*") and, subject to earlier termination pursuant to Section 8 hereof, shall terminate on March 31, 2017 (the "*Term*"). Thereafter, this Agreement shall automatically be renewed for one-year terms unless one of the parties provides written notice of termination to the other at least sixty (60) days prior to the expiration date of the then current term. For the purpose of this Agreement, the "Term" shall include all extensions and renewals.

3.  Compensation.  As full compensation for all services rendered by you to the Company under this Agreement, the Company shall pay to you the compensation set forth in Schedule A attached hereto. This schedule may be amended from time to time in writing by the agreement of the Manager and you.

2

4. <u>Disability or Death</u>.

　　A. If, as the result of any physical or mental disability (a "***Disability***"), you fail to or are unable to perform your duties for a period of sixty (60) consecutive days, the Company may, by notice to your subsequent thereto, terminate your employment under this Agreement as of the date of the notice without any further payment or the furnishing of any benefit by the Company under this Agreement (other than accrued and unpaid guaranteed payments and bonus (or as otherwise provided in Schedule A), and expenses and benefits which have accrued pursuant to any plan or by law, reduced by any Company-financed disability benefits).

　　B. The term of this Agreement shall terminate upon your death without any further payment or the furnishing of any benefit by the Company under this Agreement (other than accrued and unpaid guaranteed payments and bonus (or as otherwise provided in Schedule A), and expenses and benefits which have accrued pursuant to any plan or by law, reduced by any Company-financed disability benefits).

5. <u>Confidential Information</u>.

　　A. The parties acknowledge the highly competitive nature of the business in which the Company is or will be engaged, and that the Company owns and will own and use certain Proprietary Information (as defined below) in conjunction with its business that provides it with competitive advantages. You acknowledge that certain of said Proprietary Information has been and will be disclosed to you and/or will be developed or partially developed by you.

　　B. The Company wishes to secure and protect the secrecy and confidentiality of said Proprietary Information. You acknowledge that the secrecy and confidentiality of said Proprietary Information must be secured and protected for your own good as an employee as well as for the good of the Company and all other employees of the Company.

　　C. The parties further wish to provide for the ownership of, and other rights in, Proprietary Information which you have developed or helped to develop to date for the Company, and which you may develop or help to develop during your future employment by the Company, in accordance with the Company's policy with respect to the ownership of, and other rights in, Proprietary Information and the secrecy and confidentiality thereof.

　　D. For the purposes of this Agreement, "***Proprietary Information***" shall mean any and all of the following matter and information: trade secrets; ideas, discoveries or inventions; formulas, specifications, patterns, or techniques; computations, software and computer programs, devices, processes, or operation methods; products or equipment, or new product developments, plans or improvements; customer, supplier and/or vendor information, lists or subscription lists; financial information or statements; sales or marketing information, plans or strategies; personnel information or new personnel acquisition plans; details of contracts; pricing policies; projections; business acquisition plans; and other similar matter and information which the Company owns and will own and uses and will use, and/or which is useful in the Company's business. "Proprietary Information" shall not include such matter and information to the extent that it is publicly known or becomes known to the public without violation of the terms of this or any other Agreement, or is generally utilized by other persons or entities engaged in the same business or businesses as the Company. Any failure to mark or designate Proprietary

3

Information as "confidential" or "secret" shall not affect its status as Proprietary Information subject to the terms of this Agreement.

   E.  You hereby acknowledge that all duties performed by you to date and all duties performed by you hereunder constitute specifically ordered or commissioned work by the Company ("**_Work_**"); that the Work constitutes and shall constitute a work-made-for-hire as defined in the United States Copyright Act of 1976; that the Company is and shall be the author of said work-made-for-hire and the owner of all rights in and to the Work throughout the universe, in perpetuity and in all languages, for all now known or hereafter existing uses, media and forms, including, without limitation, the copyrights therein and thereto throughout the universe for the term of the copyrights and any renewals thereof; and that the Company shall have the right to make such changes therein and such uses thereof as it may deem necessary or desirable. Work shall include, but not be limited to, all material and information created by you in the course of your employment by the Company which is fixed in a tangible medium of expression, including, but not limited to, notes, drawings, memoranda, correspondence, documents, records, notebooks, flow charts, computer programs and source and object codes, regardless of the medium in which they are fixed. To the extent that the Work is not recognized as a work-made-for-hire, you hereby assign, transfer and convey to the Company, without reservation, all of your right, title and interest throughout the universe in perpetuity in the Work, including, without limitation, all rights of copyright and copyright renewal in said Work or any part thereof. You will take whatever steps and do whatever acts the Company requests at the Company's cost, including, but not limited to, placement of a proper copyright notice on such Works to secure or aid in securing copyright protection and will assist the Company or its nominees in filing applications to register claims of copyright in such works. You will not reproduce, distribute, display publicly, or perform publicly, alone or in combination with any data processing or network system, any Works of the Company without the written permission from the Company. The Company need not pay you any royalty, fee or other amount above and beyond your normal salary or wages for developing or helping to develop any Work and/or Proprietary Information, whether developed by you to date or in the future.

   F.  During the term and thereafter, you shall keep all Proprietary Information strictly confidential, and shall not, directly or indirectly, disclose or reveal it to any third parties or use or seek to use it for your own financial benefit or for the financial benefit of any person or entity other than the Company; <u>provided</u>, however, that you may use said Proprietary Information in the course of properly performing duties assigned to you by the Company.

   G.  All notes, data, reference materials, sketches, drawings, memoranda, records and other similar material which mentions or in any way relates to Proprietary Information or the Company's business shall belong exclusively to the Company and shall be used by you solely in the course of properly performing duties assigned to you by Company. Upon the Company's request or upon termination of this Agreement, you shall promptly turn over all such material in your possession, custody or control.

6.  <u>Non-Competition.</u>

   A.  During the term of this Agreement and for one (1) year thereafter, you agree not to engage in any Solicitation or Competition (as each term is defined below).

4

B.      *"Solicitation"* means (i) recruiting, soliciting or inducing any non-clerical employee, independent contractor or consultant of the Company to terminate his or her employment with, or otherwise reduce his or her relationship with, the Company, (ii) soliciting, hiring or assisting another person or entity to hire any non-clerical employee or consultant of the Company or any person who within six (6) months before was such a person, or (iii) soliciting or inducing any person or entity to terminate, or otherwise to cease, reduce, or diminish in any way its relationship with or prospective relationship with the Company. Notwithstanding the foregoing, this Section shall not be applicable to the following individuals: (1) Kaya Purohit, (2) Hama Shah, or (3) your parents, siblings and or your or their spouses.

C.      *"Competition"* means participating, whether directly or indirectly, in the design, development, management or operation of, or providing any consulting, employment or other services or assistance to, any Direct Competitor in any geographic area or market where the Company or any of its affiliated companies are conducting any business (other than *de minimis* business operations) as of the date of termination of the employment relationship or have conducted any business operations (other than *de minimis* business operations) during the previous twelve months. *"Direct Competitor"* means any businesses of an independent doctor of functional medicine that primarily promotes functional medicine on-line, or sells on-line products including, without limitation, printed, visual and/or audio materials relating to health and wellness, and vitamin and mineral supplements.

D.      It is expressly understood and agreed that both you and the Company consider the restrictions contained in this Article 6 to be reasonable and necessary to protect the proprietary information and/or goodwill of the Company and its affiliates. If a court holds that any restriction with regard to Competition or Solicitation is unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend over the maximum period of time, range of activities or geographic area to which it may be enforceable.

E.      The parties agree that failure to comply with this Section cannot be reasonably or adequately compensated in damages in an action at law and breach of those provisions will cause the Company irreparable harm. Therefore, in addition to the other remedies which may be available to it, in law or equity, the Company shall be entitled to injunctive relief without bond or other security with respect to the breach of this Section.

F.      If you breach any of the covenants set forth in the Agreement, you agree to pay all costs (including attorney's fees and the collection thereof) incurred by the Company in establishing that breach and in otherwise enforcing any of the covenants or provisions of this Agreement.

7.      Standards of Business Conduct

A.      Conflict of Interest.   The term "conflict of interest" describes any circumstance that could cast doubt on your ability to act with total objectivity with regard to Company's interests. You will avoid any action or involvement that could in any way compromise your actions on behalf of the Company. Activities which could raise a question of conflict of interest include, but are not limited to, the following:

5

        1.     To conduct business on behalf of the Company with a member of your family or a business organization with which you or a member of your family has a significant association, without first obtaining consent from the Manager.

        2.     To serve in an advisory, consultative, technical or managerial capacity for any non-affiliated business organization which does significant business with or is a competitor of Company, without first obtaining consent from the Manager.

        3.     To accept any remunerated position outside the Company involving time when you could reasonably be expected to be working for the Company (for example, during the normal business day), or which interferes with the proper performance of your duties.

        4.     To take advantage of any business opportunity which might be of interest to the Company.

Provided there has been no violation of Section 5 or Section 6 hereto, you will have 10 days after the Company sends you notice of a breach under this Section A to cure such breach to the satisfaction of the Manager.

        B.     <u>Legal Compliance</u>.  You will strictly comply with all laws and regulations that are or may be applicable to the Company's business, including avoiding any appearance that you or the Company's websites are offering medical advice or practicing medicine in any manner. Under no circumstances shall you make any unauthorized copy of computer software or of any other copyrighted product, or offer medical advice formally or informally to any third party.

        C.     <u>Fair Competition</u>.  Any information about competitors' activities that you seek shall be obtained solely in accordance with applicable laws. You will not disparage competitors' products and, while the Company strives to exceed customers' expectations, you shall make only those claims for the Company's products and businesses that can be fully substantiated.

        D.     <u>Use of Company's Assets</u>.  You will use the Company's facilities, equipment, supplies and name only for conducting the Company's business or for purposes properly authorized by the Manager.

        E.     <u>Entertainment, Gifts, Favors and Gratuities</u>.  You will not grant or receive unfair or preferential treatment in your dealings on behalf of Company, nor shall you engage in any actions that, if publicly disclosed, would create the impression of preferential treatment.

        F.     <u>Non-Use of Other Party's Confidential Information</u>.  You will not use any "Confidential Information", as defined by any agreement with any prior employer in connection with your duties hereunder.

8.     <u>Termination</u>.

        A.     The Company shall have the right to terminate this Agreement and your employment with the Company at any time for cause. For purposes of this Agreement, the term "cause" shall mean:

6

1. Any breach of you material obligations under this Agreement, the Company's Operating Agreement, the written policies of the Company, or any other agreement between you and the Company;

2. Fraud, theft or gross malfeasance by you, including, without limitation, conduct of a felonious or criminal nature, conduct involving moral turpitude, embezzlement or misappropriation of assets;

3. The habitual use of drugs or intoxicants to an extent that your ability to properly perform your duties is impaired;

4. Violation by you of your obligations to the Company, including, without limitation, (i) conduct which is inconsistent with your position and which results or is reasonably likely to result in an adverse effect (financial or otherwise) on the business or reputation of the Company, or (ii) gross negligence or willful misconduct by you in the performance of your duties;

5. Your failure, refusal or neglect to perform your duties within a reasonable period under the circumstances after written notice from the Manager, describing the alleged breach and offering you 10 days to cure same; or

6. Indictment of, or conviction of or plea of guilty or *nolo contendere*, by you to any felony or any other crime involving financial or moral impropriety.

7. Repeated violation by you of any of the written work rules or written policies of the Company after written notice of the Manager;

8. Breach of written standards adopted by the Company governing professional independence or conflicts of interest, including this Agreement and the Operating Agreement; or

9. Failure to achieve the financial goals set forth in the monthly, quarterly or annual budgets prepared for and approved by the Manager.

10. Your death, or if, as the result of any physical or mental disability, you have failed to or are unable to perform your duties for a period of sixty (60) consecutive days.

It is expressly acknowledged and agreed that the decision as to whether "cause" exists for termination by the Company and whether and as of what date you have become permanently disabled is delegated to the Manager for determination. If you disagree with the decision reached by the Manager, the dispute will first go to non-binding meditation in Massachusetts and if a resolution is not reached to binding arbitration in Massachusetts under the expedited procedures of JAMS, limited, however, to whether the Manager reached this decision in good faith.

B. If this Agreement is terminated by reason of a "Voluntary Termination" (as hereinafter defined) or for "cause" (other than by reason of death or disability), the Company shall not be obligated to make any further payment to you (other than accrued and unpaid

7

guaranteed payments and expenses to the date of termination) or to provide any benefit (other than benefits which have accrued pursuant to Schedule A, any plan or by law) or to you under this Agreement. For purposes of this Section, a "Voluntary Termination" by you prior to expiration of the Term shall be a termination in the sole discretion of and at the election of you, other than (i) a termination because of a material breach by the Company of any material provision of this Agreement which remains uncorrected for thirty (30) days following written notice of such breach by you to the Company or (ii) a termination within six (6) months of a material reduction in your rank or responsibility with the Company (a termination by you "for cause").

   C. The Company may terminate this Agreement at any time without cause upon 30 day's notice, in which case, the Company shall continue to pay you the guaranteed payments due to you under Section 3 through the remainder of the Term of this Agreement as and when such guaranteed payments would otherwise be payable to you hereunder. The severance benefit paid to you pursuant to this Section shall be in consideration of your continuing obligations hereunder after such termination (including, without limitation, your non-competition obligations). You shall not be under any duty or obligation to seek or accept other employment following a termination of of this Agreement pursuant to which severance benefit payments under this Section are owing and the amounts due you pursuant to this Section shall not be reduced or suspended if you accept subsequent employment or earn any amounts as a self-employed individual. Your rights under this Section are your sole and exclusive rights against the Company or its affiliates and the Company's sole and exclusive liability to you under this Agreement, in contract, tort or otherwise, for the termination of this Agreement. You covenant not to sue or lodge any claim, demand or cause of action against the Company based upon the termination of this Agreement for any monies other than those specified in this Section. If you breach this covenant, the Company shall be entitled to recover from you all sums expended by the Company (including costs and attorneys' fees and the collection thereof), in connection with such suit, claim, demand or cause of action.

   D. Termination of this Agreement does not terminate those obligations imposed by this Agreement which are continuing obligations, including, without limitation, your obligations under Articles 5 and 6.

9. <u>Miscellaneous</u>.

   A. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, applicable to agreements made and to be performed in New York, and shall be construed without regard to any presumption or other rule requiring construction against the party causing the Agreement to be drafted.

   B. This Agreement and the Company's Handbook of Employment Policies, if any, contain a complete statement of all the arrangements between you and the Company with respect to its subject matter and supersede all previous agreements, written or oral, among them relating to its subject matter. This Agreement may not be modified, amended or terminated orally. Amendments may be made to this Agreement at any time if mutually agreed upon in writing between you and the Company.

8

C.   Any amendment, notice or other communication under this Agreement shall be in writing and shall be considered given when received and shall be delivered personally, mailed by Certified Mail, Return Receipt Requested, or sent by a nationally recognized carrier service such as UPS or FedEx.

D.   The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement. Any waiver must be in writing.

E.   Each of the parties irrevocably submits to the exclusive jurisdiction of any court of the Commonwealth of Massachusetts sitting in Berkshire County or the Federal District Court, Springfield Division over any action, suit or proceeding relating to or arising out of this Agreement and the transactions contemplated hereby. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY SUCH ACTION, SUIT OR PROCEEDING. Each party hereby irrevocably waives any objection, including, without limitation, any objection to the laying of venue or based on the grounds of *forum non conveniens* which such party may now or hereafter have to the bringing of any such action, suit or proceeding in any such court and irrevocably agrees that process in any such action, suit or proceeding may be served upon that party personally or by Certified or Registered Mail, Return Receipt Requested.

F.   The invalidity or unenforceability of any term or provision of this Agreement shall not affect the validity or enforceability of the remaining terms or provisions of this Agreement which shall remain in full force and effect and any such invalid or unenforceable term or provision shall be given full effect as far as possible. If any term or provision of this Agreement is invalid or unenforceable in one jurisdiction, it shall not affect the validity of enforceability of that term or provision in any other jurisdiction.

G.   This Agreement is not assignable by either party except that it shall inure to the benefit of and be binding upon any successor to the Company by merger or consolidation or the acquisition of all or substantially all of the Company's assets, provided such successor assumes all of the obligations of the Company.

H.   It is understood and agreed by the parties hereto that you provided services to the Company prior to its legal formation as a Massachusetts limited liability company and this Agreement is dated as of the date you began to provide such services.

HYMAN DIGITAL, LLC
f/k/a HYMAN DIGITAL

By: _____
Name: Mark Hyman, M.D.
Title: Manager

DHRUMIL PUROHIT

_____

## SCHEDULE A – COMPENSATION

For so long as you are the Chief Executive Officer of the Company:

**Guaranteed Payment:** The equivalent of $140,000.00 annually, payable semi-monthly in accordance with the Company's standard payroll schedule, less any amounts required by law. You acknowledge and agree that, regarding your guaranteed payment for the first year of this Agreement, you have directed the Company to deem the first $100,000.00 of your guaranteed payment as a Capital Contribution (as defined in the Operating Agreement) for an approximate 2.4% Interest in the Company, and to pay the $40,000.00 balance as above.

**Equity Compensation:** Effective as of the Effective Date, you will be awarded a 10% Interest in the Company ("***Equity Compensation***"). This Equity Compensation will vest in four (4) equal installments over a period of four (4) years, beginning on July 1, 2016, provided that you have been continually employed by the Company from the Effective Date through the applicable vesting date. Any portion of your Equity Compensation which has not vested at the time of the Termination of Engagement shall expire and be forfeited. For the purposes of this Schedule A "***Termination of Engagement***" means your cessation of engagement with the Company, whether voluntarily or involuntarily, for cause or without cause, by reason of death, disability, retirement, resignation or otherwise.

The Company shall have the right any time following a Termination of Engagement to elect to purchase any vested Equity Compensation pursuant to and on the terms set forth in Section 9.4 of the Operating Agreement, *mutatis mutandis*.

**Bonus:** (a) Until such time as the Equity Compensation has fully vested you will receive an annual bonus of 10% of the Company's Net Cash Flow for the period between the Effective Date and December 31, 2015, and annually thereafter, less any amount paid to you as a distribution under Section 6.3 of the Operating Agreement attributable to your vested Equity Compensation, provided you are serving the Company as the Chief Executive Officer during the entirety of such period(s). Such bonus shall be payable within 30 days of the determination of the applicable year's Net Cash Flow.

(b) In the event you have not exercised the Option (defined below) prior to its expiration, , you will receive an additional bonus of 5.2% of the Company's 2016 Net Cash Flow, provided you are serving the Company as the Chief Executive Officer during the entirety of 2016. Such bonus shall be payable within 30 days of the determination of the 2016 Net Cash Flow.

10

**Additional Benefits:** In the event the Company shall determine to provide any health and/or pension benefits, you shall be entitled to receive all health and benefits plans provided by the Company.

**Expenses:** The Company shall reimburse you for all reasonable and necessary expenses incurred by you in connection with the performance of your services for the Company upon submission of appropriate expense reports and documentation in accordance with the Company's policies and procedures, and, for individual expenses over $200 and/or travel, as approved in advance by the Manager.

**Vacation:** The Company will provide you with up to ten (10) days of paid personal time off per calendar year which shall accrue and vest *pro rata* on a daily basis.

**Options:** Effective as of April 1, 2015, you will be awarded an option to purchase up to a 5% Interest in the Company at a purchase price based on a capitalization amount of the Company of $4,150,000.00 (the "***Option***"). The Option may be exercised in full prior to December 31, 2016, provided that you have been continually employed by the Company from the Effective Date through such purchase date. Any portion of your Option which you have not purchased at the time of the earlier of your Termination of Engagement and December 31, 2016 shall expire and be forfeit.

The Company shall have the right any time following a Termination of Engagement to elect to repurchase any Interests you purchased under the Option pursuant to and on the terms set forth in Section 9.4 of the Operating Agreement, *mutatis mutandis*

11