# EXHIBIT 4

## HYMAN DIGITAL, LLC
## OPERATING AGREEMENT

THE LIMITED LIABILITY COMPANY INTERESTS EVIDENCED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR UNDER THE SECURITIES LAWS OF ANY STATE OR FOREIGN JURISDICTION. SUCH LIMITED LIABILITY COMPANY INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT AND THE APPLICABLE STATE OR FOREIGN SECURITIES LAWS, PURSUANT TO REGISTRATION THEREUNDER OR EXEMPTION THEREFROM.  IN ADDITION, TRANSFER OR OTHER DISPOSITION OF SUCH LIMITED LIABILITY COMPANY INTERESTS IS FURTHER RESTRICTED AS PROVIDED IN THIS AGREEMENT.  PURCHASERS OF LIMITED LIABILITY COMPANY INTERESTS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

This Operating Agreement of HYMAN DIGITAL, LLC, a Massachusetts limited liability company (the "**Company**"), is made as of September 9, 2015 (the "**Effective Date**"), by and among the Company and each of the Members (as defined below).

## RECITALS

**WHEREAS**, the Members have caused a limited liability company to be formed pursuant to and in accordance with the Massachusetts Limited Liability Company Act, as amended from time to time (the "**LLC Law**"); and

**WHEREAS**, the Members and the Company desire to set forth their agreement as to how the business and affairs of the Company shall be managed and to establish their respective rights and obligations with respect to the Company;

**NOW, THEREFORE**, in consideration of the agreements and obligations set forth herein, and for other good and valuable consideration, the parties hereto, intending to be legally bound, hereby enter into this Operating Agreement as follows:

## ARTICLE I
## DEFINITIONS

The defined terms used in this Agreement shall have the meanings specified below:

"**Affiliate**" of a specified Person means a Person that, directly or indirectly, controls, is controlled by, or is under common control with, the specified Person. For purposes of this definition only, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting Securities, by contract or otherwise.

"**Agreement**" means this Operating Agreement of the Company, as originally executed and as it may be amended, modified, restated or supplemented from time to time, as the context requires.

"**Assignee**" has the meaning set forth in Section 9.2.

"**Capital Expenditure Reserve**" means, for any Fiscal Year, an amount determined by the Manager, in its sole discretion, to be reserved by the Company to pay for capital expenditures expected to be incurred during such Fiscal Year.

"**Capital Account**" means, with respect to any Member, the capital account determined and maintained by the Company for such Member in accordance with Section 6.5(a).

"**Capital Contributions**" means, with respect to any Member, the total amount of contributions made to the Company as of the date in question in respect of such Member's Interest, as set forth opposite such Member's name on Schedule A hereto under the heading "Capital Contribution", as it may be amended from time to time in accordance with Section 11.1(b)(iii).

"**CEO**" or "**Chief Executive Officer**" means, initially, Dhrumil Purohit, or any replacement CEO designated in accordance with Section 7.1.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time, or any successor federal income tax code.

"**Company**" has the meaning set forth in the initial paragraph of this Agreement.

"**Company Value**" means, as of any date of determination, an amount equal to (x) five (5) times EBITDA for the most recently completed twelve (12) months, plus (y) the aggregate amount of cash on the Company's balance sheet as of the end of the most recently completed calendar month, minus (z) the aggregate indebtedness of the Company as of such date.

"**Consent**" means the approval of a Person, given as provided in Section 12.1, to do the act or thing for which the approval is solicited, or the act of granting such approval, as the context may require.

"**Covered Person**" means:  (a) the Manager, the Tax Matters Member or any liquidating trustee, in each case in his or its capacity as such, or an officer of the Company, (b) any Affiliate of the Manager, the Tax Matters Member or any liquidating trustee, and (c) any officer, the Manager, a Member or employee of the Company who serves as an officer, director or representative of any other Entity at the request of the Company.

"**EBITDA**" means, for any period, (x) Net Income of the Company for such period, plus (y) to the extent deducted to determine such Net Income, the sum of (i) depreciation expense, (ii) interest expense, (iii) amortization expense and (iv) tax expense, all for such period and determined in accordance with GAAP.

"**Economic Interest**" means a Member's right to share in the allocation of one or more of the Company's allocable items, including net profits, net losses and distributions, in each case pursuant to this Agreement, but shall not include any Management Interest.

"**Effective Date**" has the meaning set forth in the initial paragraph of this Agreement.

"**Entity**" means any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or other legal entity or organization.

"**Executive Services Agreement**" shall mean the executive services agreement between the Company and the CEO dated April 1, 2015.

"**Fair Market Value**" means, with respect to any Interest, Securities or other asset, the fair market value of such Interest, Securities or other asset, as determined by the Manager in good faith in its reasonable discretion.

"**Family Group**" means: (a) an individual, his or her parents and siblings, their respective spouses and descendants and the spouses of such descendants (collectively, the "**Individual Group**"), (b) all trusts, the beneficiaries of which consist exclusively of one or more members of the Individual Group ("**Family Trusts**"), and (c) all entities which are wholly-owned, directly or indirectly, by any one or more members of the Individual Group and/or Family Trusts.

"**Fiscal Year**" means the calendar year; provided, that the Company's final Fiscal Year shall end on the date on which the winding up of the Company under Article X is completed.

"**Incapacity**" means, as to any Person, (i) the adjudication of incompetence or insanity, or (ii) the death of such Person, or (iii) the permanent disability of a Person that prevents such Person from performing his obligations under applicable law or under the terms hereof.

"**Interest**" means the entire limited liability company interest of a Member as a Member in the Company at any particular time, including the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all the terms and provisions of this Agreement.

"**Investment Company Act**" means the Investment Company Act of 1940, as amended from time to time.

"**Liquidity Event**" means (i) any sale, transfer or other disposition of all or a substantial portion of the Company's assets, (ii) any sale, transfer or exclusive license of all or substantially all of the Company's intellectual property (other than a sale, transfer or license to a wholly-owned subsidiary of the Company), (iii) any merger or consolidation of the Company in which the Members do not own, immediately after such merger or consolidation, a majority of the equity interests in the surviving Entity in approximately the same proportion as the Members did immediately prior to such merger or consolidation, or (iv) any refinancing of the Company's assets in an amount in excess of the sum of (x) the Company's then outstanding indebtedness for borrowed money secured by such assets plus (y) the amount required for capital expenditures, in each case, as approved by the Manager.

"**Majority in Interest**" means Members whose Percentage Interests represent, in the aggregate, more than 50% of the Company's aggregate Percentage Interests.

"**Management Interest**" means a Member's right to participate in the management of the business and affairs of the Company only to the extent of its right to vote on, consent to, or otherwise participate in, any particular decision or action of or by the Members as specifically set forth in this Agreement.

"**Manager**" means Mark Hyman or any replacement Manager designated in accordance with Section 7.4.

"**Member**" means each Person that executes a counterpart of this Agreement as a Member and becomes a Member as provided herein, so long as such Person continues as a Member and is reflected as such in the records of the Company, in each case in such Person's capacity as a member of the Company, and "**Members**" means all such Persons. The Members as of the Effective Date are as set forth on Schedule A hereto.

"**Minority Member**" means any Member whose Percentage Interests represent less than 25% of the Company's aggregate Percentage Interests.

"**Net Cash Flow**" means, for any Fiscal Year, (x) the gross cash receipts of the Company from all sources during such Fiscal Year or other period (but excluding any amounts, such as taxes, that are held by the Company as a collection agent or in trust for others or that are otherwise not unconditionally available to the Company), less (y) all amounts paid by the Company during the same Fiscal Year or other period (including any Company indebtedness, but excluding any unscheduled repayments of principal).  "Net Cash Flow" shall not, however, be reduced by depreciation, amortization, cost recovery deductions, depletion, similar allowances or other non-cash items, but shall be increased by any portion of the Capital Expenditure Reserve, Working Capital Reserve or any other reserve for such Fiscal Year that is unused as of the end of such Fiscal Year.  Notwithstanding the foregoing, (x) Sale Proceeds shall not be included in Net Cash Flow, and (y) Net Cash Flow shall not carry over from one Fiscal Year to the next Fiscal Year.

"**Net Income**" means, for any period, (x) the gross revenues of the Company for such period, less (y) all operating and non-operating expenses (including taxes) of the Company for such period.

"**Percentage Interest**" means, with respect to a Member at any time, the ratio of (x) the percentage of Interest held by such Member at such time, to (y) the total outstanding Interests of the Company at such time, as such ratio is set forth opposite such Member's name on Schedule A hereto, as it may be amended from time to time in accordance with Sections 5.1 and 11.1(b)(iii).

"**Permitted Transfers**" has the meaning set forth in Section 9.1(a).

"**Person**" means any individual or Entity.

"**Proportionate Share**" means, with respect to a Member, such Member's Percentage Interest.

"**Remaining Net Cash Flow**" means, for any Fiscal Year in which there is positive Net Cash Flow, (x) the amount of Net Cash Flow for such Fiscal Year, less (y) the aggregate amount of Tax Distributions made in respect of such Fiscal Year pursuant to Section 6.2, less (z) the sum of the Capital Expenditure Reserve and the Working Capital Reserve established for the following Fiscal Year.

"**Remaining Proportionate Share**" means with respect to a Member that has elected to take up more than its entire Proportionate Share, the ratio that such Member's Percentage Interest bears to the aggregate Percentage Interest of all the Members that have elected to take up more than their Proportionate Share.

"**Sale Proceeds**" means the net proceeds to the Company (if any) from any Liquidity Event, after payment of all reasonable taxes and expenses incurred by the Company in connection with such Liquidity Event and all indebtedness and other obligations of the Company repaid in connection with such Liquidity Event, and net of any Capital Expenditure Reserve or Working Capital Reserve established by the Manager from such net proceeds.

"**Securities**" means capital stock, limited partnership interests, limited liability company interests, beneficial interests, warrants, options, notes, bonds, debentures, and other securities, equity interests, ownership interests and similar obligations of every kind and nature of any Entity.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time.

"**Substituted Member**" means any Person admitted to the Company as a Member pursuant to the provisions of Section 9.3.

"**Tax Distribution**" has the meaning set forth in Section 6.2.

"**Tax Matters Member**" has the meaning set forth in Section 6.8(a).

"**Transfer**" has the meaning set forth in Section 9.1(a).

"**Treasury Regulations**" or "**Treas. Reg.**" mean the Federal income tax regulations promulgated under the Code, as such Treasury Regulations may be amended from time to time (it being understood that all references herein to specific sections of the Treasury Regulations shall be deemed also to refer to any corresponding provisions of succeeding Treasury Regulations).

"**Working Capital Reserve**" means, for any Fiscal Year, an amount determined by the Manager, in its sole discretion, to be reserved for the Company's working capital needs during such Fiscal Year.


ARTICLE II

FORMATION AND TERM

2.1     *Formation*.  The Company was formed as a limited liability company in accordance with and pursuant to the provisions of the LLC Law upon the filing of the Articles of Organization with the Office of the Secretary of the Commonwealth of Massachusetts on September 9, 2015.  The rights, duties and liabilities of the Members shall be as provided in the LLC Law, except as otherwise provided in this Agreement.

2.2     *Name*.  The name of the Company is "Hyman Digital, LLC".  However, the business of the Company may be conducted upon compliance with all applicable laws under any other name designated by the Manager.

2.3     *Term*.  The term of the Company shall continue in full force and effect for a perpetual term; provided, that the Company may earlier be dissolved in accordance with the provisions

of this Agreement or by operation of law.  The existence of the Company as a separate legal entity will continue until cancellation of the Articles of Organization in the manner required by the LLC Law.

        2.4    *Principal Place of Business*.  The principal place of business of the Company shall be located at such place within the Commonwealth of Massachusetts as the Manager may determine from time to time.

## ARTICLE III
## PURPOSES AND POWERS

        3.1    *Purposes*.  The Company is formed for the purposes set forth in the Articles of Organization, specifically, to commercialize health-related information and to engage in any lawful act or activity for which limited liability companies may be organized under the Laws of the Commonwealth of Massachusetts.

        3.2    *Powers*.  The Company shall have the power and authority, subject to Section 7.5 and Section 7.6 below, to take any and all actions necessary, appropriate, desirable, advisable, incidental or convenient to, or for the furtherance of, the purposes set forth in Section 3.1, alone or with others.

## ARTICLE IV
## CAPITAL AND MEMBERS

        4.1    *General*.  The names, addresses, Percentage Interests and Capital Contributions of the Members as of the Effective Date are set forth on <u>Schedule A</u> hereto, as it may be amended from time to time.  Upon the execution (including by power of attorney or by authorized representative) of this Agreement or a counterpart of this Agreement, each Person named as a Member of the Company on <u>Schedule A</u> hereto shall be admitted to the Company as a Member.

        4.2    *Changes*.  A Member will cease to be a Member when such Person ceases to own an Interest in the Company and is no longer reflected as a Member on <u>Schedule A</u> hereto.

        4.3    *Classes of Interests*.  Subject to Section 7.5 below, the Manager may authorize the Company to issue additional classes of interests.  Such new interests shall have the respective rights, preferences, privileges and restrictions determined by the Manager.  As of the Effective Date, each Member has been issued the number and class of Interest set forth besides his, her or its name on <u>Schedule A</u>.

        4.4    *Certificates*.  In the sole discretion of the Manager, the issued and outstanding Interests may be represented by certificates. In the event the Company issues such certificates, each shall bear the following legend:

THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO RESTRICTIONS ON TRANSFER AND OTHER CONDITIONS AND RESTRICTIONS, AS SPECIFIED IN THE OPERATING AGREEMENT OF THE COMPANY, DATED AS OF THE 9th OF SEPTEMBER, 2015, AS THE SAME MAY BE AMENDED FROM TIME TO TIME, COPIES OF WHICH ARE ON FILE AT THE OFFICE OF THE COMPANY AND WILL BE FURNISHED WITHOUT CHARGE TO ANY MEMBER OF THE COMPANY UPON WRITTEN REQUEST.

4.5     *Powers of Members*.  The Members shall have the power to exercise any and all rights or powers granted to the Members pursuant to the express terms of this Agreement.  However, except as specifically provided herein, the Members shall have no other rights or powers, including, without limitation, any power or authority to act for or on behalf of, or to bind, the Company.

4.6     *Nature of a Member's Interest*.  A Member's Interest shall for all purposes be personal property.  No Member has any interest in any specific Company property.

4.7     *No Other Persons Deemed Members*.  Unless admitted to the Company as a Member as provided in this Agreement, no Person shall be, or shall be considered a Member.  The Company may elect to deal only with Persons so admitted as Members (including their duly authorized representatives) and shall have no obligation to deal with any transferee of an Economic Interest who has not been admitted to the Company as a Member.  The Company shall not be required to deal with any other Person (other than with respect to distributions to Assignees pursuant to assignments in compliance with Article IX) merely because of an assignment or transfer of an Interest to such Person; provided, that any distribution by the Company to the Person shown on the Company's records as a Member or to its legal representatives, or to the assignee of the right to receive Company distributions as provided herein, shall relieve the Company of all liability to any other Person who may be interested in such distribution by reason of any other assignment by the Member, or for any other reason.

4.8     *Partition*.  Each Member waives any and all rights that it may have to maintain an action for partition of the Company's property or otherwise seek the dissolution of the Company.

ARTICLE V
CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

5.1     *Capital Contributions*.  Prior to or upon execution of this Agreement, each Member has made or shall make a Capital Contribution to the Company in the amount set forth under the heading "Capital Contributions" opposite the name of such Member on Schedule A to this Agreement.

In the event the Company requires additional capital, the Members may contribute such amounts in the form of cash or other property having monetary value as determined by the Manager, and such additional contributions do not have to be proportionate with their then capital in the Company. In lieu of additional capital contributions, the Member may loan monies to the Company, which loans shall be subordinate to any loans to the Company from banks or other financial institutions and shall bear interest at the prime rate then charged by TD Bank, Lenox Branch. Any additional Members admitted to the Company shall make such Capital Contributions, if any, as the Manager deems appropriate.

5.2     *Admission of Additional Members and Creation of Additional Interests*.

(a)     *Authority*.  Subject to the limitations set forth in this Section 5.2 and in Section 7.5, upon the approval of the a Majority in Interest of the Members, the Company may admit additional Members to the Company (other than by reason of a Transfer of an Interest pursuant to Article IX) or create and issue such additional classes or series of Interests, having such designations, preferences and relative, participating or other special rights, powers and duties, as the Manager shall determine. The Members acknowledge and agree that rights afforded to any additional classes or series of Interests

(including, without limitation, rights to distributions and liquidation proceeds) may, subject to Section 7.5, result in a corresponding reduction in the rights of the Members. Upon the issuance pursuant to this Section 5.2(a) of any class or series of Interests, the Manager may, subject to Sections 7.5 and 11.1(c), amend any provision of this Agreement and authorize any Person to execute, swear to, acknowledge, deliver, file and record, if required, such documents, to the extent necessary or desirable to reflect the admission of any additional Member to the Company or the authorization and issuance of such class or series of Interests and the related rights and preferences thereof.

(b)      *Preemptive Rights of Members*.  Subject to Section 5.2(c), if the Company proposes to issue additional Interests (a "**Proposed Issuance**"), the Company shall deliver to each Member a written notice of such Proposed Issuance at least thirty (30) days prior to the date of the Proposed Issuance (the "**Subscription Period**").  Subject to Section 5.2(c), each Member shall have the option, exercisable at any time during the Subscription Period by delivering written notice to the Company (a "**Subscription Acceptance**"), to subscribe, on the same terms as those proposed for the issuance of such additional Interests, for up to its Proportionate Share of any such additional Interests and (y) up to its Remaining Proportionate Share of any such additional Interests not subscribed for by the other Members (with the provisions of this clause (y) to be applied repeatedly, *mutatis mutandis*, until all of the additional Interests have been allocated, or no Member wishes to subscribe for any further additional Interests, as specified in the subscribing Member's Subscription Acceptance).  The Company shall have ninety (90) days from the expiration of the Subscription Period to sell all or any part of the Proposed Issuance, on the same terms as those set forth in the notice of such Proposed Issuance.  Any part of the Proposed Issuance that is not acquired by the Members or third parties within ninety (90) days from the expiration of the Subscription Period may not be issued or sold until such Interests are again offered to the Members in accordance with this Section 5.2(b).

(c)      *Excepted Issuances*.  Section 5.2(b) shall not apply to (i) any Required Sale in accordance with Section 9.6; or (ii) any issuance of Interests in connection with mergers, acquisitions, strategic transactions, equipment leases or debt financings that have been approved in accordance with Section 7.5; (v) (collectively, "**Excepted Issuances**").  Furthermore, the provisions of Section 5.2(b) shall terminate upon the occurrence of any Liquidity Event (other than a Liquidity Event of the type described in clause (iv) of the definition of "Liquidity Event") that has been approved in accordance with Section 7.5.

(d)      *Conditions*.  No additional Member shall be admitted to the Company pursuant to this Section 5.2 unless and until the conditions of Section 9.1(c) are satisfied (with such conditions being interpreted as applying to the admission of an additional Member rather than to a Transfer) or waived in accordance with Section 15.6, and such prospective additional Member has executed a counterpart of this Agreement.

(e)      *Consent*.  Each Member hereby consents to the admission to the Company of any additional Member in accordance with the provisions of this Section 5.2 and to the issuance to any such Person of Interests.

5.3      *No Right to Interest or Return of Capital Contributions*.  No Member shall be paid interest on its Capital Contributions or on such Member's Capital Account. No Member shall have any right to demand the return of its Capital Contribution or to withdraw any part of its Capital Account, except as otherwise specifically provided in this Agreement or except upon dissolution of the Company pursuant to Article X. Under circumstances requiring a return of any Capital Contribution, no

Member shall have the right to demand or receive property other than cash in return for its Capital Contributions.

   5.4 *Liability of Members*.  In no event shall any Member (or former Member) (i) have any liability for the repayment or discharge of the debts and obligations of the Company, or (ii) be obligated to make any contribution to the Company.

## ARTICLE VI
### DISTRIBUTIONS; ALLOCATION OF PROFITS AND LOSSES

   6.1 *Allocations of Profits and Losses*.  Net profits and net losses for each Fiscal Year shall be allocated to each Member in accordance with the Member's Percentage Interest.

   6.2 *Tax Distributions*.  If, in any Fiscal Year, the Company has positive taxable income and positive Net Cash Flow, then, as soon as reasonably practicable and in any event before March 15 of the immediately following Fiscal Year, the Company shall make a distribution to each Member (a "**Tax Distribution**") of such amount as may be necessary to allow such Member to pay its federal, state and local estimated income tax obligations, taking into account all other amounts previously distributed or advanced to such Member under Section 6.3 with respect to such Fiscal Year, arising from the allocation of taxable income to such Member with respect to such Fiscal Year pursuant to this Article. Such income tax obligations for all Members shall be calculated based on an assumed aggregate federal, state and local income tax rate of forty-five percent (45%) without regard to any other tax attributes of the Members.  All Tax Distributions made to a Member shall be creditable against (and shall reduce) future distributions to be made to such Member under Section 6.3.

   6.3 *Distributions Generally*.  Except as expressly provided in Sections 6.2 and 10.3(b), all distributions, whether of Remaining Net Cash Flow, Sale Proceeds or otherwise, shall be distributed to the Members, pro rata in accordance with their respective Percentage Interests.

   6.4 *Manager's Discretion to Make Distributions*.  All distributions pursuant to Section 6.3 shall be at such times and in such amounts as shall be determined by the Manager in his sole discretion. Notwithstanding anything to the contrary contained in this Agreement, distributions to Members shall be subject to the restrictions contained in the LLC Law.

   6.5 *Capital Accounts*.

   (a) *Establishment of Capital Accounts*. There shall be established for each Member on the books of the Company a Capital Account initially reflecting an amount equal to its Capital Contribution.  The Capital Accounts shall be adjusted from time to time to reflect the Members' allocable shares of net profits or net losses, special allocations pursuant to Section 6.6, distributions pursuant to Sections 6.2, 6.3 and 10.3(b) and as otherwise required by the Code and Treasury Regulations.

   (b) *Transfer of Capital Accounts*.  In the event of any transfer of any Interest in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest.

6.6    *Substantial Economic Interest.*  It is the intention of the Members that the allocations hereunder shall be deemed to have "substantial economic effect" within the meaning of Section 704 of the Internal Revenue Code and Treasury Reg. Section 1.704-1. Should the provisions of this agreement be inconsistent with or in conflict with Section 704 of the Code or Regulations thereunder, then Section 704 of the Code and Regulations shall be deemed to override the contrary provisions hereof. If Section 704 or the Regulations at any time require that this Agreement contain provisions which are not expressly set forth herein, such provisions shall be incorporated into this Agreement by reference and shall be deemed a part of this Agreement to the same extent as though they had been expressly set forth herein, and the Managers shall be authorized by an instrument in writing to amend the terms of this Agreement to add such provisions, and any such amendment shall be retroactive to whatever extent required to create allocations with a substantial economic effect.

6.7    *Tax Matters Member.*

(a)    From time to time, the Manager shall select a Person (the "**Tax Matters Member**") to serve as the "tax matters partner" for the Company under §6231 of the Code.  Each of the Members hereby designates the Tax Matters Member as, and delegates to the Tax Matters Member all right, power and authority to act as and perform the duties of, the "tax matters partner" of the Company for all purposes of §6231 of the Code, and the Tax Matters Member shall have all such rights, powers and authority and shall have and discharge all of the obligations of such a "tax matters partner," including, without limitation, the authority to sign the Company's tax return; <u>provided</u>, that Tax Matters Member shall exercise all such rights, powers and authority only as instructed by the Manager.  The Tax Matters Member shall initially be Mark Hyman.

(b)    To the fullest extent permitted by law, each Member hereby delegates to the Tax Matters Member all rights, powers and authority to act as "tax matters partner" under §6231 of the Code and hereby constitutes and appoints the Tax Matters Member as such Member's true and lawful attorney-in-fact, with power to act in such Member's name and on behalf, including the power to act through such agents or attorneys as the Tax Matters Member shall appoint, to receive notices, to make, execute and deliver, swear to, acknowledge and file any and all reports, responses and notices and to do any and all things required or advisable, in the Manager's judgment, to be done by the Tax Matters Member.

6.8    *Withholding Taxes.*

(a)    *Authority to Withhold; Treatment of Withheld Tax.*  Notwithstanding any other provision of this Agreement, each Member hereby authorizes the Company to withhold and to pay over, or otherwise to pay, any withholding or other taxes that the Company is required to pay (whether pursuant to the Code or any other provision of United States federal, state or local or foreign law) with respect to such Member or as a result of such Member's participation in the Company; and if and to the extent that the Company shall be required to withhold or pay any such withholding or other taxes, such Member shall be deemed for all purposes of this Agreement to have received a payment from the Company as of the time such withholding or other tax is required to be paid, which payment shall be deemed to be a distribution with respect to such Member's Interest in the Company.  To the extent that the aggregate amount of such payments to a Member for any Fiscal Year exceeds the amount of distributions that such Member would have received for such Fiscal Year, the Company shall notify such Member as to the amount of such excess and such Member shall make a prompt payment to the Company of such amount by wire transfer.  The Company shall promptly notify each Member of any

withholding or other taxes payable by the Company with respect to such Member and, upon the request of such Member, shall use reasonable efforts to assist such Member to secure any available tax refunds, credits or exemptions (including exemptions from withholding) with respect to such withholding or other taxes.

(b)     *Distributions in Kind*.  If the Company transfers property to Members as a distribution and such transfer is subject to withholding or other taxes payable by the Company on behalf of any Member (the "**Withheld Amount**"), the Company shall notify such Member as to the extent (if any) of the Withheld Amount and such Member shall make a prompt payment to the Company of the Withheld Amount by wire transfer (it being understood that, notwithstanding anything else herein to the contrary, the Company may refrain from transferring property having a Fair Market Value of at least the Withheld Amount until the Company has received payment of such Withheld Amount).

(c)     *Withholding Tax Rate*.  Any withholdings referred to in this Section 6.8 shall be made at the maximum applicable statutory rate under the applicable tax law unless the Company shall have received an opinion of counsel or other evidence, satisfactory to the Manager, to the effect that a lower rate is applicable, or that no withholding is applicable.

(d)     *Withholding From Distributions to the Company*.  In the event that the Company receives a distribution from or in respect of which tax has been withheld, the Company shall be treated as having received cash in an amount equal to the amount of such withheld tax, and each Member shall be treated as having received as a distribution the portion of such withheld amount that is attributable to such Member.

(e)     *Indemnification*.  Each Member shall, to the fullest extent permitted by applicable law, indemnify and hold harmless the Company and each Person who is or who is deemed to be the responsible withholding agent for United States federal, state or local or foreign income tax purposes against all claims, liabilities and expenses of whatever nature (other than any claims, liabilities and expenses in the nature of penalties and accrued interest thereon that result from such Person's gross negligence, willful misconduct or fraud) relating to the Company's or such Person's obligation to withhold and to pay over, or otherwise to pay, any withholding or other taxes payable by the Company or any of its Affiliates with respect to such Member or as a result of such Member's participation in the Company.

(f)     *Form W-9*.  Notwithstanding anything to the contrary in this Section 6.8, unless otherwise required by a change in the Code or any other applicable law, if a Member has provided the Company with a duly completed and executed Internal Revenue Service Form W-9, the Company will not withhold any United States federal income taxes with respect to such Member.

## ARTICLE VII
## MANAGEMENT

7.1     *Management by the Manager*.  The business and affairs of the Company shall be managed by the Manager, subject to the provisions of Section 7.5 and any other provision of this Agreement that expressly provides that the Members shall have authority with respect to a particular matter.  The Manager shall manage the Company's business and affairs in a prudent and businesslike manner, and shall be a "manager" within the meaning of the LLC Law.  Except as expressly provided in Section 7.5 and any other provision of this Agreement that expressly provides that any class of

Members shall have authority with respect to a particular matter, unless the Members shall have otherwise directed, the Manager shall have discretion to manage and control the business and affairs of the Company, to make decisions affecting the business and affairs of the Company and to take such actions as the Manager deems necessary or appropriate to accomplish the purposes of the Company as set forth herein, including, without limitation, to exercise all of the powers of the Company set forth in Section 3.2 of this Agreement.

Notwithstanding the foregoing, subject to the provisions of Section 7.5 and 7.6, and any other provision of this Agreement that expressly provides that the Members or the Manager shall have authority with respect to a particular matter, the Manager hereby delegates the day-to-day operation of the Company to the CEO.

7.2     *Expenses of the Company*.  The Manager shall be reimbursed by the Company for all reasonable out-of-pocket expenses incurred by the Manager in connection with his/her service for or on behalf of the Company.  Except as expressly provided in the foregoing sentence the Manager shall not be entitled to receive any compensation from the Company.  The CEO shall be reimbursed and compensated by the Company in accordance with the Executive Services Agreement.

7.3     *Liability of the Manager and the CEO*.

(a)     Except as provided in §8(a) of the LLC Law, notwithstanding anything to the contrary set forth in this Agreement, but without limiting Section 8.3, neither the Manager nor the CEO shall be liable for monetary damages to the Company, any Member or any Assignee for losses sustained or liabilities incurred as a result of errors in judgment, mistakes of fact or law or any other act or omission.

(b)     The Members expressly acknowledge that neither the Manager nor the CEO is under an obligation to consider the separate interest of the Members (including, without limitation, the tax consequences to the Members) in deciding whether to cause the Company to take (or decline to take) any actions, and that neither the Manager nor the CEO shall be liable for monetary damages for losses sustained, liabilities incurred, or benefits not derived by the Members in connection with such decisions, provided that the Manager or the CEO, as applicable, has acted in good faith.

7.4     *Other Matters Concerning the Manager and the CEO*.

(a)     The Manager and/or the CEO may rely and shall be protected in acting, or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by him in good faith to be genuine and to have been signed or presented by the proper party or parties.

(b)     The Manager and/or the CEO may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, architects, engineers, environmental consultants and other consultants and advisers selected by him or her in good faith using reasonable care and diligence, and any act taken or omitted to be taken by the Manager or the CEO in reliance upon the opinion of such Persons as to matters that the Manager or CEO, as applicable, reasonably believes to be within such Person's professional or expert competence shall be conclusively presumed to have been done or omitted in good faith and in accordance with such opinion.

(c)      The Manager may resign upon written notice to the Members stating an effective date no sooner than thirty (30) days after the date of such notice, which resignation does not have to be accepted by the Members to be effective. Such resignation shall terminate the Manager's rights and obligations (in his or her capacity as such under this Agreement) upon the effectiveness of such resignation, but shall not affect the Manager's Interest or any of his or her rights or obligations as a Member or in any other capacity under this Agreement.  Upon any such resignation a Majority in Interest of the Members shall have the right to designate a replacement Manager.

(d)      The CEO may resign only in accordance with the Executive Services Agreement.

7.5      *Limitation on Manager's and CEO's Authority.*  Notwithstanding anything to the contrary in Section 7.1 or any other provision of this Agreement, neither the Manager nor the CEO shall not take (or cause or permit the Company or any of its subsidiaries to take) any of the following actions without the prior Consent of a Majority in Interest of the Members:

(i)      any Liquidity Event;

(ii)      any issuance of additional Interests representing an ownership interest in the LLC;

(iii)      any hiring of, or any payment of salary, other compensation or any other amount to a CEO;

(iv)      any alteration or change in the rights, preferences or privileges of the Interests; the creation (by reclassification or otherwise) of any new class or series of Interests having rights, preferences or privileges senior to or on a parity with the Interests;

(v)      any amendments to the Company's Articles of Organization; or

(vi)      any dissolution of the Company.

7.6      *Limitation on CEO's Authority.*

(a)      Notwithstanding anything to the contrary in Section 7.1 or any other provision of this Agreement, and without limiting Section 7.6(b), the CEO shall not take (or cause or permit the Company or any of its subsidiaries to take) any of the following actions without the prior Consent of the Manager and a Majority in Interest of the Members:

(i)      make any payment in excess of $10,000, or enter into any agreement under which the Company would pay or otherwise require consideration in excess of $10,000 (or products or services having a fair market value in excess of $10,000), unless the applicable documents (including, without limit, any purchase order, contract, application or check) have been signed by (i) the CEO and (ii) the Manager;

(ii)      any incurrence by the Company of any capital expenditures, individually or in the aggregate, in excess of $10,000 in any Fiscal Year, unless such capital expenditures were included in the most recent Annual Budget and Strategic Plan for such Fiscal Year;

(iii)     any incurrence by the Company of any indebtedness for borrowed money except (i) to the extent contemplated in the Annual Budget and Strategic Plan for such Fiscal Year, (ii) ordinary course working capital financing/cash management credit lines in an amount not to exceed $10,000.00 per Fiscal Year, and (iii) purchase money equipment financing including leases in a capitalized amount not to exceed $10,000.00 per Fiscal Year;

(iv)     any guaranty of any indebtedness of a Member or any other Person;

(vii)     any grant of options or warrants to purchase Interests or any other issuance or sale of convertible securities, other Interest equivalents (other than under the Executive Services Agreement, to the extent such grant or issuance has been approved by the Manager);

(viii)     any hiring of any employee or independent contractor with a salary or compensation in excess of $20,000 or if such Person's salary would cause the aggregate amount of compensation paid in any Fiscal Year to exceed the amount set forth for salaries and other compensation in the Annual Budget and Strategic Plan; provided, that at any time, the Consent of the Manager shall be required with respect to any increase in the salary or compensation of any of any employee or independent contractor that raises such Person's compensation above fifty percent (50%) of his or her then-current compensation;

(ix)     any payment of salary, bonus, fees, other compensation or any other amount to any employee or independent contractor in excess of the amount provided for in the most recent Annual Budget and Strategic Plan;

(x)     any hiring of, or any payment of salary, other compensation or any other amount to, (A) any Affiliate of the CEO or any other employee or independent contractor of the Company or (B) any person who is a member of a Family Group that includes the CEO or any other employee or independent contractor of the Company;

(xi)     entry by the Company into any contract, agreement or transaction with the CEO, any employee, independent contractor, or any Affiliate or member of a Family Group of the CEO or employee or independent contractor, other than the Executive Services Agreement;

(xii)     any acquisition of a business, whether by stock or asset purchase, merger, consolidation or otherwise;

(xiii)     any formation of, or investment in, any entity (including, without limitation, any joint venture and any subsidiary of the Company);

(xiv)     the adoption of each Annual Budget and Strategic Plan (defined below) for each Fiscal Year;

(xv)     entry by the Company into any material new line of business or any material change to the Company's existing line of business;

(xvi)   any change in the location of the Company's headquarters or principal place of business;

(xvii)   any other action that is inconsistent with, or could reasonably be expected to cause the Company's operating results to deviate materially from, the most recent Annual Budget and Strategic Plan; or

(v)   any actions resulting in any alteration or change in the rights, preferences or privileges of the Interests.

(b)   The CEO shall prepare and submit to the Members, as soon as practicable after the Effective Date, for the fiscal year ending December 31, 2015 and at least 90 days prior to the commencement of each subsequent Fiscal Year, an annual budget and strategic plan (the "***Annual Budget and Strategic Plan***") which describes the business plan for the Company for such Fiscal Year. Each Annual Budget and Strategic Plan shall be approved by a Majority in Interest of the Members within 30 days of the submission thereof and shall remain operative until amended by a Majority in Interest of the Members.

## ARTICLE VIII
## LIABILITY, EXCULPATION, INDEMNIFICATION AND INSURANCE

8.1   *Liability*.  To the fullest extent permitted by law, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member or Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or Covered Person.

8.2   *Duties and Liabilities of Covered Persons*.  No Covered Person shall be liable to the Company or to any Member for any loss or liability arising out of any act or omission in connection with the Company taken or omitted by such Covered Person in good faith reliance on the provisions of this Agreement.

8.3   *Exculpation*.

(a)   To the fullest extent permitted by applicable law, and except as otherwise expressly provided herein, no Covered Person shall be liable to the Company or any Member for any loss or liability arising out of any act or omission of such Covered Person in connection with the Company to the extent that such act or omission was taken or omitted in good faith and in a manner the Covered Person reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal act, the Covered Person had no reasonable cause to believe such Person's conduct was unlawful.

(b)   A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of

assets, liabilities, profits or losses or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

8.4     *Indemnification*.  To the fullest extent permitted by applicable law, but subject to Section 8.6 below, the Company shall indemnify and hold harmless each of the Covered Persons from and against any and all liabilities, obligations, losses, damages, fines, taxes and interest and penalties thereon (other than taxes based on fees or other compensation received by such Covered Person from the Company), claims, demands, actions, suits, proceedings (whether civil, criminal, administrative, investigative or otherwise), costs, expenses and disbursements (including legal and accounting fees and expenses, costs of investigation and sums paid in settlement) of any kind or nature whatsoever (collectively, "**Claims and Expenses**") which may be imposed on, incurred by or asserted at any time against such Covered Person in any way related to or arising out of this Agreement, the Company or the management or administration of the Company or in connection with the business or affairs of the Company or the activities of such Covered Person on behalf of the Company; provided, that a Covered Person shall not be entitled to indemnification under this Section 8.4(a) against Claims and Expenses to the extent that they are attributable to (i) the failure of such Covered Person to act in good faith and in a manner such Covered Person reasonably believed to be in or not opposed to the best interests of the Company, (ii) a willful breach or violation of this Agreement by such Covered Person or (iii) fraud, gross negligence or willful misconduct by such Covered Person.

8.5     *Advancement of Expenses*.  To the fullest extent permitted by applicable law, but subject to Section 8.6 below, the Company shall pay the expenses (including reasonable legal fees and expenses and costs of investigation) incurred by any Covered Person in defending any claim, demand, action, suit or proceeding (other than a claim, demand, action, suit or proceeding brought by the Company against any Covered Person) as such expenses are incurred by such Covered Person and in advance of the final disposition of such matter; provided, that such Covered Person undertakes to repay such expenses if it is determined by agreement between such Covered Person and the Company (or, in the absence of such an agreement, by a final judgment of a court of competent jurisdiction) that such Covered Person is not entitled to be indemnified pursuant to Section 8.4.  Any claim for advancement of expenses shall set forth in reasonable detail the basis for the claim.

8.6     *Notice of Proceedings*.  Promptly after receipt by a Covered Person of notice of the commencement of any proceeding against such Covered Person, such Covered Person shall, if a claim for indemnification in respect thereof is to be made against the Company, give written notice to the Company of the commencement of such proceeding; provided, that the failure of a Covered Person to give notice as provided herein shall not relieve the Company of its obligations under Sections 8.4 and 8.5, except to the extent that the Company is prejudiced by such failure to give notice.  In case any such proceeding is brought against a Covered Person (other than a proceeding by or in the right of the Company), after the Company has acknowledged in writing its obligation to indemnify and hold harmless the Covered Person, the Company will be entitled to assume the defense of such proceeding; provided, that (i) the Covered Person shall be entitled to participate in such proceeding and to retain its own counsel at its own expense (unless there is an actual conflict of interest between the Company and the Covered Person in which case, the cost and expenses of the Covered Person's separate counsel for that portion of the proceeding for which there is an actual conflict of interest shall be borne by the Company) and (ii) if the Covered Person shall give notice to the Company that in its good faith judgment certain claims made against it in such proceeding could have a material adverse effect on the Covered Person or its Affiliates other than as a result of monetary damages, the Covered Person shall have the right to control (at its own expense and with counsel reasonably satisfactory to the Company)

the defense of such specific claims with respect to the Covered Person (but not with respect to the Company or any other Member); and provided, further, that if a Covered Person elects to control the defense of a specific claim with respect to such Covered Person, such Covered Person shall not consent to the entry of a judgment or enter into a settlement that would require the Company to pay any amounts under Section 8.4 without the prior written consent of the Company, such consent not to be unreasonably withheld. After notice from the Company to such Covered Person acknowledging the Company's obligation to indemnify and hold harmless the Covered Person and electing to assume the defense of such proceeding, the Company will not be liable for expenses subsequently incurred by such Covered Person in connection with the defense thereof. Without the consent of such Covered Person, the Company will not consent to the entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Covered Person of a release from all liability arising out of the proceeding and claims asserted therein. Any decision that is required to be made by the Company pursuant to Section 8.4, Section 8.5 or this Section 8.6 shall be made on behalf of the Company by the Manager.

        8.7    *Insurance*. The Company may purchase and maintain directors' and officers' insurance, to the extent and in such amounts as are customary, on behalf of Covered Persons and such other Persons as the Manager shall determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company or such indemnities, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement or by law.

ARTICLE IX
TRANSFERABILITY OF A MEMBER'S INTEREST

        9.1    *Restrictions on Transfers of Interests*.

        (a)    No transfer, sale, assignment, grant of a participation in, gift, pledge, encumbrance, hypothecation, exchange or other disposition (herein collectively called a "**Transfer**") of all or any portion of a Member's Interest may be made except (x) with the written Consent of the Manager and (y) in accordance with and as specifically permitted by the provisions of this Agreement; provided, that, subject to Sections 9.1(c) and 9.2(a), the following Transfers ("**Permitted Transfers**") shall not require such Consent:

        (i)    subject to Section 9.4 below, any Transfer by operation of law to the estate or personal representative of an Incapacitated Member (which estate or representative will then be subject to the same restrictions on Transfer as all other Members), provided that, the ultimate beneficiar(y)(ies) of a deceased or incompetent Member other than Mark Hyman shall have only the rights of an Assignee unless they are admitted a Substituted Member pursuant to the terms of Section 9.3 below, and the ultimate beneficiar(y)(ies) of Mark Hyman shall be deemed Substituted Member(s);

        (ii)    any Transfer by a Member to any other Member.

        (b)    Any Transfer or attempted Transfer of an Interest in violation of the terms of this Agreement shall be null and void and have no effect. Each Transferor hereby agrees to indemnify the Company and remaining Members against any and all loss, liabilities and damages arising directly or indirectly out of any Transfer or purported Transfer in violation of this Agreement.

(c)      Notwithstanding any other provision of this Section 9.1, no Transfer of all or any portion of a Member's Interest may be made unless:

(i)      such Transfer would not result in a violation of applicable law, including the Securities Act and any state securities or "Blue Sky" laws applicable to the Company or the Interest to be Transferred;

(ii)      such Transfer would not cause the Company to lose its exemption from the registration requirements of the Investment Company Act;

(iii)      such Transfer would not cause the Company to lose its status as a partnership for federal income tax purposes and, without limiting the generality of the foregoing, such Transfer will not be effected on or through an "established securities market" or a "secondary market or the substantial equivalent thereof," as such terms are used in Treasury Regulations § 1.7704-1, and the transferring Member and the transferee shall each have provided a certificate to that effect;

(iv)      such Transfer, when added to the total of all other Transfers of Interests within the preceding twelve (12) months, would not result in the Company being considered to have terminated within the meaning of § 708 of the Code;

(v)      such Transfer would not result in the Company being required to register under § 12(g) of the Securities Exchange Act of 1934, as amended;

(vi)      the transferring Member and the transferee shall have agreed in writing to provide the Company with any information requested by the Company relating to the Company's obligation to make basis adjustments under § 743 of the Code (including, without limitation, the Company's obligations under § 6031 of the Code); and

(vii)      if requested by the Company, the Member shall have provided an opinion of counsel satisfactory to the Company as to the matters set forth in clauses (i) through (v) of this Section 9.1(c) and such other matters as the Company may reasonably request.

(d)      *No Transfers to Minors*.  In no event will all or any part of an Interest be Transferred to a minor or an incompetent except in a trust, or pursuant to the Uniform Transfers to Minors Act, or by will or intestate succession.

(e)      *Payment of Expenses*.  Each Member agrees that it shall pay all reasonable expenses, including all reasonable attorneys' fees and accountants' fees, incurred by the Company in connection with a Transfer of an Interest by that Member.

(f)      *Transferor Remains Liable*.  Each Member agrees that, notwithstanding the Transfer of all or any portion of its Interest, it will remain liable for its obligations under Sections 5.1, 15.1 and 15.3 thereunder.

(g)      *Non-Circumvention.*  No Member shall be permitted to Transfer its Interests (or any portion thereof) if the sole purpose of such Transfer is to avoid the provisions of this Section 9.1.

9.2     *Assignees*.

(a)     The Company will not recognize for any purpose any purported Transfer of all or any portion of the Interest of a Member unless the provisions of Section 9.1 shall have been complied with and there shall have been filed with the Company a dated notice of such Transfer in form satisfactory to the Manager, executed and acknowledged by both the seller, assignor or transferor and the purchaser, assignee or transferee ("**Assignee**"), and (unless the Manager shall otherwise consent) such notice (i) contains the acceptance by the Assignee of all of the terms and provisions of this Agreement, and (ii) represents that such Transfer was made in accordance with all applicable laws and regulations.

(b)     Unless and until an Assignee of an Interest becomes a Substituted Member, such Assignee shall not be entitled to give Consents with respect to such Interest.

(c)     Subject to Section 9.1(e), any Member that sells, transfers or assigns all of its Interest shall cease to be a Member and shall cease to have the rights of a Member hereunder.

(d)     Anything herein to the contrary notwithstanding, both the Company and the Manager shall be entitled to treat the assignor of an Interest as the absolute owner thereof in all respects, and shall incur no liability for distributions made to it in good faith, until such time as a written assignment that conforms to the requirements of this Article IX has been received by the Company.

(e)     A Person who is the Assignee of all or any portion of the Interest of a Member as permitted hereby but does not become a Substituted Member and who desires to make a further Transfer of such Interest, shall be subject to all of the provisions of this Article IX to the same extent and in the same manner as any Member desiring to make a Transfer of its Interest.

9.3     *Substituted Members*.

(a)     Upon (i) a Permitted Transfer that otherwise satisfies the requirements of this Agreement or the written Consent of the Manager, as applicable, (ii) execution by the Assignee of the instruments specified in Section 9.3(b), and (iii) payment by the assignor Member and/or Assignee of the amounts specified in Section 9.1(e) and 9.3(b), Schedule A to this Agreement shall be amended to reflect the admission of the Assignee, and the Assignee shall be admitted, as a Substituted Member.

(b)     Each Substituted Member, as a condition to its admission as a Member, shall execute and acknowledge such instruments, in form and substance reasonably satisfactory to the Manager, as the Manager reasonably deems necessary or desirable to effectuate such admission and to confirm the agreement of the Substituted Member to be bound by all the terms and provisions of this Agreement with respect to the Interest acquired.  All reasonable expenses, including attorneys' fees not paid by the assignor Member pursuant to Section 9.1(e) that are incurred by the Company in this connection, shall be borne by such Substituted Member.

(c)     Until an Assignee shall have been admitted to the Company as a Substituted Member pursuant to Section 9.3(a), such Assignee shall only be entitled to the rights of an Assignee of an Interest under this Agreement.

(d)     Any Person which acquires all or any portion of the Interest of a Member and which is admitted as a Substituted Member shall assume all or a proportionate portion of the Capital

- 19 -

Account of such Member. Subject to Section 9.1(f), to the extent permitted by law, a transferring Member shall not have any liability for amounts required to be paid with respect to its Interest after the time, if any, when the purchaser, assignee or transferee of such Interest, or portion thereof, is admitted as a Substituted Member.

       9.4    *Incapacity; Withdrawal; Termination of Employment.*

       (a)    In the event of the Incapacity of a Minority Member, the voluntary termination of employment by a Minority Member who is an employee (including the CEO) for cause, or the termination of employment of a Minority Member who is an employee (including the CEO) without cause (any such event an "**Included Termination Event**"), or the voluntary withdrawal of a Minority Member, the voluntary termination of employment by a Minority Member who is an employee (including the CEO) without cause, or the termination of employment of a Minority Member who is an employee (including the CEO) for cause (any such event an "**Excluded Termination Event**", and, together with any Included Termination Event, a "**Termination Event**"), the Company will purchase from such Member or such Member's legal representative, as applicable (such Member or their legal representative, the "**Departing Member**"), and the Departing Member shall sell to the Company all of such Departing Member's Interests, now owned or hereafter acquired, in accordance with the following:

       (i)    On the Closing Date (defined below), the Company shall make a cash payment (the "**Down Payment**") to the Departing Member in an amount equal to the full amount of the Key Man Insurance, if any, or twenty-five percent (25%) percent of the Purchase Price (defined below) if there is no Key Man Insurance; and

       (ii)    The balance of the Purchase Price (the "**Balance**") shall be paid by the Company's delivery to the Departing Member on the Closing Date of a non-negotiable promissory note in the principal amount of the Balance substantially in the form of Exhibit 1 attached hereto (the "**Note**"). As more fully set forth in said Exhibit 1, the Note shall bear interest at four percent (4%), with payments thereunder to be made in quarterly installments over the 3-year period commencing three (3) months following the Closing Date, at the end of which 3-year period all remaining unpaid principal and accrued interest under the Note shall be paid in full.

       (iii)    The date on which the Corporation shall purchase the Departing Member's Interests shall be a date (the "**Closing Date**") which is no later than sixty (60) days after (A) the qualification or appointment of a Incapacitated Member's legal representative (or, if no legal representative is appointed or qualifies, within one hundred eighty (180) days following the death of the deceased Member or the adjudication of incompetence or insanity) or (B) the date of the Termination Event, on which Closing Date the Down Payment for the Departing Member's Interests shall be paid and the Note shall be delivered to the Departing Member.

       (iv)    The "**Purchase Price**" shall be an amount equal to the Member's Percentage Interest times the Company Value on the date giving rise to the Termination Event. Notwithstanding the foregoing, if the Termination Event is an Excluded Termination Event, the Purchase Price shall be reduced by an amount equal to 30%.

       (b)    In the event of the Incapacity of Mark Hyman, Misha Hyman, at his sole discretion, may designate himself to replace Mark Hyman as Manager by notifying the other Members within 45 days of the date of such Incapacity.

9.5     *Key Man Insurance*.  Within sixty (60) days after the execution of this Agreement, the Company shall obtain a life and disability insurance policy on each of the Members, and shall maintain the same until such time as such Members shall cease to be a Member. The Manager may, from time to time, cause the amounts of such policy to be increased. Upon the death or Incapacity of either of the Members, the proceeds from his life and disability insurance policy shall be the property of the Company and shall be used for payment of such Member's Interests pursuant to Section 9.4(a).

9.6     *Required Sale*.  Notwithstanding anything in this Agreement to the contrary, but subject in all events to Section 7.5, if at any time the Company approves a proposal (a "**Sale Proposal**") from a third party for (i) the sale or exchange, directly or indirectly, of all or substantially all of the Interests of the Members, (ii) the merger of the Company with or into another Entity in which the Members will receive cash or securities of any other entity for their Interests or (iii) the sale by the Company or its subsidiaries of all or substantially all of their assets (each, a "**Required Sale**"), then the Company shall deliver a notice (a "**Required Sale Notice**") with respect to such Sale Proposal to all Members stating that the Company proposes to effect the Required Sale and providing the terms of the Sale Proposal and the identity of the third party involved in the Sale Proposal.  Each Member, upon receipt of a Required Sale Notice, shall be obligated (and such obligation shall be enforceable by the Company and the other Members) to sell hers/his/its Interests and participate in the Required Sale contemplated by the Sale Proposal, to vote hers/his/its Interests in favor of the Required Sale at any meeting of Members called to vote on or approve the Required Sale and/or to consent in writing to the Required Sale, to waive all dissenters' or appraisal rights in connection with the Required Sale, to enter into agreements of sale or merger agreements relating to the Required Sale, and otherwise to take all actions necessary or desirable to cause the Company and the Members to consummate the Required Sale.  Any such Sale Proposal, and the terms of any Required Sale, may be amended or modified from time to time, and any such Required Sale Notice may be rescinded, upon the approval of the Manager, subject to Section 7.5.  The Company shall give prompt written notice of any such amendment, modification or rescission to all of the Members.  The obligations of the Members pursuant to this Section are subject to the satisfaction of the following conditions:

(a)     subject to clauses (b) and (e) below, each of the Members shall receive the same proportion and type of the aggregate consideration from such Required Sale that such Member would have received if such aggregate consideration had been distributed by the Company to the Members in complete liquidation pursuant to the rights and preferences set forth in this Agreement as in effect immediately prior to the Required Sale;

(b)     if any Member is given an option as to the form, amount or timing of consideration to be received, all Members shall be given the same option;

(c)     any expenses incurred for the benefit of the Company or all Members, and any indemnities, holdbacks, escrows and similar items relating to the Required Sale, that are not paid or established by the Company (other than those that relate to representations or indemnities concerning a Member's valid ownership of such Member's Interest free and clear of all liens, claims and encumbrances or a Member's authority, power and legal right to enter into and consummate a purchase or merger agreement or ancillary documentation) shall be paid or established by the Members in proportion to the reduced amount of consideration each Member would have received if the aggregate consideration from such Required Sale had been reduced by the aggregate amount of such expenses, indemnities, holdbacks, escrows or similar items;

(d)      in no event shall any Member have any liability in excess of the net consideration actually received by her/him/ in the Required Sale; and

(e)      in no event shall any Member be required to take any type or amount of consideration that it is not legally permitted to hold.

A Required Sale shall not be subject to the provisions of Section 9.1.

## ARTICLE X
## DISSOLUTION, LIQUIDATION AND TERMINATION

10.1     *Dissolution.*  The Company shall be dissolved and its affairs wound up upon the first to occur of the following:

(a)      an election by the Manager, in accordance with Section 7.5, to dissolve the Company at any time;

(b)      the entry of a court decreed dissolution of the Company under §44 of the LLC Law; or

(c)      the written consent of all members.

Dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the assets of the Company have been distributed as provided in Section 10.3 and the Articles of Organization have been canceled.

10.2     *Death, Legal Incapacity, etc.*  The incapacity or death, or the retirement, resignation or expulsion from the Company of a Member (by Transfer of an Interest or otherwise), or the occurrence of any other event that causes a Member to cease to be a member of the Company, shall not cause the dissolution or termination of the Company, and the Company, notwithstanding such event, shall continue without dissolution upon the terms and conditions provided in this Agreement, and each Member, including, without limitation, each Substituted Member, by executing this Agreement, agrees to such continuation of the Company without dissolution.

10.3     *Liquidation of Company Assets upon Dissolution.*

(a)      Upon dissolution, the Company shall be liquidated and wound up in an orderly manner in accordance with the provisions of this Section 10.3.  The Manager may wind up the affairs of the Company or may appoint one or more liquidating trustees (who may be Members) to wind up the affairs of the Company; provided, that if there shall be no Manager, a Majority in Interest of the Members may appoint one or more liquidating trustees (who may be Members) to act as the liquidating trustee in effecting such liquidation.  The Manager, or the liquidating trustee, as applicable, is authorized to sell, exchange or otherwise dispose of the assets of the Company, or to distribute Company assets in kind, as the Manager or the liquidating trustee, as applicable, shall determine to be in the best interests of the Members.  The Manager or the liquidating trustee, as applicable, also is authorized to hold any funds required to be held in escrow pursuant to the provisions of any agreement for the sale of investments that require such an escrow.  The Manager or the liquidating trustee, as applicable, shall use commercially reasonable efforts to complete liquidation of the Company within

two years after the dissolution of the Company, provided that such period may be extended for up to two additional one-year periods by the Manager.  The reasonable out-of-pocket expenses incurred by the Manager or the liquidating trustee, as applicable, in connection with winding up the Company (including legal and accounting fees and expenses), all other liabilities or losses of the Company or the Manager or the liquidating trustee, as applicable, incurred in accordance with the terms of this Agreement and reasonable compensation for the services of the liquidating trustee shall be borne by the Company.  Except as otherwise required by law, neither the Manager nor the liquidating trustee shall be liable to any Member or the Company for any loss attributable to any act or omission taken in good faith in connection with the winding up of the Company and the distribution of Company assets.  The Manager or the liquidating trustee, as applicable, may consult with counsel and the accountants with respect to winding up the Company and distributing its assets and shall be justified in acting or omitting to act, in accordance with the advice or opinion of such counsel or accountants, provided that the Manager or the liquidating trustee, as applicable, shall have used reasonable care in selecting such counsel or accountants.

(b)     Upon dissolution of the Company, the expenses of liquidation (including compensation for the services of the liquidating trustee and legal and accounting fees and expenses) and the Company's liabilities and obligations to creditors (including any liabilities to Members, if any, other than liabilities for distributions) shall first be paid, or reasonable provisions shall be made for payment thereof, from cash on hand or from the liquidation of Company properties.  If any Company liability is contingent, conditional or unmatured in amount, a reserve equal to the maximum amount to which the Company could reasonably be held liable shall be established.  Upon payment or other discharge of such liability, the amount remaining in such reserve not needed, if any, will be distributed in accordance with the following sentence.  After payment or provision for payment of all expenses of liquidation and liabilities and obligations of the Company, the remaining assets of the Company (whether cash or Securities) shall be distributed to the Members in proportion to, and to the extent of, each Member's Capital Account in compliance with Treasury Regulations §1.704-1(b)(2)(ii)(b)(2), as adjusted pursuant to Section 6.5(b), giving effect to the allocations under Article VI such that, to the fullest extent possible, the final distribution under this Section 10.3 is consistent with the provisions of Section 6.3.

10.4     *Articles of Dissolution/Termination*.  Within ninety (90) days following this dissolution and the commencement of winding up the Company, Articles of Dissolution shall be filed with the Secretary of State of the State of New York pursuant to the LLC Law. Upon completion of the dissolution, winding up, liquidation, and distribution of the assets of the Company, the Company shall be deemed terminated.

10.5     *Claims of the Members*.  The Members and former Members shall look solely to the Company's assets for the return of their Capital Contributions, and if the assets of the Company remaining after payment of or due provision for the payment of all debts, liabilities and obligations of the Company are insufficient to return such Capital Contributions, the Members and former Members shall have no recourse against the Company, any other Member or the Manager unless the same is found to have acted in bad faith.

ARTICLE XI
AMENDMENTS

11.1    *Adoption of Amendments; Limitations Thereon.*

(a)    *General.*  Subject to Sections 11.1(b) and 11.1(c), this Agreement may not be amended, modified, supplemented or waived without the prior Consent of a Majority in Interest of the Members, except that this Agreement may be amended in the manner expressly and specifically provided in any provision of this Agreement.

(b)    *Amendments by Manager.*  Notwithstanding the limitations of Section 11.1(a), but subject to Section 11.1(c), this Agreement may be amended from time to time by the Manager without the Consent of any Member (i) to correct any printing, stenographic, clerical or other minor errors or omissions; (ii) to amend <u>Schedule A</u> to admit one or more additional Members or one or more Substituted Members, or withdraw one or more Members, in accordance with the terms of this Agreement; (iii) to amend <u>Schedule A</u> to provide any necessary information regarding any Member or any additional or Substituted Member; or (iv) to amend <u>Schedule A</u> to reflect additional Capital Contributions made by the Members and/or other adjustments to the Members' Capital Accounts, in accordance with the terms of this Agreement.

(c)    *Limitation on Amendments.*  Notwithstanding anything to the contrary in Section 11.1(a) or Section 11.1(b), no amendment may be made that would (i) change Sections 5.2(b) or 9.4 without the consent of all the Members, or (ii) have the effect of increasing the liability or obligations of a Member or reducing disproportionately a Member's right to distributions, without the Consent of the adversely affected Member, <u>provided</u>, that the admission of an additional Member, an increase in another Member's Capital Contributions, a forfeiture or reduction of another Member's Interests or an issuance of additional interests shall not be deemed to increase the liability or obligations of a Member or reduce a Member's right to distributions for purposes of this clause.

(d)    *Copies of Amendments.*  The Manager will promptly send each Member a copy of any amendment adopted pursuant to Section 11.1(a) or 11.1(b).

11.2    *Amendment of Articles of Organization.*  In the event this Agreement shall be amended pursuant to this Article XI, the Manager or, at the direction of the Manager, an authorized person, shall amend the Articles of Organization to reflect such change if such amendment is required and approved in accordance with Sections 7.5(a)(v) and shall make any other filings or publications required or desirable to reflect such amendment.

ARTICLE XII
CONSENTS, VOTING AND MEETINGS OF MEMBERS

12.1    *Method of Giving Consent.*  Any Consent required by this Agreement may be given as follows:

(a)    by the affirmative vote by the approving Member to the doing of the act or thing for which the Consent is solicited at any meeting called and held to consider the doing of such act or thing; or

(b)      by a written Consent given by the approving Member at or prior to the doing of the act or thing for which the Consent is solicited.

12.2    *Meetings*.  Any matter requiring the Consent, vote or approval of all or any of the Members pursuant to this Agreement may be considered at a meeting of the Members, or the Members may take such action without a meeting, if a Consent or Consents in writing, setting forth the action so taken, shall be signed by the Members having not less than the minimum votes that would be necessary to authorize or take such action at a meeting. Meetings of Members may be called, and notices of meetings may be given, at any time and for any reason (i) by the Manager or the CEO in his/her/its discretion or (ii) by a Majority in Interest of the Members in their discretion.  Notice of meetings of Members shall be given not less than five (5) nor more than sixty (60) days prior to the meeting.  Notice may be waived by the Members.  Any such notice shall state briefly the purpose, time and place of the meeting.  All such meetings shall be held in the United States, within or outside the Commonwealth of Massachusetts, at such reasonable place as the Manager or CEO shall designate and during normal business hours.  Members may participate in a meeting of the Members by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear and speak to each other, and such participation in a meeting shall constitute presence in person at the meeting.

12.3    *Record Dates*.  The Manager may set in advance a date for determining the Members entitled to notice of and to vote at any meeting.  All record dates shall not be more than sixty (60) days prior to the date of the meeting to which such record date relates.

12.4    *Voting Rights*.  Except as expressly provided in this Agreement or to the extent otherwise required by applicable laws, all Interests will vote together and not as separate classes. Notwithstanding anything to the contrary in the LLC Act, no Member shall have the right to vote on, or consent to, any matter except to the extent expressly set forth in the Articles of Organization or this Agreement.  If and to the extent the Articles of Organization or this Agreement expressly entitle any Member to vote on, or consent to, any matter, such Member shall be entitled to cast a number of votes equal to the number of Interests then held by such Member.

## ARTICLE XIII
## RECORDS AND REPORTS; FISCAL AFFAIRS

13.1    *Records and Accounting*.

(a)      Appropriate records and books of account of the business of the Company, including a list of the names, addresses, Interests, and Capital Contributions of all Members, shall be maintained at the Company's principal place of business. Any Member, or its duly authorized representatives, shall be entitled to a copy of the list of names and addresses of the Members, provided such information shall be used only for Company purposes. Each Member and its duly authorized representatives shall be permitted for any purpose reasonably related to such Member's interest as a member of the Company to inspect the books and records of the Company and visit the offices or properties of the Company at any reasonable time during normal business hours.

(b)      The cash basis of accounting shall be followed by the Company for federal income tax purposes. The taxable year of the Company shall be its Fiscal Year.

- 25 -

(c)     The Company shall maintain books for the purpose of registering the Transfer of certificates, if any, representing Interests.

(d)     The Company shall furnish to any Member or its authorized representative, upon written request, any information such Member may reasonably request regarding the business, operations or financial condition of the Company.

13.2    *Tax Information*.  For each Fiscal Year, the Company shall send to each Person who was a Member at any time during such Fiscal Year (i) not later than sixty (60) days after the end of such Fiscal Year, an estimated Form K-1 for such Fiscal Year, (ii) as soon as reasonably practicable and in any event on or prior to the date required by applicable law, a final Form K-1 for such Fiscal Year, and (iii) upon reasonable request by such Person, such other information, if any, with respect to the Company as may be necessary for the preparation of such Person's federal, state and local income tax returns.

13.3    *Elections*.  The determinations of the Manager with respect to the treatment of any item or its allocation for United States federal, state or local tax purposes will be binding upon all of the Members so long as such determination shall not be inconsistent with any express term hereof. The Manager shall have the right to cause the Company to make an election, pursuant to §754 of the Code (or corresponding provisions of subsequent law), to adjust the basis of the Company's assets as provided by §§734 and 743 of the Code.

ARTICLE XIV
CONFLICT OF INTEREST/OTHER BUSINESS VENTURES

14.1    *Disclosure of Members' and Manager's Interests.*

(a)     Notwithstanding anything contained in this Agreement to the contrary, a contract or other transaction between the Company and a Member or the Manager or any Affiliate of a Member or the Manager shall not be void or voidable for such reason alone or because such Person was present at the meeting approving such contract or transaction and its vote counted for such purpose, if the material facts with respect to such Person's interest in such contract or transaction are disclosed in good faith or known to:

(i)     the other Members entitled to vote thereon, and such other Members approve the contract or transaction by a vote sufficient for such purpose without counting the vote of the interested Member, or, if the vote of the disinterested Members is insufficient for approval, by unanimous vote of the disinterested Members; or

(ii)    a Majority in Interest of the Members entitled to vote thereon approve the contract or transaction.

(b)     If the requirements of clause (a) above are not met, the Company may void a contract or transaction unless the parties thereto establish that it was fair and reasonable to the Company at the time of its approval.

ARTICLE XV
GENERAL PROVISIONS

15.1   *Notices.*

(a)   Except as specifically provided elsewhere in this Agreement, all notices, requests, consents or other communications to the Company or to any Member hereunder shall be in writing (which shall include a facsimile transmission and electronic mail ("***email***")) and shall be given (i) if to the Company, at Hyman Digital LLC, 55 Pittsfield Road, Suite 9, Lennox Commons, Lenox, Massachusetts 01240, Attn: Mark Hyman, Email: *mark@ultrawellnesscenter.com*, with a carbon copy to Sonya del Peral, Esq., 22 Park Row, Chatham, New York 12037, Email: *sdp@sdplaw.com*, or such other address or facsimile number as the Company may hereafter specify by written (including facsimile or email) notice to the Members; and (ii) if to a Member, at the Member's address, email or facsimile number set forth on Schedule A hereto or such other address, email or facsimile number as such Member may hereafter specify by written (including facsimile or email) notice to the Company.

(b)   Each such notice, request, consent or other communication shall be given (i) by hand delivery, (ii) first class mail, (iii) by nationally recognized courier service or United States Express Mail, (iv) by facsimile, (v) by email.

(c)   Each such notice, request, consent or other communication shall be effective (i) if delivered by hand, when delivered at the address specified in this Section 15.1, (ii) if sent by first class mail, five days after such mailing to the address specified in this Section 15.1, (iii) if delivered by nationally recognized overnight courier service or sent by United States Express Mail, on the second following business day after delivery to such service or such mailing, (iv) if given by facsimile, when such facsimile is transmitted to the facsimile number specified in this Section 15.1 and the appropriate answer back or confirmation is received or (v) if given by email, when such email is transmitted to the email address specified in this Section 15.1 and a response or "read receipt" is received.

15.2   *Entire Agreement.*   This Agreement (including the Schedules attached hereto) shall constitute the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and shall supersede any prior understanding or agreement, oral or written, with respect thereto, all of which prior understandings and agreements shall hereafter be null and void. There are no representations, agreements, arrangements or understandings, oral or written, between or among the Members relating only to the subject matter of this Agreement except as expressly set forth herein.

15.3   *Confidentiality.*   Each Member agrees that such Member shall keep confidential, and shall not disclose to any third Person, without the consent of the Manager, any non-public information with respect to the Company (including any Person in which the Company holds, or contemplates acquiring, stock or any other interest) that is disclosed to such Member by or on behalf of the Company, provided that a Member may disclose any such information (i) as has become generally available to the public, other than as a result of a breach of this Section 16.3, (ii) to its employees and professional advisers who need to know such information and agree to keep it confidential, (iii) to the extent required in order to comply with contractual reporting obligations, to its limited partners or members who have agreed to keep such information confidential; (iv) to the extent necessary in order to comply with any law, order, regulation or ruling applicable to such Member; (v) to third parties by the Manager (subject to appropriate confidentiality agreements) in connection with the fulfillment of his or

- 27 -

her duties hereunder; and (vi) as may be required in response to any summons or subpoena or in connection with any litigation, it being agreed that, unless such information has become generally available to the public, if such information is being requested pursuant to a summons or subpoena or a discovery request in connection with a litigation, (x) the Member shall give the Company notice of such request and shall cooperate with the Company at the Company's request so that the Company may, in its discretion, seek a protective order or other appropriate remedy, if available, and (y) in the event that such protective order is not obtained (or sought by the Company after notice), the Member (A) shall furnish only that portion of the information which, in accordance with the advice of counsel, is legally required to be furnished and (B) will exercise its reasonable best efforts to obtain assurances that confidential treatment will be accorded such information.  Schedule A hereto, as it may be amended from time to time, shall be distributed to the Members, but shall otherwise remain confidential.

15.4    *Binding Effect*.  Subject to the limitations set forth in Article IX, this Agreement and all of the terms and provisions hereof shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective legal representatives, heirs, successors and permitted assigns.

15.5    *Severability*.  If any provision of this Agreement, or the application of such provision to any Person or circumstance or in any jurisdiction, shall be held to be invalid or unenforceable to any extent, (i) the remainder of this Agreement shall not be affected thereby, and each other provision hereof shall be valid and enforceable to the fullest extent permitted by law, (ii) as to such Person or circumstance or in such jurisdiction such provision shall be reformed to be valid and enforceable to the fullest extent permitted by law and (iii) the application of such provision to other Persons or circumstances or in other jurisdictions shall not be affected thereby.  Any default hereunder by a Member shall not excuse a default by any other Member.

15.6    *No Waiver*.  Neither the failure nor delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence.  No waiver shall be effective unless it has been approved in accordance with Section 11.1, is in writing and has been signed by the party asserted to have granted such waiver.

15.7    *Governing Law*.  This Agreement, and all rights, remedies and obligations of the parties hereunder, shall be governed by, construed and enforced in accordance with the laws of the Commonwealth of Massachusetts without regard to principles of conflict of laws.

15.8    *Judicial Proceedings*.  IN ANY JUDICIAL PROCEEDING INVOLVING ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE COMPANY OR ITS OPERATIONS, EACH OF THE MEMBERS UNCONDITIONALLY ACCEPTS THE EXCLUSIVE JURISDICTION AND VENUE OF THE UNITED STATES DISTRICT COURT OF MASSACHUSETTS (SPRINGFIELD DIVISION), OR THE BERKSHIRE COUNTY SUPERIOR COURT AND THE APPELLATE COURTS TO WHICH ORDERS AND JUDGMENTS THEREOF MAY BE APPEALED.  IN ANY SUCH JUDICIAL PROCEEDING, THE MEMBERS AGREE THAT IN ADDITION TO ANY METHOD FOR THE SERVICE OF PROCESS PERMITTED OR REQUIRED BY SUCH COURTS, TO THE FULLEST EXTENT PERMITTED BY LAW, SERVICE OF PROCESS MAY BE MADE BY PREPAID

CERTIFIED MAIL WITH A PROOF OF MAILING RECEIPT VALIDATED BY THE U.S. POSTAL SERVICE CONSTITUTING EVIDENCE OF VALID SERVICE.  EACH OF THE MEMBERS HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR RELATING TO THE COMPANY OR ITS OPERATIONS.

15.9   *Third Party Beneficiaries*.  This Agreement is solely for the benefit of the parties hereto, and nothing in this Agreement shall be deemed to create any legal, equitable or other third-party beneficiary rights in any person not a party to this Agreement.

15.10   *Expenses*.  Each Member shall be responsible for its own fees and expenses incurred by such Members in connection with the transactions contemplated by this Agreement and any related transactions. Any Member who advances funds for the formation of the Company shall be reimbursed by the Company.

15.11   *Headings and Captions*.  The headings, subheadings and captions contained in this Agreement are included for convenience of reference only, and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

15.12   *Counterparts; Facsimile Signatures*.  This Agreement and any amendment hereto may be signed in any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one Agreement (or amendment, as applicable).  Delivery of an executed signature page to this Agreement by facsimile or email shall be as effective as delivery of a manually executed counterpart hereof.

15.13   *Effectiveness*.  This Agreement and the provisions hereof shall become effective with respect to the Company and shall be binding upon each of the Members at such time as this Agreement has been executed and delivered by the Company and each of the Members.

*[The remainder of this page has been intentionally left blank.]*

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first above written.

HYMAN DIGITAL, LLC

By:_____
  Name:  Mark Hyman, M.D.
  Title:  Manager

_____
     Dhrumil Purohit, Member

_____
     Mark Hyman, M.D., Member

EXHIBIT 1

## PROMISSORY NOTE

$_____                                        _____, Massachusetts
                                                          _____, 20\_\_\_

**FOR VALUE RECEIVED,** the undersigned, _____ (**"*Maker*"**), promises to pay to [the order of] _____, residing at _____ _____ ("*Payee*"), the principal sum of _____ ($_____) Dollars, together with interest on the unpaid principal amount thereof at 4% per annum.

Payments by Maker hereunder shall be made to Payee at _____, or to such other address as Payee may designate, and shall be made in _____ (\_\_) [quarterly/annual] installments of principal and interest, amortized over _____ (\_\_) months, commencing on _____ and continuing on the \_\_\_ day of each subsequent _____, until _____, 20\_\_, at which time all remaining unpaid principal and accrued interest hereunder shall be paid in full.

All payments made by Maker hereunder shall first be applied to accrued interest and the balance of any such payment shall be applied in reduction of principal.  Maker may prepay all or any part of the principal sum of this Note at any time without penalty.

Maker's failure to make any required payment pursuant to this Note within fifteen (15) days of its due date shall constitute a default hereunder.  Upon the occurrence of such a default, Payee shall give written notice thereof to Maker.  In the event Maker shall fail to cure such default within ten (10) days following its receipt of said notice, Payee, at Payee's option, may give Maker further written notice thereof, whereupon all remaining unpaid principal and accrued interest hereunder shall then become immediately due and payable.

This Note has been executed and delivered to Payee by Maker pursuant to the provisions of a certain Operating Agreement dated as of _____, 20\_\_ by and among _____, _____, and _____, and is entitled to the benefits thereof.

This Note shall be construed and enforced in accordance with the laws of the Commonwealth of Massachusetts.

[Signature of Maker]