UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **DHRUMIL PUROHIT**, individually, and derivatively on behalf of HD, LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>**DR. MARK HYMAN AND HYMAN DIGITAL, LLC,**<br><br>*Defendants.*<br><br>---<br><br>**HYMAN DIGITAL, LLC,**<br><br>*Counterclaim Plaintiff,*<br><br>v.<br><br>**DHRUMIL PUROHIT,**<br><br>*Counterclaim Defendant.* | Civil Action<br>No. 1:24-cv-11784-WGY |

### AFFIDAVIT OF MARK HYMAN, M.D. IN SUPPORT OF MOTION FOR THE APPOINTMENT OF RECEIVER

Pursuant to 28 U.S.C. § 1746, I, Dr. Mark Hyman, hereby state as follows:

1. I am a founding member of Hyman Digital, LLC ("HD"), and currently hold a 90% interest in the company.

2. In 2015 I hired Dhrumil Purohit to serve as HD's Chief Executive Officer. As CEO, Mr. Purohit was responsible for promoting the work of myself and other medical experts. The full terms of Mr. Purohit's employment were set forth in an Executive Services Agreement

dated July 15, 2015 (the "ESA").[1] As compensation, Mr. Purohit received 10% of HD, vested over four years. While Mr. Purohit was potentially entitled to obtain an additional ownership interest in HD, the total amount of Mr. Purohit's ownership interest in HD will have to be determined by the Court.

3. As CEO and pursuant to the ESA, Mr. Purohit was expected to develop and grow HD's products and content, and promote myself and my associated brands, through creative and innovative social media, content development, product development, advertising, and sponsorship initiatives.

4. In 2018, HD released two 8-part docuseries called *The Broken Brain* and *The Broken Brain 2*, which featured myself and a cross-section of leading experts who examined the application of functional medicine to brain disorders.

5. *The Broken Brain* docuseries received substantial acclaim and millions of views. In light of the widespread public appetite for the docuseries' health-related content, HD launched a general audience spinoff podcast called the *Broken Brain Podcast*, focused exclusively on topics related to mental and brain health.

6. To protect its material, HD obtained copyrights for five episodes of the podcast, as well as trademarks for the phrase "Broken Brain" in both print and media.

7. Nearly one million subscribers to *The Broken Brain* docuseries email list were also added to the *Broken Brain Podcast* listserv. That email list supported the success of the podcast, helping it quickly develop a large and loyal audience.

8. As part of his work for HD, Mr. Purohit was responsible for developing and producing both HD's *The Broken Brain* docuseries and the *Broken Brain Podcast*, as well as

---

[1] A true and correct copy of the ESA is attached as Exhibit 1 to the *Answer and Counterclaims* [ECF no. 11] filed in this case.

their associated marketing, advertising, and sales strategies. Specifically, Mr. Purohit was responsible for (1) ensuring that the emails and social media contacts gathered in connection with *The Broken Brain Podcast* were integrated into marketing and promotional efforts across the HD universe to maximize the significant value of those assets and (2) obtaining and engaging sponsors and advertisers for the *Broken Brain Podcast*.

9. Approximately once a week, HD would release a new episode of the *Broken Brain Podcast* and then email it to every address on the email list. This email list and the associated weekly email announcements represented valuable advertising real estate.

10. HD's other newsletters charge premium prices for third-party product features and advertisements. Mr. Purohit, however, failed to secure sponsorships for this product.

11. Rather than using my existing social media platforms, or creating "Broken Brain" titled channels, Mr. Purohit instead unilaterally decided to use his personal social media channels, which had previously been used solely for personal content (and never for podcasts, commercial content, or even health-related content), to post episodes of HD's the *Broken Brain Podcast*.

12. In addition, Mr. Purohit set up separate podcast distribution channels, including with Acast (a third-party podcast hosting and monetization company), under his personal name to publish HD's *Broken Brain Podcast* and other HD content.

13. In the three years after its creation, Mr. Purohit helped produce 203 episodes of the *Broken Brain Podcast*, a considerable undertaking that took up a large portion of Mr. Purohit's time as CEO of HD.

14. In April 2021, without my knowledge or consent, Mr. Purohit changed the name of the *Broken Brain Podcast* to the *Dhru Purohit Podcast* ("DPP").

15. The podcasts's content, general format, sponsors, and subscribers remained the same, but Mr. Purohit changed its logo and other branding to emphasize his own name and brand instead of HD's.

16. Mr. Purohit represented, through both words and actions, that these changes were nothing more than a rebranding of the same podcast. For example, Mr. Purohit started the podcast's first post-rebrand episode by saying "[h]i everyone, Dhru Purohit here, host of this podcast, which is now called the *Dhru Purohit Podcast*, formerly known as the *Broken Brain Podcast*. New title, same great content."

17. In addition, numerous contemporaneous company emails, on which Mr. Purohit was copied, all confirm that this was merely a rebranding.

18. Until Mr. Purohit filed his Complaint in this action, he also hosted all prior episodes of the *Broken Brain Podcast* alongside DPP on the same Acast podcast platform and social media channels, further evidencing that DPP was merely a continuation of the *Broken Brain Podcast* under a different name—not a new product.

19. Despite the rebranding, both HD and Mr. Purohit treated DPP as HD property. Mr. Purohit worked to develop and grow the podcast during normal business hours, using HD employees and resources. Mr. Purohit even engaged a YouTube marketer, paid for by HD, to implement a YouTube strategy to grow subscribers.

20. The podcast remained featured on HD's website and other media properties, and Mr. Purohit continued utilizing the email list and social media accounts originally developed for the *Broken Brain Podcast* to promote DPP.

21. All advertisers and sponsors for DPP were contracted under HD's masthead by HD employees, were invoiced by HD, and remitted payment to HD. All advertising and

sponsorship revenue for DPP flowed through HD and is reflected in the company's financial statements.

22. Thereafter, Mr. Purohit began devoting a significant amount of company time and resources to DPP, even adding a second weekly episode—which required the dedication of a full-time team, including a new assistant and a new videographer, both employed by HD.

23. While the *Broken Brain Podcast* focused exclusively on brain and mental health topics, Mr. Purohit eventually pivoted DPP to focus on general health topics, using a nearly identical format, content, business model, guests, and sponsors as HD's other primary podcast, *The Doctor's Farmacy*, a general health podcast which I host.

24. In essence, Mr. Purohit turned DPP into a direct competitor, creating a situation where HD's products competed with each other for subscribers and views.

25. In the interest of (1) focusing my schedule on major health initiatives and leadership, patient care, and professional education; (2) avoiding a public image issue with multiple name changes; (3) retaining an active and growing marketing list; and (4) maintaining cordial relations with my CEO (who clearly courted public recognition and attention), I acquiesced to Mr. Purohit's questionable rebranding strategy, and never demanded that Mr. Purohit revert DPP back to the *Broken Brain Podcast* or something more identifiable with HD.

26. Based on Mr. Purohit's conduct and representations, I justifiably believed that DPP was being operated as a HD asset, that its advertising revenue, goodwill, and opportunities for growth and cross-promotion would flow to the company, and that Mr. Purohit was growing and expanding HD's footprint and messaging.

27. In a similar spirit, I accepted Mr. Purohit's subsequent March 2022 request to receive 95% of HD's profit from DPP, which was paid to Mr. Purohit exclusively as an incentive and discretionary commission.

28. Pursuant to this arrangement, HD (which received all the podcast's revenue in the first instance) remitted a quarterly payment to Mr. Purohit for these proceeds, again in the spirit of keeping Mr. Purohit motivated as HD's CEO.

29. This arrangement, as confirmed through communications between myself and Mr. Purohit at the time, was intended as a bonus for the effort required to build the podcast, and to incentivize the continued growth and development of DPP as a HD asset.

30. HD and Mr. Purohit also developed an electronic newsletter, released through a newly curated email list, called *Try This*. Mr. Purohit developed *Try This* during his tenure as CEO, and its content was entirely within the scope of Hyman's Digital's business.

31. HD hired an employee whose job duties included, among other things, "writing *Try This*" content and who used the HD website, email lists, and podcast advertising spots to promote *Try This*.

32. Like DPP, all *Try This* sponsors and advertisers were negotiated and secured by HD employees, were contracted under HD's name, and all sponsorship and advertising revenue was paid to HD Every aspect of this arrangement was reflected contemporaneously in HD's books and records, and all costs and revenue associated with *Try This* were recorded in HD's financial statements. And just like DPP, *Try* This was promoted by and posted on HD's website.

33. Beginning with the *Broken Brain Podcast* and continuing with DPP, Mr. Purohit began using the associated *Broken Brain* newsletter and email list (highly valuable advertising real estate worth more than $50,000 per email sponsorship spot) and the company's website

6

834806-v1A

(including over 500 pages on the website used by HD, drhyman.com) to amplify and direct traffic to Mr. Purohit's personal social media channels and the two products he developed during his employment as CEO: the *Try This* newsletter and DPP

34. These emails were sent out under my name—not Mr. Purohit's—effectively using my reputation and prestige to enhance Mr. Purohit's brand.

35. I have since learned that Mr. Purohit actively encouraged multiple sponsors of HD's *The Doctor's Farmacy* podcast to re-direct substantial advertising dollars away from *The Doctor's Farmacy* and toward DPP—the only HD media property with (1) Mr. Purohit's name and branding on it, (2) that Mr. Purohit hosts, and (3) with a majority of the revenue expressly allocated for Mr. Purohit in a discretionary commission.

36. During his employment as CEO, Mr. Purohit's management style was unprofessional and inappropriate. During performance reviews, employees repeatedly mentioned his absence from the company's operations and expressed confusion about the reporting structure.

37. Mr. Purohit was prone to intemperate outbursts, and on numerous occasions he publicly disrespected and disparaged me, including to employees and potential investors, and during important discussions with potential partners that represented significant opportunities for the company.

38. Mr. Purohit's outrageous behavior came to a head during a September 12, 2023, conference call with a key HD business partner. On the call, Mr. Purohit refused to proceed with a quick Instagram post from me regarding a particular type of laboratory test, loudly reproached me for "overruling him" and "swooping and pooping," calling me "clueless," being "too

7

flexible" with "these types of minimal-overhead, large-yield efforts," and issued me an ultimatum that he would quit if I agreed to the post.

39. Following the call, I sought to speak with Mr. Purohit one-on-one to better understand his aggressive and uncooperative behavior. In response to this effort to fashion a more productive path forward, Mr. Purohit explicitly stated to me, "I quit," and launched into an expletive-laden diatribe about how he needed to build his own brand and focus on efforts that wholly benefitted himself and members of his family.

40. Mr. Purohit's resignation took effect November 30, 2023.

41. Upon resigning, Mr. Purohit absconded with DPP and *Try This* and he continues to host a back catalogue of HD podcasts and newsletters on his personal social media channels and continues to create new content for DPP and *Try This*, despite both being HD's property.

42. Mr. Purohit continues to sell advertising against DPP's back catalogue, profiting to the tune of hundreds of thousands of dollars off content that was created during his employment with HD. And until filing this claim, he continued to host and receive revenue from the *Broken Brain Podcast*, only removing this valuable catalogue in July 2024 without permission or notice, leaving HD without any distribution channel for this asset, and putting HD's sponsorship contracts for this catalogue at risk.

43. In response to a cease-and-desist letter from HD in November 2023, Mr. Purohit changed the name of DPP to *The Dhru Purohit Show*. However, *The Dhru Purohit Show* continues to use the same format and intellectual property, and many of the same partners, sponsors, and advertisers, and the same distribution channels and subscribers which rightfully belong to HD despite Mr. Purohit having registered them surreptitiously under his own name.

44. Shortly after *commencing* this litigation Mr. Purohit removed all episodes and content of the *Broken Brain Podcast* from his channels.

45. Following Mr. Purohit's departure, HD carried out an organizational audit, and for the first time began to uncover the depth and extent of Mr. Purohit's malfeasance, neglect of duties, and improper self-dealing.

46. In stark contrast to the amount of effort and attention Mr. Purohit devoted to self-promotion and diverting HD assets, property, and opportunities to ultimately unjustly enrich himself and his family, this investigation has revealed that this was at the expense of his other duties and responsibilities.

47. Mr. Purohit did minimal work in other areas, causing *The Doctor's Farmacy* podcast to drop in ratings, as only one example, and social media growth to slow significantly.

48. As CEO, Mr. Purohit lacked clear strategy or planning, despite numerous requests by me for such a strategy, there was no proactive strategic or growth-oriented management of personnel or operations.

49. Although HD's revenue did increase—primarily due to my growing industry credibility and my podcast—nearly all key performance indicators declined materially under Mr. Purohit's leadership, resulting in substantial losses and opportunity costs.

50. Mr. Purohit failed to develop or execute an effective or coherent business model or strategy for HD. He failed to prepare an organizational strategy, multiple budgets, or team project plans.

51. Mr. Purohit failed to provide this most basic operational information even in the face of my repeated requests. In addition, Mr. Purohit appears to have devoted almost no effort to developing even the most basic elements of a business strategy. For example, he inexplicably

9
834806-v1A

retired previously successful product lines, without replacing them with comparable revenue drivers, or even a strategic plan for addressing the loss in revenue or the diminished diversification of HD's revenue streams—including the 10 Day Detox and the Hyman+ membership.

52. Under Mr. Purohit's management, the 1-million subscriber *Broken Brain* email list—which, if used in service of HD's content, would have been a major source of ad and sponsor revenue—has diminished to half its previous size and results in little user engagement.

53. Mr. Purohit displayed a similar neglect in other core areas. He failed to develop, design, or manage an online marketplace for HD's website, resulting in an untapped potential revenue source.

54. Mr. Purohit failed to update HD's website or newsletters despite requests to do so, making the website appear dated and behind the industry's developing trends and best practices.

55. Mr. Purohit failed to incorporate any industry best practices, or even baseline operational strategies, including employing paid media, customer retargeting, or any search engine optimization strategy, costing HD a significant amount in potential revenue.

56. Mr. Purohit appears to have completely neglected content strategy, and instead relied on repurposing outdated content without regard to trends, market research, or developments in the field. This neglect left HD in a precarious position upon Mr. Purohit's abrupt resignation, leaving HD's new leadership and team members effectively incapacitated, and requiring them to develop all strategic and operational plans from scratch.

57. Mr. Purohit's hiring decisions appear to have been motivated solely by nepotism and personal loyalty, as on several occasions he chose individuals (including relatives) with irrelevant, inapplicable, or nonexistent skills for the position in question, including his personal

trainer, and two of his sisters—one of whom, while serving as HD's Chief Content Officer, developed her own competing startup brand and podcast.

58. It was never contemplated that I would act as the CEO of HD, and my other obligations prevent me from acting in that capacity at this time. Indeed, the reason for HD's existence, providing a platform for myself and Mr. Purohit to work together, no longer exists since Mr. Purohit resigned as HD's CEO and seeks to withdraw as a member from HD.

59. While HD's operations are currently stable, it does not have the ability to continue operations in the long term. Mr. Purohit absconded with valuable HD assets, and also claims to be owed approximately $2.4 million pursuant to HD's operating agreement.

60. HD does, however, own assets that appear to have material value, including historical podcasts and content that have the ability to generate advertising revenue.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Dated: August 10 , 2024

Mark Hyman, M.D.