## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DHRUMIL PUROHIT, individually, and derivatively on behalf of HD, LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>DR. MARK HYMAN AND HYMAN DIGITAL, LLC,<br><br>*Defendants.* | Civil Action<br>No. 1:24-cv-11784-WGY |
| HYMAN DIGITAL, LLC,<br><br>*Counterclaim Plaintiff,*<br><br>v.<br><br>DHRUMIL PUROHIT,<br><br>*Counterclaim Defendant.* |  |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR THE APPOINTMENT OF RECEIVER

Defendant-Counterclaim Plaintiff Hyman Digital, LLC ("HD") and defendant Dr. Mark

Hyman ("Dr. Hyman," and together with HD the "Defendants") submit this memorandum of law

in support of their *Motion for the Appointment of Receiver* (the "Motion").

## PRELIMINARY STATEMENT

Dhrumil Purohit ("Mr. Purohit") brought this litigation, both individually and

derivatively on behalf of HD, asserting, among other things that the Defendants breached HD's

operating agreement, that Dr. Hyman breached is his fiduciary duty to HD, that Dr. Hyman

834807

misappropriated HD's assets and that certain other assets in Mr. Purohit's possession do not belong to HD. Dr. Hyman and HD dispute all of Mr. Purohit's allegations and claims, and have asserted counterclaims for, among other things, numerous breaches of Mr. Purohit's employment agreement, breaches of his fiduciary obligations to HD, misappropriation of HD's assets and trade secrets, and infringement of HD's trademarks and copyrights.

HD's mission is to grow and support Dr. Hyman's efforts to promote functional medicine, educate consumers through evidence-based but easily understandable content, and improve health outcomes. In service of this mission, HD produced content across multiple platforms, including social media content, newsletters, podcasts, products, and books. HD was formed to permit Dr. Hyman and Mr. Purohit to work together, so that Mr. Purohit could promote the work of Dr. Hyman and other medical experts, and expand and monetize Dr. Hyman's brand and digital footprint, leaving Dr. Hyman free to focus on his medical practice, research, books, and other business ventures. Dr. Hyman and HD had high hopes for Mr. Purohit's tenure as CEO and believed they had found a true partner, and, for a time, HD was successful. Eventually, however, Mr. Purohit decided he could make more money operating on his own, leading him to resign his position as CEO of HD, absconding with various HD assets that were developed during Mr. Purohit's time with HD and plainly belong to HD under the terms of Mr. Purohit's employment agreement and black letter law. Mr. Purohit has continued to profit from and monetize those assets since his departure from HD.

Mr. Purohit's abrupt and unexpected resignation left HD in a precarious state. Largely unbeknownst to Dr. Hyman, Mr. Purohit had for years used HD for his own personal benefit. He hired friends and family members for senior HD positions, despite their lack of qualifications, and used valuable advertising real estate in HD content to promote—for free—his own

834807

platforms, as well his friends' and family members' content, products, and services. While internally and externally presenting himself as though he were developing content for HD, he was instead developing and growing both his own following and competing products on the back of HD and Dr. Hyman—using company time, company employees and resources, and services that were paid for by the company. At the same time, he neglected his duties to other areas of HD, resulting in static growth, a diminished follower base, and declining performance relative to peers.

As a result of Mr. Purohit's resignation as CEO, HD's ability to continue long term operations has been threatened. Aside from the valuable assets with which Mr. Purohit absconded—the ownership of which are at issue in this action—HD also unquestionably owns other, undisputed assets that appear to have value and can generate positive cash flow, including historical podcasts and content. HD's principal debts are those that are incurred in the ordinary course of business, and those debts are usually paid in full in the ordinary course of business. Mr. Purohit, however, claims to be owed approximately $2.4 million pursuant to HD's operating agreement. If this claim is valid—and its propriety is at issue in this action—HD is likely insolvent.

At its core, this case is a classic business divorce—the relationship between the two members of HD is irretrievably broken and both parties have accused the other of breaching their duties to HD and misappropriating HD's assets. The Court will determine which party's claims are valid. While HD has assets that appear to have value, it is apparent that neither side will trust the other to preserve and liquidate those assets. This is, therefore, also a classic case for the appointment of a receiver, an independent third party who can take control of, preserve, analyze,

3

and liquidate HD's assets to create cash to be held pending the Court's resolution of the disputes between HD's two members.

<h1 style="text-align:center">BACKGROUND[1]</h1>

The facts alleged by Mr. Purohit are set forth in his complaint in this case and will not be repeated here. For present purposes, it suffices to say that Mr. Purohit accuses Dr. Hyman of breaching his fiduciary duties, misappropriating corporate opportunities, and other managerial malfeasance. Mr. Purohit further claims that he owns certain content developed while he was employed as HD's CEO, and seeks a declaration that such content belongs to him personally. As set forth in their *Answer and Counterclaims*, Dr. Hyman and HD categorically deny those allegations, many of which are unnecessarily inflammatory and could further damage HD's brands.

**A.      The Creation of HD, Hiring of Mr. Purohit, and Execution of the ESA**

In 2015, Dr. Hyman hired Dhrumil Purohit to serve as HD's Chief Executive Officer to promote the work of Dr. Hyman and other medical experts. The terms of Mr. Purohit's employment as CEO, and his duties and obligations to HD, were set forth in an Executive Services Agreement dated July 15, 2015 (the "ESA")[2]. As compensation, Mr. Purohit received 10% of HD, vested over four years. ESA., Schedule A. While Mr. Purohit was potentially entitled to obtain an additional ownership interest in HD, the total amount of Mr. Purohit's ownership interest in HD will have to be determined by the Court. Dr. Hyman retained the remaining ownership interests in HD. *Id.*

---

[1] The facts in this memorandum are supported by the *Affidavit Of Mark Hyman, M.D. In Support Of Motion for the Appointment of Receiver*, which was filed contemporaneously.

[2] A true and correct copy of the ESA is attached as Exhibit 1 to the Defendants' *Answer and Counterclaims* [ECF no. 11] in this case.

834807

As CEO and pursuant to the ESA, Mr. Purohit was expected to develop and grow HD's products and content, and promote Dr. Hyman and his associated brands, through creative and innovative social media, content development, product development, advertising, and sponsorship initiatives. In addition, the ESA acknowledged and reiterated Mr. Purohit's fiduciary duty of loyalty to HD. To that end, Mr. Purohit agreed in the ESA to devote his best efforts and all of his business time to HD, ESA § 1.B, refrain from activities and outside ventures that would detract from or interfere with his duties to HD, *id.* § 1.D., and avoid conflicts of interest, *id.* § 1.E., including taking advantage of any company opportunities for his own benefit, *id.* § 7.A.4.

The ESA clearly stated that all of Mr. Purohit's "Work" for HD constituted work for hire owned by HD, and that Mr. Purohit transferred all rights, title, and interest in and for such work to HD to the degree such work was not considered work for hire. *Id.* at § 5.E. The ESA also prohibits Mr. Purohit from reproducing, distributing, or publicly displaying or exhibiting any such Work. *Id.* The ESA also required Mr. Purohit to safeguard HD's "Proprietary Information," including "customer, supplier, and/or vendor information, lists or subscription lists," "sales or marketing information, plans or strategies" and, importantly, to not "use or seek to use [such information] for [his] own financial benefit or for the financial benefit of any person or entity other than the Company." *Id.* at §§ 5.D, 5.F. Finally, Mr. Purohit agreed to be bound by the ESA's broad non-competition and non-solicitation provisions which not only prohibit him from working for another doctor but also from selling and promoting online health and wellness products.

**B.** *HD's Broken Brain Docuseries, Email List, and Podcast*

In 2018, HD released two 8-part docuseries called *The Broken Brain* and *The Broken Brain 2*, which featured Dr. Hyman and a cross-section of leading experts who examined the

5

application of functional medicine to brain disorders. *The Broken Brain* docuseries received substantial acclaim and millions of views. In light of the widespread public appetite for the docuseries' health-related content, HD launched a general audience spinoff podcast called the *Broken Brain Podcast*, focused exclusively on topics related to mental and brain health. To protect its material, HD obtained copyrights for five episodes of the podcast, as well as trademarks for the phrase "Broken Brain" in both print and media.

Nearly one million subscribers to *The Broken Brain* docuseries email list were also added to the *Broken Brain Podcast* listserv. That email list supported the success of the podcast, helping it quickly develop a large and loyal audience. As part of his work for HD, Mr. Purohit was responsible for developing and producing both HD's *The Broken Brain* docuseries and the *Broken Brain Podcast*, as well as their associated marketing, advertising, and sales strategies. Specifically, Mr. Purohit was responsible for (1) ensuring that the emails and social media contacts gathered in connection with *The Broken Brain Podcast* were integrated into marketing and promotional efforts across the HD universe to maximize the significant value of those assets, and (2) obtaining and engaging sponsors and advertisers for the *Broken Brain Podcast*.

Approximately once a week, HD would release a new episode of the *Broken Brain Podcast* and then email it to every address on the email list. This email list and the associated weekly email announcements represented valuable advertising real estate. Indeed, HD's other newsletters charge premium prices for third-party product features and advertisements. Mr. Purohit, however, failed to secure sponsorships for this product, resulting in substantial lost revenue for HD.

Rather than using Dr. Hyman's existing social media platforms, or creating "Broken Brain" titled channels, Mr. Purohit instead unilaterally decided to use his personal social media

834807

channels, which had previously been used solely for personal content (and never for podcasts, commercial content, or even health-related content), to post episodes of HD's the *Broken Brain Podcast*. In addition, he set up separate podcast distribution channels, including with Acast (a third-party podcast hosting and monetization company), under his personal name to publish HD's *Broken Brain Podcast* and other HD content.

### C. *Mr. Purohit's Exploitation of HD's Assets for Personal Gain*

In the three years after its creation, Mr. Purohit helped produce 203 episodes of the *Broken Brain Podcast*, a considerable undertaking that took up a large portion of Mr. Purohit's time as CEO of HD. In April 2021, without first even discussing, let alone receiving the consent of Dr. Hyman, Mr. Purohit changed the name of the *Broken Brain Podcast* to the *Dhru Purohit Podcast* ("DPP"). The podcast's content, general format, sponsors, and subscribers remained the same, but Mr. Purohit changed its logo and other branding to emphasize his own name and brand instead of HD's.

Mr. Purohit represented, through both words and actions, that these changes were nothing more than a rebranding of the same podcast. For example, Mr. Purohit started the podcast's first post-rebrand episode by saying "[h]i everyone, Dhru Purohit here, host of this podcast, which is now called the *Dhru Purohit Podcast*, formerly known as the *Broken Brain Podcast*. New title, same great content." Dhru Purohit, *My Step-by-Step Sleep Protocol*, YouTube (March 31, 2021), https://www.youtube.com/watch?v=xxOZYeMwm18. In addition, numerous contemporaneous company emails, on which Mr. Purohit was copied, all confirm that this was merely a rebranding. And until Mr. Purohit filed his Complaint in this action, he also hosted all prior episodes of the *Broken Brain Podcast* alongside DPP on the same Acast podcast platform and social media channels, further evidencing that DPP was merely a continuation of the *Broken*

834807

*Brain Podcast* under a different name—not a new product.

Despite the rebranding, both HD and Mr. Purohit treated DPP as HD property. Mr. Purohit worked to develop and grow the podcast during normal business hours, using HD employees and resources. Mr. Purohit even engaged a YouTube marketer, paid for by HD, to implement a YouTube strategy to grow subscribers. The podcast remained featured on HD's website and other media properties, and Mr. Purohit continued utilizing the email list and social media accounts originally developed for the *Broken Brain Podcast* to promote DPP. All advertisers and sponsors for DPP were contracted under HD's masthead by HD employees, were invoiced by HD, and remitted payment to HD. All advertising and sponsorship revenue for DPP flowed through HD and is reflected in the company's financial statements.

Thereafter, Mr. Purohit began devoting a significant amount of company time and resources to DPP, even adding a second weekly episode—which required the dedication of a full-time team, including a new assistant and a new videographer, both employed by HD.

While the *Broken Brain Podcast* focused exclusively on brain and mental health topics, Mr. Purohit eventually pivoted DPP to focus on general health topics, using a nearly identical format, content, business model, guests, and sponsors as HD's other primary podcast, *The Doctor's Farmacy*, a general health podcast which was and is hosted by Dr. Hyman. In essence, Mr. Purohit turned DPP into a direct competitor, creating a situation where HD's products competed with each other for subscribers and views.

In the interest of (1) focusing his schedule on major health initiatives and leadership, patient care, and professional education; (2) avoiding a public image issue with multiple name changes; (3) retaining an active and growing marketing list; and (4) maintaining cordial relations with his CEO (who clearly courted public recognition and attention), Dr. Hyman acquiesced to

8

Mr. Purohit's questionable rebranding strategy, and never demanded that Mr. Purohit revert DPP back to the *Broken Brain Podcast* or something more identifiable with HD. Based on Mr. Purohit's conduct and representations, Dr. Hyman justifiably believed that DPP was being operated as a HD asset, that its advertising revenue, goodwill, and opportunities for growth and cross-promotion would flow to the company, and that Mr. Purohit was growing and expanding HD's footprint and messaging.

In a similar spirit, Dr. Hyman accepted Mr. Purohit's subsequent March 2022 request to receive 95% of HD's profit from DPP, which was paid to Mr. Purohit exclusively as an incentive and discretionary commission. Pursuant to this arrangement, HD (which received all the podcast's revenue in the first instance) remitted a quarterly payment to Mr. Purohit for these proceeds, again in the spirit of keeping Mr. Purohit motivated as HD's CEO. This arrangement, as confirmed through communications between Dr. Hyman and Mr. Purohit at the time, was intended as a bonus for the effort required to build the podcast, and to incentivize the continued growth and development of DPP as a HD asset.

HD and Mr. Purohit also developed an electronic newsletter, released through a newly curated email list, called *Try This*. Mr. Purohit developed *Try This* during his tenure as CEO, and its content was entirely within the scope of HD's business. Indeed, HD hired an employee whose job duties included, among other things, "writing *Try This*" content and who used the HD website, email lists, and podcast advertising spots to promote *Try This*. Although Mr. Purohit now seeks to characterize this as a personal hire, the job offer was made on behalf of HD, and the employee's acceptance letter clearly indicates that she was to be a HD employee, she was paid by HD, and her email signature represented that she was a HD employee.

834807

Like DPP, all *Try This* sponsors and advertisers were negotiated and secured by HD employees, were contracted under HD's name, and all sponsorship and advertising revenue was paid to HD. Every aspect of this arrangement was reflected contemporaneously in HD's books and records, and all costs and revenue associated with *Try This* were recorded in HD's financial statements. And just like DPP, *Try This* was promoted by and posted on HD's website.

Beginning with the *Broken Brain Podcast* and continuing with DPP, Mr. Purohit began using the associated *Broken Brain* newsletter and email list (highly valuable advertising real estate worth more than $50,000 per post) and the company's website (including over 500 pages on the website used by HD, drhyman.com) to amplify and direct traffic to Mr. Purohit's personal social media channels and the two products he developed during his employment as CEO: the *Try This* newsletter and DPP. These emails were sent out under Dr. Hyman's name—not Mr. Purohit's—effectively using Dr. Hyman's reputation and prestige to enhance Mr. Purohit's brand.

HD has since learned that Mr. Purohit actively encouraged multiple sponsors of HD's *The Doctor's Farmacy* podcast to re-direct substantial advertising dollars away from *The Doctor's Farmacy* and toward DPP—the only HD media property with (1) Mr. Purohit's name and branding on it, (2) that Mr. Purohit hosts, and (3) with a majority of the revenue expressly allocated for Mr. Purohit in a discretionary commission.

### D. *Mr. Purohit's Abrupt Resignation*

During his employment as CEO, Mr. Purohit's management style was unprofessional and inappropriate. During performance reviews, employees repeatedly mentioned his absence from the company's operations and expressed confusion about the reporting structure. Mr. Purohit was prone to intemperate outbursts, and on numerous occasions he publicly disrespected and

834807

disparaged Dr. Hyman, including to employees and potential investors, and during important discussions with potential partners that represented significant opportunities for the company.

Mr. Purohit's outrageous behavior came to a head during a September 12, 2023, conference call with a key HD business partner. On the call, Mr. Purohit refused to proceed with a quick Instagram post from Dr. Hyman regarding a particular type of laboratory test, loudly reproached Dr. Hyman for "overruling him" and "swooping and pooping," calling him "clueless," being "too flexible" with "these types of minimal-overhead, large-yield efforts," and issued Dr. Hyman an ultimatum that he would quit if Dr. Hyman agreed to the post.

Following the call, Dr. Hyman sought to speak with Mr. Purohit one-on-one to better understand his aggressive and uncooperative behavior. In response to this effort to fashion a more productive path forward, Mr. Purohit explicitly stated to Dr. Hyman, "I quit," and launched into an expletive-laden diatribe about how he needed to build his own brand and focus on efforts that wholly benefitted Mr. Purohit and members of his family. His resignation took effect November 30, 2023.

E.    *Mr. Purohit's Wrongful Post-Resignation Conduct*

Upon resigning, Mr. Purohit absconded with DPP and *Try This*. He continues to host a back catalogue of HD podcasts and newsletters on his personal social media channels and continues to create new content for DPP and *Try This*, despite both being HD's property. Worse, Mr. Purohit continues to sell advertising against DPP's back catalogue, profiting to the tune of hundreds of thousands of dollars off content that was created during his employment with HD. And until filing this claim, he continued to host and receive revenue from the *Broken Brain Podcast*, only removing this valuable catalogue in July 2024 without permission or notice,

834807

leaving HD without any distribution channel for this asset, and putting HD's sponsorship contracts for this catalogue at risk.

In violation of his contractual non-competition obligations, Mr. Purohit has used these products to promote the work of individuals and companies that directly compete with HD and its partners. And in violation of his contractual non-solicitation obligations, Mr. Purohit solicited multiple former employees of HD, as well as several company partners and sponsors, to switch their allegiances from HD to DPP and *Try This*.

Mr. Purohit has, by his actions, effectively acknowledged that his operation of DPP constitutes an unlawful use of HD's property and trademarks. In response to a cease-and-desist letter from HD in November 2023, Mr. Purohit changed the name of DPP to *The Dhru Purohit Show*. But merely changing the name of the podcast does not cure his unlawful conduct, because he continues to use the same format and intellectual property, and many of the same partners, sponsors, and advertisers. In addition, shortly after commencing this litigation Mr. Purohit removed all episodes and content of the *Broken Brain Podcast* from his channels—content he at least implicitly acknowledges belongs to HD but has not returned or paid for.

### F.     *HD Discovers Additional Improprieties*

Following Mr. Purohit's departure, HD carried out an organizational audit, and for the first time began to uncover the depth and extent of Mr. Purohit's malfeasance, neglect of duties, and improper self-dealing. In stark contrast to the amount of effort and attention Mr. Purohit devoted to self-promotion and diverting HD assets, property, and opportunities to ultimately unjustly enrich himself and his family, HD's investigation has revealed that this was at the expense of his other duties and responsibilities. Mr. Purohit did minimal work in other areas, causing *The Doctor's Farmacy* podcast to drop in ratings, as only one example. As CEO, Mr.

834807

Purohit lacked clear strategy or planning, and there was no proactive strategic or growth-oriented management of personnel or operations. Although HD's revenue did increase—primarily due to Dr. Hyman's growing industry credibility—nearly all key performance indicators declined materially under Mr. Purohit's leadership, resulting in substantial losses and opportunity costs.

Mr. Purohit failed to develop or execute an effective or coherent business model or strategy for HD. He failed to prepare an organizational strategy, multiple budgets, or team project plans—despite being obligated to do so under section 7.6(b) of the HD's Operating Agreement[3] and section 1.C of the ESA. Indeed, he failed to provide this most basic operational information even in the face of Dr. Hyman's repeated requests. In addition, Mr. Purohit appears to have devoted almost no effort to developing even the most basic elements of a business strategy. For example, he inexplicably retired previously successful product lines, without replacing them with comparable revenue drivers, or even a strategic plan for addressing the loss in revenue or the diminished diversification of HD's revenue streams—including the 10 Day Detox and the Hyman+ membership. And under his management, the 1-million subscriber *Broken Brain* email list—which, if used in service of HD's content, would have been a major source of ad and sponsor revenue—has diminished to half its previous size and results in little user engagement.

Mr. Purohit displayed a similar neglect in other core areas. He failed to develop, design, or manage an online marketplace for HD's website, resulting in an untapped potential revenue source. He also failed to update HD's website or newsletters despite requests to do so, making the website appear dated and behind the industry's developing trends and best practices. And Mr. Purohit failed to incorporate any industry best practices, or even baseline operational strategies,

---

[3] A true and correct copy of HD's Operating Agreement is attached as Exhibit 4 to the Defendants' *Answer and Counterclaims*.

834807

including employing paid media, customer retargeting, or any search engine optimization strategy, costing HD a significant amount in potential revenue. He appears to have completely neglected content strategy, and instead relied on repurposing outdated content without regard to trends, market research, or developments in the field. This neglect left HD in a precarious position upon Mr. Purohit's abrupt resignation, leaving HD's new leadership and team members effectively incapacitated, and requiring them to develop all strategic and operational plans from scratch.

In addition, Mr. Purohit's hiring decisions appear to have been motivated solely by nepotism and personal loyalty, as on several occasions he chose individuals (including relatives) with irrelevant, inapplicable, or nonexistent skills for the position in question, including his personal trainer, and two of his sisters—one of whom, while serving as HD's Chief Content Officer, developed her own competing startup brand and podcast. Mr. Purohit was aware of, and complicit in, her dereliction of duties and improper competition.

As the foregoing makes clear, it was never contemplated that Dr. Hyman would act as the CEO of HD, and Dr. Hyman's other obligations prevent him from acting in that capacity at this time. Indeed, the reason for HD's existence, providing a platform for Dr. Hyman and Mr. Purohit to work together, no longer exists since Mr. Purohit resigned as HD's CEO and seeks to withdraw as a member from HD.

While HD's operations are currently stable, it does not have the ability to continue operations in the long term. Mr. Purohit absconded with valuable HD assets, and also claims to be owed approximately $2.4 million pursuant to HD's operating agreement. HD does, however, own assets that appear to have material value, including historical podcasts and content that have

834807

the ability to generate advertising revenue. Unless a receiver is appointed to preserve, analyze and liquidate those assets, their value will be lost.

## ARGUMENT

The Defendants request the appointment of a receiver for HD who is authorized to: (a) continue HD's operations while the receiver seeks a buyer for HD's assets, (b) subject to the Court's approval, sell HD's assets to the highest and best bidder, and (c) upon the completion of such a sale, or a determination that no viable sale is possible, wind down HD's operations.

### A.    The Appointment of a Receiver is Guided by the *Turabo* Factors.

A receiver is an officer of the court appointed to accomplish specified goals. *See Fleet Nat'l Bank v. H & D Entm't, Inc.*, 926 F. Supp. 226,240 (D. Mass. 1996), *aff'd sub nom. Fleet Nat'l Bank v. H & D. Entm't, Inc.*, 96 F.3d 532 (1st Cir. 1996) (a receiver's "duties are framed by the task he or she is ordered to accomplish"). The receiver's powers are determined by the court's orders, and may include administering and supervising the receivership estate and its property, continuing business operations, collecting revenue, investigating and pursuing potential claims, recovering and collecting assets and liquidating assets. *See* 65 Am. Jur. 2d Receivers § 150, *et seq.*; Wright & Miller, Receivers, 12 Fed. Prac. & Proc. Civ., Rule 66 (3d ed.), *et seq.* The District of Massachusetts has embraced this scope of authority, empowering receivers to, among other things, take possession of financial and other books and records, make employment decisions, oversee the liquidation of assets, and modify or enter into contracts on behalf of the receivership estate. *See e.g., Global NAPs, Inc. v. Verizon New England, Inc.*, 389 F. Supp. 3d 144, 145 (D. Mass. 2019); *Fleet Nat'l Bank v. H & D Entm't, Inc.*, 926 F. Supp. at 240; *Canney v. City of Chelsea*, 925 F. Supp. 58 (D. Mass. 1996); *Monument Square Assocs., Inc. v. Resolution Tr. Corp.*, 792 F. Supp. 874, 876 (D. Mass. 1991).

834807

The appointment of a receiver is an equitable remedy left to the discretion of the Court. *See Chase Manhattan Bank N.A. v. Turabo Shopping Center, Inc.*, 683 F.2d 25, 26-27 (1st Cir. 1982). While there is no "set formula" for the appointment of a receiver, courts have identified various factors relevant to such an appointment, including:

> . . . imminent danger that property would be lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and the plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.

*Id. quoting CFTC v. Comvest Trading Corp.*, 481 F. Supp. 438, 441 (D. Mass. 1979)).

The *Turabo* court also identified two other relevant factors, "the probability that appointment of a receiver will protect the interests of the party seeking appointment and the nature of the receiver's duties." *Turabo*, 683 F.2d at 27. The party seeking the appointment of a receiver, moreover, must have something more than a mere claim against the entity subject to the receivership. *See Leone Indus. v. Associated Packaging, Inc.*, 795 F. Supp. 117, 120 (D.N.J. 1992) (Party seeking receiver must have "an equitable interest in the property to be seized or . . . judgments that cannot otherwise be satisfied.") *quoting Piambino v. Bailey*, 757 F.2d 1112, 1131 (11th Cir. 1985).

### B. Shareholder Disputes Constitute Grounds for a Receiver.

Federal courts recognize that the protection of the rights of shareholders constitutes grounds for the appointment of a receiver:

> It is well recognized that a court of equity has jurisdiction to grant the appointment of a receiver on a shareholder's petition for the purpose of conserving corporate assets and supervising corporate business. It is also clear that solvency of the corporation is not a bar to such an appointment.

16

*Ferguson v. Birrell*, 190 F. Supp. 506, 511 (S.D.N.Y. 1961), *citing Burnite Coal Briquette Co. v. Riggs*, 274 U.S. 208 (1927); *see also Bailey v. Proctor*, 160 F.2d 78, 81-82 (1st Cir. 1947) (Receiver appointed for corporation to protect shareholder interests).

Like a shareholder of a corporation, the holder of a membership interest in a limited liability company has grounds to seek the appointment of a receiver because it has more than a mere claim against that company. The members instead hold an equitable interest in the limited liability company. *See Bailey v. Proctor*, 160 F.2d at 81-82; *Leone Indus.*, 795 F. Supp. at 120; *see also* M.G.L. c. 156C § 56 (Authorizing members to file suits on behalf of limited liability companies).

**C.     The *Turabo* Factors Weigh in Favor of Appointing a Receiver.**

Several of the *Turabo* factors weigh in favor of appointing a receiver, and none weigh against it. This case presents a situation where the two members of HD both claim that the other breached his duty to HD and misappropriated HD's assets. HD cannot survive long term, and has assets that are in imminent danger of being lost if they cannot be sold. Since it is apparent that neither of the members trusts the other, an independent third party is the only viable solution for the transparent marketing and sale of HD's assets. Since there are no material creditors of HD, the members of HD will be equally harmed if the value of HD's assets is lost. And, ultimately, the Court will determine which of the litigant's claims are valid and who should ultimately receive any value from HD's assets.[4] *See Turabo*, 638 F.2d at 26-27.

The last two of the relevant *Turabo* factors, "the probability that appointment of a receiver will protect the interests of the party seeking appointment and the nature of the receiver's duties," also warrant the appoint of a receiver. *Id*. at 27. Since all of the parties to this

---

[4] Since one of the litigants in this case will prevail, the likelihood of success of the Defendants, the parties requesting the appointment of a receiver, is not relevant here.

834807

litigation have an interest in maximizing the value of HD's assets, thus maximizing the pool of funds available to the prevailing party, the receiver will protect the interests of both of HD's members. The Defendants, moreover, are requesting the appointment of a receiver only to provide an independent third party, subject to oversight by the Court, to preserve, analyze and liquidate, if appropriate, HD's assets. While the appointment of a receiver is an acute remedy, HD will not survive long term in any event, and the nature of the receiver's proposed duties are limited to those necessary to preserve the value of HD's assets.

[this space intentionally left blank]

834807

## CONCLUSION

For the foregoing reasons, good cause exists to appoint the receiver requested by the

Defendants in accordance with the terms of the proposed order attached to the Motion as Exhibit

B.

<div style="margin-left:45%">

Hyman Digital, LLC and Dr. Mark Hyman,
By their attorneys,


/s/ *D. Ethan Jeffery*
D. Ethan Jeffery (BBO #631941)
MURPHY & KING, Professional Corporation
28 State Street
Boston, Massachusetts 02109
Tel: (617) 423-0400
Email: ejeffery@murphyking.com

and

Alexander K. Parachini (BBO #569567)
E. Danya Perry (*pro hac vice forthcoming*)
Karen Friedman Agnifilo (*pro hac vice forthcoming*)
David Russell (*pro hac vice forthcoming*)
E. DANYA PERRY PLLC
445 Park Avenue, 7th Floor
New York, NY 10022
Tel: (212) 213-3070
aparachini@danyaperrylaw.com
dperry@danyaperrylaw.com
kagnifilo@danyaperrylaw.com
drussell@danyaperrylaw.com

</div>

Dated: August 13, 2024

834807